# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| OPTIMISCORP, a Delaware corporation, ALAN MORELLI, and ANALOG VENTURES, LLC,<br><br>    Plaintiffs,<br><br>  v.<br><br>JOHN WAITE, WILLIAM ATKINS, GREGORY SMITH, and WILLIAM HORNE,<br><br>    Defendants. | C.A. No. 8773-VCP |

## MEMORANDUM OPINION

Submitted: April 30, 2015
Decided: August 26, 2015

Anthony W. Clark, Esq., Douglas D. Herrmann, Esq., Amy C. Huffman, Esq., Danielle K. Berster, Esq., Ana Lucia Hurtado, Esq., SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; Darius Ogloza, Esq., OGLOZA FORTNEY LLP, San Francisco, California; *Attorneys for Plaintiffs OptimisCorp, Alan Morelli, and Analog Ventures, LLC.*

Stephen P. Brauerman, Esq., Vanessa R. Tiradentes, Esq., Sara E. Bussiere, Esq., BAYARD, P.A., Wilmington, Delaware; *Attorneys for Defendants John Waite, William Atkins, and Gregory Smith.*

Bruce E. Jameson, Esq., Eric J. Juray, Esq., John G. Day, Esq., PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; *Attorneys for Defendant William Horne*.

**PARSONS, Vice Chancellor.**

On October 20, 2012, the board of the plaintiff corporation, a company involved in providing physical therapy services and developing physical therapy-related software, met and voted to terminate the plaintiff CEO upon the advice of several attorneys. Previously, another attorney, an independent third party, had conducted an investigation and concluded that the CEO had engaged in conduct—receiving oral sex from a subordinate employee in his office, which also was the bedroom of his house—that could amount to sexual harassment. The board, at the same meeting, also voted to amend a stockholders agreement to remove a provision that granted the initial stockholders, who were controlled by the CEO, the right to appoint a majority of the board. The CEO, a former corporate attorney, quickly moved to reacquire control, which included replacing every director he had appointed who had voted to remove him. Three of the four defendants also were directors of the plaintiff corporation and, as of the CEO's ouster, collectively held roughly as many shares as the CEO. The October 20 meeting was a bungled act of corporate governance marred by several flaws. Based on those missteps, the CEO eventually prevailed in having his removal and the amendment to the stockholders agreement vacated in a subsequent action in this Court pursuant to 8 *Del. C.* § 225.

Back at the helm, the CEO soon terminated the fourth defendant in this action, the company's CFO, who was involved romantically with the CEO's former wife. A few months later, the three director defendants resigned from the company's board and the next day sued the company in California, where it is headquartered, to rescind the stock-for-stock transaction by which their former physical therapy company had become a

1

subsidiary of the plaintiff corporation. The director defendants were terminated from that company shortly thereafter.

In this action, the CEO and the company return to this Court alleging that the four defendants engaged in a long-running and wide-ranging conspiracy that involved, essentially, everyone who disagreed with the CEO's management of the company. The plaintiffs seek approximately $50 million in damages, as well as equitable relief in the form of an extension of the stockholders agreement in order to cement the CEO's control for another two years. The alleged wrongs range from nebulous breaches of fiduciary duty based on undermining the company's strategic vision to breach of contract claims. After extensive pre-trial proceedings, I tried this matter for six days in February 2015. This Memorandum Opinion ("Opinion") reflects my post-trial findings of fact and conclusions of law, as well as my rulings on certain ancillary motions. Because of the far-ranging claims advanced by the plaintiffs and the number of non-party actors who figure in their narrative, the recitation of the facts is unusually lengthy.

Overall, the plaintiffs seek damages and equitable relief for breach of the duty of loyalty, breach of contract, and tortious interference, and they advance secondary liability theories of aiding and abetting and conspiracy. The defendants deny liability on all counts, argue that there was and is no conspiracy, and contend that the CEO is a paranoid narcissist. The defendants also accuse the plaintiffs of having undermined the integrity of the litigation process by engaging in conduct akin to bribing and tampering with witnesses.

For the reasons that follow, I conclude that the plaintiffs' actions have threatened the integrity of this proceeding. The record includes evidence that supports a finding that the plaintiffs paid witnesses for the content of their testimony, threatened witnesses with criminal charges, attempted to open criminal investigations, and generally engaged in threats of civil litigation based on questionable or baseless claims, all in an effort to secure "evidence" that would aid the plaintiffs in this case. As sanctions for this conduct, I dismiss the plaintiffs' conspiracy claims against all of the defendants (although I also hold, in the alternative, that the plaintiffs failed to prove their conspiracy claim) and I draw certain adverse inferences against the plaintiffs in connection with certain of their other claims. Additionally, I find that the plaintiffs have not met their burden of proving: (1) their breach of the duty of loyalty claims, with the exception of one claim relating to candor; (2) their claims for breach of either the terms of the stockholders agreement or the implied covenant of good faith and fair dealing inherent in that agreement; or (3) their tortious interference claims. Finally, I find that the plaintiffs have not proven damages.

## I.   INTEGRITY OF THE PROCEEDINGS

Unfortunately, because it bears on witness credibility and, ultimately, the facts found in this Opinion, I consider it necessary to start in the middle of this story and address the defendants' charge that the plaintiffs have undermined the integrity of these proceedings, and only then tell the facts from the beginning.[1]  After a truncated recitation

---

[1]   Citations to testimony presented at trial are in the form "Tr. # (X)" with "X" representing the surname of the speaker, if not clear from the text. Exhibits will be cited as "JX #" and facts drawn from the parties' pre-trial Joint Stipulation are

of the necessary background, all of which is explored in greater detail in Section II *infra*, I turn to the acts that the defendants argue were wrongful.

### A. Relevant Actors

There are three Plaintiffs in this action. Plaintiff Optimis*Corp* ("Optimis" or the "Company") is a Delaware corporation with its principal place of business in Pacific Palisades, California. Plaintiff Alan Morelli has been the Company's CEO since its inception, with the exception of the period from October 20, 2012 through March 21, 2013, during which time his status was uncertain. Plaintiff Analog Ventures, LLC ("Analog"), is a California LLC managed by Morelli that holds many of his Optimis shares.[2] When this action was filed, Morelli owned or controlled at least 7,400,000 shares of Optimis stock.[3]

Morelli, who is described in detail in Section II.D *infra*, is the locomotive propelling this litigation. Described as a charismatic visionary, Morelli succeeded in convincing numerous successful business owners, including the three director defendants,

---

cited as "JS § #." Because of the sheer quantity of the evidence, I note that the record citations provided often are indicative, rather than exhaustive, and are provided only for facts that may be disputed.

[2] Analog Ventures' interests are aligned with Morelli. Accordingly, when referring to actions taken by Morelli and Analog, I simply refer to them as "Morelli."

[3] The Joint Stipulation lists Morelli as personally owning or controlling 4,139,290 shares and Analog as owning 3,250,000 shares. At trial, however, it was revealed for the first time that Morelli received roughly 1.6 million additional shares of stock in lieu of cash to satisfy the Company's advancement obligations to him. Tr. 588-89 (Morelli). That transaction was approved by the current board of Optimis, the majority of whom were appointed by Morelli. *Id.* at 589-90.

to sell their companies to Optimis in all-stock transactions, thus tying their success or failure directly to Optimis and its physical therapy software and indirectly to Morelli. As a manager, however, Morelli is ineffective. He has been characterized as controlling, intolerant of dissent, paranoid, and vindictive. He contends that his relations with Optimis employee and non-party Tina Geller were consensual and that the related sexual harassment allegations were manufactured by the defendants, and other members of a large conspiracy, as a baseless pretext to remove him from power.

There are four defendants. Defendant William Horne started as a consultant to the Company in 2006 and became the Chief Financial Officer in January 2008. He was stripped of all power and authority on March 25, 2013, placed on administrative leave on April 16, and formally terminated on May 10, 2013. He owns 167,668 shares (less than 1%) of the Company's stock. Defendants John Waite, William Atkins, and Gregory Smith (collectively, the "Director Defendants" and together with Horne, "Defendants") jointly owned Rancho Physical Therapy, Inc. ("Rancho"), a California professional corporation that provides physical therapy services in various clinics in San Diego, Riverside, and San Bernardino, with its principal place of business in Murrieta, California. The Director Defendants entered into a Stock Purchase Agreement and Plan of Reorganization dated June 14, 2007, pursuant to which Rancho became a wholly owned subsidiary of Optimis and the Director Defendants became directors and stockholders of Optimis. Rancho was the first, and largest, of a number of physical therapy businesses acquired by the Company. Following the Rancho acquisition, the Director Defendants no longer owned any Rancho stock, having exchanged it for stock in

5

Optimis. The Director Defendants continued to be employed by Rancho after the sale, but each accepted a significant reduction in salary from what they had received before the acquisition. Waite also served as the Chief Operating Officer of Optimis from 2009 until his resignation in the summer of 2013. Collectively, the Director Defendants own 8,755,000 Optimis shares.

Tina Geller[4] is a physical therapist formerly employed by Optimis. She joined the Company in May 2010 and later began managing the Company's Pacific Palisades clinic. As described in detail *infra*, it was her communication to Waite that triggered the sexual harassment investigation that formed the basis of Morelli's termination by the board on October 20, 2012. The parties heavily dispute the genesis and propriety of that investigation. It is undisputed, however, that Morelli received oral sex from Geller on multiple occasions while she was an employee of the Company and providing physical therapy to him, and that Morelli also fondled Geller on occasion during those sessions.[5] Geller filed suit against Optimis in April 2013.[6] Defendants, and in particular Horne,

---

[4]    After the events giving rise to this case, Geller changed her surname to Robinson. For consistency, and because she was known as such during the relevant time periods, I refer to her throughout this Opinion as Geller and her deposition is cited as "Geller Dep."

[5]    Tr. 404-05, 474-76, 618-19 (Morelli). Morelli placed the number of oral sex incidents at five or six. *Id.* at 404. Geller testified that it occurred eight to ten times. Geller Dep. 28.

[6]    Geller first filed a complaint with the California Department of Fair Employment and Housing on March 26, 2013. JX 703. On April 10, 2013, she filed a civil complaint in the California Superior Court for the County of Los Angeles alleging,

6

contend that the manner in which Plaintiffs settled that lawsuit with Geller amounts to witness tampering and bribery.

Helene Fearon and Stephen Levine co-founded Fearon & Levine, a consulting firm that they sold to Optimis in December 2008. As with Rancho, that transaction was stock-for-stock with no cash consideration and Fearon and Levine accepted significantly lower salaries.[7] Fearon and Levine currently are employed by Optimis Services, Inc., a wholly owned subsidiary of the Company. Their positions at the Company primarily involve assuring compliance with government and industry regulations, as well as helping develop and market the Company's OptimisPT software package. For many months before Morelli's temporary ouster, both Fearon and Levine had been seeking pay raises from the Company. Although they briefly received their desired raises around November 2012 when the Director Defendants were in control, those raises were undone as part of the Section 225 Action (the "225 Action"). Fearon and Levine had significant reputational capital and they staked it on the success of OptimisPT.[8]

---

among other things, quid pro quo sexual harassment, a hostile work environment, and retaliation. JX 726.

[7] Tr. 745-46 (Fearon). Upon joining Optimis, Fearon took a pay cut from making $150,000 to $180,000 per year to $65,000. *Id.* at 748 (Fearon). Levine took a similar pay cut to $65,000. *Id.* at 1618 (Levine).

[8] *Id.* at 743 (Fearon: explaining that she still worked for the Company "because of the 5,000 users of the software that has my name on it, my face behind it, and my credibility"); *id.* at 1576 (Levine: "[I]f we were to leave the company, that would be very bad for the company and, frankly, we felt it would . . . damage our credibility in the industry and our reputation.").

7

In the spring of 2014, with discovery in this action underway and Levine on the brink of personal bankruptcy,[9] Plaintiffs "settled" with Fearon and Levine, who then received raises to $150,000, the amount they demanded, as well as back pay. Notably, neither Fearon nor Levine was a party to this or any other litigation with Plaintiffs at that time. Fearon and Levine also exchanged mutual releases with the Company, although there is no evidence that either Fearon or Levine understood what, if any, claims the Company legitimately might have against them.[10] In turn, Fearon and Levine provided favorable affidavits that Plaintiffs attempted to submit in opposition to Defendants' then-pending summary judgment motions. Around the same time and on the eve of the scheduled trial, Plaintiffs also sought to amend their Complaint to allege that Fearon and Levine were co-conspirators with Defendants.[11] Defendants contend that, by these and related actions, Plaintiffs tampered with and effectively bribed Fearon and Levine.

Chris Olsen formerly served as the Controller of Rancho. He served in that position from April 2001 until December 2013. I found Olsen's trial testimony highly credible and probative. He also provided a unique perspective, because he was not involved in the core events giving rise to this lawsuit, but was associated with Optimis

---

[9] *Id.* at 1618 (Levine).

[10] *Id.* at 775-77 (Fearon); *id.* at 1618-23 (Levine).

[11] In a previous Memorandum Opinion, I denied Plaintiffs' motion to amend, held that the Fearon and Levine affidavits were untimely, and refused to consider them in resolving Defendants' summary judgment motions. *OptimisCorp v. Waite*, 2015 WL 357675 (Del. Ch. Jan. 28, 2015).

8

while the Director Defendants were employees of Rancho and after they were fired. Olsen credibly testified that the atmosphere at Optimis following the Director Defendants' termination was "You're with us or you're with them [Defendants]. And if you're with them, we'll put you in the lawsuit."[12] At one meeting, Morelli "suggested that the Company would reward [Olsen] if [he] were able to come up with the corporate minutes that [Morelli] was looking for," but which he could not find or did not exist.[13] On another occasion, Olsen was asked to sign a declaration that had been prepared in advance by Optimis' agents, but he crossed out the majority of the declaration as false.[14]

In moving for summary judgment, Defendant Horne requested that the Court dismiss the claims against him as a sanction for litigation misconduct. The Director Defendants joined in that request. I deferred consideration of the request until after trial. Defendants briefed the issue again in their pre- and post-trial briefs, in which they aver that the settlements Optimis and Morelli made with Geller, Fearon, and Levine constitute witness tampering and bribery. Defendants further suggest that Plaintiffs essentially attempted to bribe Olsen. After digressing briefly below to provide an overview of the major factual disputes in this case, I address Defendants' witness tampering arguments in turn.

---

[12]     Tr. at 1217.

[13]     *Id.* at 1219.

[14]     *Id.* at 1220.

To put in perspective why Plaintiffs' actions with respect to these witnesses is so important, I provide here a summary of the facts found in Section II *infra*. Optimis simultaneously developed two software packages: OptimisPT and Optimis*Sport*. Many individuals at the Company, including Defendants, Fearon, and Levine, believed that continuing to develop and stabilize OptimisPT was the Company's top priority and best hope for succeeding as a business and that the Company was misallocating resources by putting too much emphasis on Optimis*Sport*. Morelli made the allocation decisions in the Company, and he disagreed. Because of a stockholders agreement, Morelli had the right to appoint five of Optimis' nine board members. As time went on, Defendants and others, including Fearon and Levine, became increasingly frustrated with the stalled development of OptimisPT and the spending on Optimis*Sport* and its related promotional events. They blamed Morelli for these problems.

Geller's initial role at Optimis is unclear, but she worked on Optimis*Sport* and functioned essentially as Morelli's personal physical therapist. Geller's husband also worked at Optimis. During 2011 and 2012, it is undisputed that, on some occasions, Morelli engaged in sexual conduct with Geller during these physical therapy sessions. These interactions ceased as Geller spent more time running the Pacific Palisades clinic. It is undisputed that, at a conference in February 2012, Geller told Horne about some of Morelli's conduct, and that Horne shortly thereafter told George Rohlinger what Geller

---

[15]     Record citations pertinent to this overview are provided in Section II *infra*.

10

told him, but Horne did not report the matter to Human Resources. Rohlinger worked closely with Waite, but it is contested whether Rohlinger later told Waite what Horne had told him. After the February conference, Horne allowed Geller to use his apartment for free, because it was closer to Pacific Palisades than her home. Horne was not using it because he was staying with Terry Doherty, Morelli's former wife.

Plaintiffs contend that Defendants despised Morelli's leadership, wanted to remove him and take control themselves, and were conspiring with others, including Fearon and Levine, to develop a plan as to how to do so. Plaintiffs allege that Defendants encouraged, lobbied, and bribed Geller to turn her purportedly consensual interactions with Morelli into a sexual harassment complaint. Defendants deny these allegations. On September 21, 2012, Geller spoke with Waite by telephone. She apparently was concerned that she was going to be reassigned from the Pacific Palisades clinic, where she had been working, back to Morelli's home, which was his Optimis office. What was said on the September 21 call is disputed, but Geller told Waite something about Morelli's behavior. Geller asked Waite not to report the matter. Waite reported it to Human Resources and an investigation began promptly thereafter.

The investigation involved a third-party attorney, chosen indirectly by Optimis' insurance carrier, who interviewed several Optimis employees. The investigator, Nancy Solomon, found Geller credible and corroborated by other witnesses. Solomon did not find Morelli credible. Morelli contends that the investigation was rushed and that Defendants manipulated it. Defendants deny those allegations. Waite scheduled a special meeting of the board of directors for October 20 to deal with Geller's allegations

11

and Morelli's possible removal. He did not include any sort of meeting agenda in the notice. Solomon's report was completed a few days before the October 20 meeting. At the meeting, the board formed an ad hoc committee comprised of everyone except Morelli. The committee was advised by Leonid Zilberman, an attorney hired by the Company's insurer, that the Company needed to fire Morelli as CEO to have the best defense in a subsequent sexual harassment lawsuit. Other attorneys concurred in that advice. The board fired Morelli and amended the stockholders agreement to prevent him from returning himself to power and undoing their action. Waite was appointed interim CEO.

Plaintiffs' primary duty of loyalty claim alleges that Defendants conspired to remove Morelli from power, bribed Geller to make false sexual harassment allegations, and used the sexual harassment investigation as a pretext to remove Morelli and take control of the Company. Geller is key to this claim. Plaintiffs' other main duty of loyalty claim alleges that Defendants undermined Morelli's authority and the Company's "strategic vision" by countermanding Morelli's authority and attempting to divert resources from Optimis*Sport* to OptimisPT. According to Plaintiffs, Fearon and Levine were key members of this purported anti-Morelli conspiracy.

## C.    Analytical Framework: Litigation Ethics and the Administration of Justice

I take extremely seriously the claims of witness tampering and bribery. In the nearly 300 pages of post-trial briefing, however, the parties failed to articulate a clear standard under which to evaluate the conduct being challenged. Horne offered the criminal standards for witness tampering and bribery, cited the Rules of Professional

12

Conduct, repeatedly emphasized that Morelli is a Delaware lawyer, albeit an inactive one, and asked this Court to dismiss all claims against Defendants as a sanction for litigation misconduct by Morelli and Plaintiffs' Delaware and California attorneys.[16]  Plaintiffs deny that there was any wrongdoing, assert that aggressive, good faith pursuit of settlements is both acceptable and encouraged by public policy, and contend that Defendants have been treated fairly and have not been impeded from accessing crucial information.  I begin with a review of what I conclude are the guiding principles.

Some of the alleged wrongs can be examined from the perspective of the Delaware Lawyers' Rules of Professional Conduct (the "Rules" or "DLRPC").  Rule 3.4, entitled "Fairness to Opposing Party and Counsel," forbids a lawyer to "unlawfully obstruct another party's access to evidence"[17] and further instructs that lawyers shall not "falsify evidence, counsel or assist a witness to testify falsely, or offer an inducement to a witness that is prohibited by law."[18]  Rule 8.4(d), which is a catchall provision, provides that it is professional misconduct to "engage in conduct that is prejudicial to the administration of justice."[19]

---

[16]  *See State Line Ventures, LLC v. RBS Citizens, N.A.*, 2009 WL 4723372, at *1 (Del. Ch. Dec. 2, 2009) ("A Delaware lawyer always appears as an officer of the Court and is responsible for the positions taken, the presentation of the case, and the conduct of the litigation.").

[17]  DLRPC R. 3.4(a).

[18]  *Id.* R. 3.4(b).

[19]  *Id.* R. 8.4(d).

13

"In Delaware there is the fundamental constitutional principle that [the Supreme] Court, alone, has sole and exclusive responsibility over all matters affecting governance of the Bar."[20] Accordingly, the Court of Chancery generally does not have jurisdiction to enforce the Rules. "The Rules are to be enforced by a disciplinary agency, and are not to be subverted as procedural weapons."[21] The Supreme Court has set forth the standard by which this Court should consider allegations of misconduct:

> Absent misconduct which taints the proceeding, thereby obstructing the orderly administration of justice, there is no independent right of counsel to challenge another lawyer's alleged breach of the Rules outside of a disciplinary proceeding. Likewise, the trial courts have no jurisdiction to entertain such application except as noted above. *Nonetheless, trial courts retain their traditional powers, which are indeed potent, to address, rectify and punish conduct of a party or counsel which threatens the legitimacy of judicial proceedings.*[22]

Thus, for this Court to address directly an alleged violation of the Rules, that violation must involve "prejudice to the fairness of the proceeding" itself.[23] Furthermore, such a finding must be supported by clear and convincing evidence.[24] This is a high bar.

---

[20] *In re Appeal of Infotechnology, Inc.*, 582 A.2d 215, 220 (Del. 1990).

[21] *Id.*

[22] *Id.* at 221-22 (emphasis added). *See also Crumplar v. Super. Ct. ex rel. New Castle Cty.*, 56 A.3d 1000, 1009 (Del. 2012) ("If a trial judge believes an attorney has committed misconduct, referral to the Office of Disciplinary Counsel, not Rule 11 sanctions, is the proper recourse in the absence of prejudicial disruption of the proceeding.").

[23] *In re Rehab. of Indem. Ins. Corp., RRG*, 2014 WL 637872, at *3 (Del. Ch. Feb. 19, 2014).

14

Outside of the cases involving disqualification of counsel, very little Delaware law exists on what sort of conduct "threatens the legitimacy of judicial proceedings" such that a trial court would be justified in employing its "traditional powers." Most frequently, the Court of Chancery invokes its "inherent power to regulate the conduct of the attorneys that appear before it"[25] and maintains fairness by shifting fees when a party acts in bad faith.[26] Only rarely has this Court dismissed cases on the basis of bad faith conduct.

---

[24] *In re Appeal of Infotechnology*, 582 A.2d at 221. "The clear and convincing standard requires evidence that 'produces in the mind of the trier of fact an abiding conviction that the truth of [the] factual contentions [is] highly probable.'" *Hudak v. Procek*, 806 A.2d 140, 147 (Del. 2002) (internal quotations omitted) (quoting *Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1151 (Del. 2002)).

[25] *Audio Jam, Inc. v. Fazelli*, 1995 WL 1791087, at *2 (Del. Ch. Aug. 17, 1995).

[26] *See, e.g.*, *Choupak v. Rivkin*, 2015 WL 1589610, at *21-23 (Del. Ch. Apr. 6, 2015) (reviewing the law on bad faith fee shifting and concluding that fee shifting was appropriate after finding, using the preponderance-of-the-evidence standard, that the defendant committed perjury); *ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC*, 2013 WL 5152295, at *10 (Del. Ch. Sept. 16, 2013) ("When a party or its counsel engages in litigation misconduct to a degree sufficient to support fee shifting, the consequences go beyond monetary harm to the opposing party. The misconduct affects the court, which must devote resources to address the resulting problems, thereby depriving other litigants of the court's attention. More broadly, misuse of the litigation process undermines the public's confidence in the legal system."); *Fairthorne Maint. Corp. v. Ramunno*, 2007 WL 2214318, at *9 (Del. Ch. July 20, 2007) (finding bad faith because of the "plethora of frivolous defenses and counterclaims," the "shifting nature of [defendants'] arguments through their pleadings, briefs and oral argument," and the "incivility injected into these proceedings").

In *Bessenyei v. Vermillion, Inc.*,[27] the Court dismissed a case that was based on falsely verified pleadings. The Court in *Bessenyei* concluded that the false verifications undermined the integrity of the judicial process because the verification requirement is designed to encourage truthfulness.[28] From *Bessenyei*, one can draw the principle that actions that undercut the truthfulness of the proceeding are ones that threaten the legitimacy of the judicial process because they impede, and potentially undermine, the Court's ability to find facts accurately, which in turn prevents the Court from equitably dispensing justice.

Equally relevant are the principles articulated in *Parfi Holding AB v. Mirror Image Internet, Inc.*[29] In that case, Chief Justice Strine, then writing as a Vice Chancellor, addressed a motion to dismiss presented under Rule 41(b) and "the inherent authority of this court to hold litigants responsible for misconduct in the litigation process."[30] In *Parfi*, the Court found, by clear and convincing evidence, that the plaintiffs repeatedly had misled the Court in an effort to gain a tactical advantage, which "implicate[d] this court's inherent authority to police the litigation process, to ensure that

---

[27]    2012 WL 5830214 (Del. Ch. Nov. 16, 2012).

[28]    *Id.* at *8 ("This Court's rules, in an effort to assure truthfulness, require verifications of complaints, answers, and comparable pleadings. Failing to comply with this requirement is not some mere technicality; it undercuts the integrity of the judicial process.").

[29]    954 A.2d 911 (Del. Ch. 2008).

[30]    *Id.* at 927.

16

acts that undermine the integrity of that process are sanctioned."[31]  The Court dismissed the plaintiffs' claims as a result of their inequitable conduct and, in so doing, held that: "When a party knowingly misleads a court of equity in order to secure an unfair tactical advantage, it should forfeit its right to equity's aid.  Otherwise, sharp practice will be rewarded, and the tradition of civility and candor that has characterized litigation in this court will be threatened."[32]

In the present case, the argument is not that Plaintiffs have lied to the Court, but instead that Plaintiffs fundamentally have impaired the Court's ability to find facts by offering improper material inducements and employing overbearing threats of criminal and civil litigation, a combination of carrots and sticks that has corrupted the witnesses. In that vein, Defendants point the Court to this State's criminal statutes prohibiting the bribing or tampering with witnesses.[33]

If the published case law is any indication, witness bribing is a rare phenomenon in Delaware.  I find relevant, however, the comments of the Delaware Supreme Court in

---

[31]  *Id.* at 932.

[32]  *Id.* at 915.

[33]  11 *Del. C.* § 1261 ("A person is guilty of bribing a witness when the person offers, confers or agrees to confer any benefit upon a witness or a person about to be called as a witness in any official proceeding upon an agreement or understanding that: (1) The testimony of the witness will be thereby influenced . . . ."); 11 *Del. C.* § 1263 ("A person is guilty of tampering with a witness when: (1) The person knowingly induces, influences or impedes any witness or victim by false statement, fraud or deceit, with intent to affect the testimony or availability of such a witness . . . .").

*Weber v. State.*[34]   In that case, the Supreme Court reversed a murder conviction on

several grounds.  One of those grounds related to the bias of several witnesses to the

stabbing.  It was revealed during the trial that the family of the victim paid approximately

$85 to each of three of the State's witnesses for haircuts and new suits.  Importantly,

there was no evidence that the witnesses were being paid to alter their testimony in any

way.  But, the victim's family members knew the testimony that the witnesses were going

to provide and approved of those statements.  The legal question in *Weber* related to cross

examination of the witnesses for bias.  In the course of addressing that issue, the Supreme

Court remarked that:

> [The victim's family's] actions, if not falling within the ambit
> of the criminal proscriptions against bribing a witness (11
> *Del. C.* § 1261), certainly violate the spirit of the law and cast
> into doubt the integrity of the proceedings in this case. . . .
> *Similar conduct by an attorney would violate the Code of
> Professional Responsibility*. . . . These tactics, as well as less
> blatant attempts to improperly influence a witness' testimony,
> are fundamentally unfair and *pervert the truth-seeking
> function of trial*.[35]

Plaintiffs downplay the significance of these comments as dicta and emphasize that the

holding in *Weber* is limited to the right of cross examination, which Defendants have had

as to the witnesses in question here: Geller, Fearon, Levine, and Olsen.  I do not agree

that the Court's comments were so limited.  The Supreme Court, which has the

---

[34]   457 A.2d 674 (Del. 1983).

[35]   *Id.* at 679 n.6 (emphasis added).

constitutional obligation to police the Bar, went out of its way to note that similar conduct by an attorney would be professional misconduct.

From the foregoing review, I conclude that the inquiry into whether the integrity of these proceedings has been undermined should focus on the extent to which the Court's truth-finding function has been impaired, thus throwing into question any ruling that ultimately might issue. With that standard in mind, I turn to Plaintiffs' litigation conduct in this case.

## D. The Geller Settlement

Despite the fact that she did not testify at trial, Geller's credibility is a key issue in this case.[36] Morelli's alleged sexual harassment of Geller formed the basis of Morelli's ouster on October 20, 2012, and that firing ranks highly among the items that led to this lawsuit. Thus, Geller is an important witness in this litigation. For example, in their Verified Complaint (the "Complaint"), Plaintiffs alleged that Defendants attempted to "coax Geller into bringing a false sexual harassment complaint against Morelli and to use it as an excuse to remove him and solicit the other directors and stockholders to support their change in control."[37] Plaintiffs further alleged that Defendants "bribed Geller into cooperating in an investigation against Morelli."[38] In their post-trial briefing, Plaintiffs continue to maintain that Defendants used Geller's claims as a pretext to effect a change

---

[36] *See infra* Section V.A.

[37] Compl. ¶ 18.

[38] *Id.* ¶ 20.

19

in control at Optimis,[39] and breached their duty of loyalty by manipulating Geller and the subsequent investigation.[40] Plaintiffs' failure to prove these allegations seriously would undercut their case. Aside from documentary evidence, the best sources of information as to whether Defendants "bribed Geller" and otherwise used her as a pretext would be the testimony of Defendants and Geller on those issues. If the other evidence is not determinative, then Geller's credibility would be pivotal to resolving these contentions.

### 1. Evidentiary objections

Plaintiffs did not raise their evidentiary objections to the materials and communications relating to their settlement with Geller until their reply brief. With respect to other issues, such as certain hearsay objections, Plaintiffs fairly did not need to press those objections earlier because they did not know what documents would be relied upon by Defendants in their briefs. But, the Geller settlement materials are different. Horne has pursued this witness tampering line of attack since briefing on his summary judgment motion, including extensive questioning at trial. In addition, Plaintiffs preemptively responded to the concerns about litigation misconduct the Court expressed at trial in a lengthy section of their opening brief. Yet, Plaintiffs failed to mention their evidentiary objections anywhere in that context. Instead, they waited until their reply. I

---

[39]    Pls.' Post-Trial Opening Br. [hereinafter "POB"] 19-22.

[40]    *Id.* at 49-50.

therefore hold that Plaintiffs have waived their evidentiary objections as to the settlement with Geller.[41]

Even if Plaintiffs' evidentiary objections were not waived, they are without merit. As to communications resulting from the California mediation, Plaintiffs object under California Evidence Code § 1119. That provision makes inadmissible and, indeed, prevents the discovery of writings prepared for mediations or evidence of things said in mediations.[42] Plaintiffs have not offered any explanation, however, as to how the California Evidence Code applies in this action. That Code, by its terms, applies only to the courts and judicial proceedings of California.[43] Additionally, any protection Section 1119 may offer has been waived. That section also prevents even the discovery of the items Plaintiffs now challenge. Even if California law somehow could bind the evidentiary determinations of the courts of this State, by voluntarily producing the mediation materials and communications in this action, Plaintiffs have waived any protection offered by Section 1119.

---

[41] *Zutrau v. Jansing*, 2013 WL 1092817, at *6 (Del. Ch. Mar. 18, 2013); *Emerald P'rs v. Berlin*, 2003 WL 21003437, at *43 & n.144 (Del. Ch. Apr. 28, 2003). I recognize that Horne pointed out Plaintiffs' evidentiary objections in his answering brief, but that is not surprising because, throughout this case, Plaintiffs' positions and the arguments they ultimately have asserted have been a moving target. *See infra* Section IV.

[42] Cal. Evid. Code § 1119(a)-(b).

[43] *Id.* § 300.

21

Plaintiffs next contend that Delaware Rule of Evidence 408 precludes the admissibility of any of the Geller settlement discussions. Rule 408 states, in relevant part:

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount is not admissible to prove liability for or invalidity of the claim or its amount. . . . This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negating a contention of undue delay or proving an effort to obstruct a criminal investigation or prosecution.[44]

Plaintiffs also suggest that, based on the strong public policy favoring settlements, any doubts should be resolved in favor of excluding such evidence.[45] Here, I conclude that Rule 408 does not apply.

By its terms, Rule 408 precludes admissions of offers of compromise for the purpose of proving the liability or amount of the claim actually being settled. I do not read the rule as requiring the exclusion of offers of compromise of Claim A in Litigation 1 from being used to prove or disprove the validity and amount of a different Claim B in Litigation 2. Plaintiffs purportedly were settling Geller's sexual harassment claims in the

---

[44] D.R.E. 408.

[45] *E.g.*, *Candlewood Timber Gp. LLC v. Pan Am. Energy LLC*, 2006 WL 1382246, at *13 (Del. Super. May 16, 2006) ("Moreover, 'if application of Rule 408 exclusion is doubtful, the better practice is to exclude evidence of compromise negotiations.'" (quoting *Chase Manhattan Bank v. Iridium Africa Corp.*, 2003 WL 22928042, at *2 (D. Del. Nov. 25, 2003)).

settlement. Neither the validity nor the value of those claims is at issue here. The question in this case is whether Defendants breached their fiduciary duties to the Company. Accordingly, Rule 408 is not applicable in these circumstances.

Additionally, even if Rule 408 did apply, the Geller settlement materials still would be admissible under the Rule's proviso regarding "another purpose," which constitutes an illustrative, not exclusive, list. The Geller settlement documents are being admitted primarily to assist in determining whether Plaintiffs undermined the integrity of these proceedings—a purpose quite close to Rule 408's enumerated "proving bias or prejudice of a witness" exception—which is separate from whether Plaintiffs' claims are meritorious. Moreover, issues of Geller's potential bias and credibility are particularly important here because she did not appear at trial.

Accordingly, Plaintiffs waived their evidentiary objections and, in any event, I would overrule those objections.[46]

### 2. The mediation settlement

I start my examination of Plaintiffs' settlement with Geller with the mediation settlement. I begin here because the evidence supports the conclusion that the settlement

---

[46] Plaintiffs also contend that the Geller settlement materials are not even relevant to this case and, as such, should be excluded under Rule 402. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." D.R.E. 401. The Geller settlement materials are relevant because, among other things, they pertain to Geller's credibility and Defendants' charge that Plaintiffs have undermined the integrity of these proceedings.

entered into between Plaintiffs and Geller following their mediation may have been a legitimate, good faith effort to settle her sexual harassment claims, even if Plaintiffs simultaneously were contemplating using that settlement for other purposes. More importantly, the mediation settlement provides a baseline against which to examine the subsequent Morelli-funded settlement, which is the focus of Defendants' complaints.

By mid-April 2013, Geller, through her California counsel, Jack Schaedel, had filed sexual harassment complaints against the Company. On May 30, 2013, the parties engaged in a lengthy mediation that lasted about 20 hours.[47] One aspect of the resulting draft settlement agreement that is central to Defendants' contentions that Plaintiffs bribed Geller is the Geller Declaration: a sworn statement by Geller as to the chain of events that led to her claims. Early on Saturday, June 1, the parties apparently reached a settlement agreement (the "Mediation Settlement"). At 2:16 a.m., Mike Margolis, counsel to Optimis, emailed Schaedel stating: "Jack, this confirms that we have reached a deal."[48] Attached to that email were the then-final Geller Declaration ("Geller's Mediation Declaration") and an interim settlement agreement.

Plaintiffs had required a declaration from Geller as a prerequisite for settlement. Earlier in the negotiations, Margolis informed Schaedel that the "declaration is a threshold problem"[49] and that Morelli and the Company were "re-evaluating our interest

---

[47]  Schaedel Dep. 80.

[48]  JX 771.0001.

[49]  JX 770.0003.

24

in the settlement in light of Geller's apparent insistence on hedging her bets in the declaration."[50] Recognizing that Plaintiffs wanted a declaration consistent with their view of the events in this case,[51] Schaedel touted his view that "the Declaration supports the 'insurgents-conspiracy' argument."[52]

The end result of these discussions was Geller's Mediation Declaration, a one-and-a-half-page, eight-paragraph statement. That Declaration includes language geared toward this case. For example, paragraph 5 states that Geller was encouraged by Jeannine Gunn to provide more information to Nancy Solomon, the investigator, and that Geller "was aware that many leaders of the company, including Jeannine, believed that it was important to remove Alan [Morelli] in order for the company to get things done."[53] Paragraph 7 then reads: "In October 2012, I learned that my statements to Ms. Solomon had been used to oust Alan from his position as Optimis' CEO."[54] Overall, however, Geller's Mediation Declaration focuses on Geller's sexual harassment claims, provides a timeline for how those claims came to be investigated, and tries to suggest weaknesses in her story.

---

[50] *Id.*

[51] *Id.* at 0002 ("She isn't hedging her bets, she's giving you every word she can. She has financial incentive just to say what you want to hear but she's not doing that. At some point you have to give her credit for that, and accept the best language you can get.").

[52] *Id.* at 0001.

[53] JX 771.0004.

[54] *Id.*

For reasons that are not entirely clear, but which appear to relate to the fact that the Company's insurer would not fund the Mediation Settlement, that agreement never was consummated.

### 3. The Morelli-funded settlement

On December 2, 2013, six months after the Mediation Settlement, the parties executed a final settlement. That agreement consisted of: (1) a mutual release; (2) a "Questions and Answers Appendix" (the "Q&A Appendix"); (3) a revised sixteen-paragraph, nearly five-page sworn declaration (the "Final Geller Declaration");[55] (4) an unsworn but signed summary statement (the "Summary Statement"); and (5) a sworn declaration from Geller's attorney (the "Schaedel Declaration"). Together these five items constitute the "Geller Settlement." My review of the evidence leaves me with an abiding conviction that the money Plaintiffs paid to Geller was for the differences between the Mediation Agreement—to which Plaintiffs previously agreed—and the various components of the Geller Settlement. Those differences all relate to this proceeding and in many instances are keyed to specific allegations in Plaintiffs' Complaint. Stated more cynically, it appears that, under the guise of settling a California sexual harassment complaint by an employee making $58,000 a year,[56] Plaintiffs agreed

---

[55] JX 920.0016-20 [hereinafter "Geller Decl."].

[56] Geller Dep. 235.

to pay Geller $550,000[57] to provide a declaration with numerous statements intended for use in this Delaware proceeding.[58]

Preliminarily, I consider it important to describe what the Geller Settlement contains before I turn to how Plaintiffs reached that agreement with Geller. Above I quoted the two sentences from Geller's Mediation Declaration that appeared most directed toward this litigation. By contrast, I quote below some of the many examples of statements from the Final Geller Declaration that are not in Geller's Mediation Declaration, and that clearly are intended for use in this litigation:

- "Mr. Horne made it clear on multiple occasions that he did not like Mr. Morelli and said that the Company would be better off without him." (¶ 3).

- "I came to understand that the Rancho executives did not like Mr. Morelli and claimed that the Company would be better off without him." (¶ 4).

- "I was also aware that Mr. Waite and others had a strong dislike for Mr. Morelli and were unhappy with the way Mr. Morelli was running the Company. In retrospect, it is likely that they were setting in motion a plan to use me as a means to try and accomplish their objective of removing Mr. Morelli and taking control of the Company. Messrs. Waite, Horne, Godges, and

---

[57]    JX 920.0006.

[58]    Plaintiffs now have disowned Geller, denied that Geller is their witness, and explicitly called her a "perjurer." POB 74. But, on August 23, 2014, in opposition to the Director Defendants' summary judgment motion, Plaintiffs cited the Final Geller Declaration (Exhibit 25 to that brief) repeatedly as the basis for factual assertions they made. As of that date, Plaintiffs' attorneys claimed that they were unable to make Geller available for a deposition. Later, when Geller was deposed, she essentially recanted substantial portions of the Final Geller Declaration.

others had apparently wanted to get control of the Company." (¶ 7).

- "Ms. Gunn, like Mr. Waite and others, did not like Mr. Morelli and did not want him to be in control of the Company. I did not realize at the time that she and others saw me as their tool to provide a detailed and damning report against Mr. Morelli as a pretext to remove Mr. Morelli from his control position at Optimis*Corp.*" (¶ 9).

- "The stress of what I was being asked to do by Mr. Waite, Ms. Solomon, and others was causing me to be barely able to function or perform tasks such as processing accounts receivable . . . . Mr. Waite encouraged me to make a complaint against Mr. Morelli." (¶ 13).

- "[A]fter my September 21, 2012 call to Mr. Waite, it was clear to me that I was being treated much better than I was treated before I made the call. . . . Based on what I now know to have been taking place within the Company, the raise and the support were rewards for my disclosure about my activity with Mr. Morelli." (¶ 14).

- "I now see that I likely was a pawn being manipulated by Mr. Waite and others who were seeking to get control of the Company." (¶ 15).

These statements map almost perfectly to Plaintiffs' position in this litigation. Indeed, the Final Geller Declaration leaves no doubt about its purpose:

- "I am providing this statement in part because of the continuing effort by Mr. Waite and others to take over the Company. . . . I believe I was manipulated and misled and it was wrong for Mr. Waite and others to use me to attempt to remove Mr. Morelli." (¶ 16).

Geller provided all of these statements under oath, although it is clear from their face that she lacked personal knowledge of much to which she swore. Importantly, she

28

also provided the Summary Statement, which, as explained *infra*, Plaintiffs deliberately did not ask Geller to provide under oath, but still asked her to sign and include in the Geller Settlement, making it appear to be her statements. It reads like the synopsis of an overwrought legal thriller:

> The events here involve corporate intrigue and treachery. I am an aspiring physical therapist, who got into a relationship with my company's CEO, Alan Morelli. I don't recall exactly how it all began, but it would be reasonable to believe it was initiated by me. . . . [A]s I have now learned, it is clear that I was being lobbied and manipulated by the CEO's enemies, including John Waite, to become a chess piece in taking control of the Company. I have also learned Mr. Waite took my comments and turned them into not only a tale of egregious sexual harassment, but also a pretext for a corporate coup. . . . Evidence that I have now seen indicates that Mr. Waite, Will Horne, and others found a willing lawyer and a willing investigator to conduct an investigation that apparently gave them what they wanted most, a pretext to sack the CEO. This began a lengthy and bitter corporate battle for control of the Company.[59]

Many similar remarks are included in the Q&A Appendix.[60] Finally, Schaedel, Geller's lawyer, who had had only one conversation with Horne and had never spoken to Waite, provided the Schaedel Declaration, in which he swore that "[Horne] desired to see the company [Optimis] go bankrupt," and that Waite's actions "seem consistent with a

---

[59] JX 920.0011.

[60] For example, Geller answered "True" to the statement: "It was common knowledge among a group of employees that John Waite, George Rohlinger, and/or other employees had plans to remove Alan Morelli as CEO and Chairman of OptimisCorp (the "Company") in order to take control of the Company." *Id.* at .0009. These true/false statements were neither under oath nor signed.

desire to see the company lose lawsuits and to be forced into bankruptcy."[61]  From that limited source of firsthand information, Schaedel declared under oath that the conclusion was "inescapable that Horne, Waite and others saw my client's lawsuit against Mr. Morelli and Optimis*Corp* as very helpful to their pre-existing desires and intentions to usurp control of the company."[62]

The record contains extensive evidence showing how the Mediation Agreement morphed into the sprawling Geller Settlement about which Defendants complain.  It is reasonable to infer from that evidence that the amount of the settlement payments was directly tied to the content of Geller's testimony and its utility in this litigation.  Plaintiffs have emphasized that the settlement discussions all required that Geller tell only "the truth" and that she swore under penalty of perjury.  But, the record also shows that Plaintiffs unilaterally supplied documents to Geller that supported their position in this litigation when she resisted providing Plaintiffs with the sworn statements they sought.  In these circumstances, even if I presume Plaintiffs believe the statements they worked to obtain from Geller to be true, they created an environment, including the potential for a large six-figure payday for Geller, in which her testimony easily could have been influenced.

The record is unclear as to what happened in the weeks immediately following the preparation of the Mediation Settlement, which was never signed.  On July 29, 2013,

---

[61]     *Id*. at .0014.

[62]     *Id.* at .0015.

30

however, Gary Mathiason, one of Morelli's lawyers,[63] wrote to Schaedel that he and Morelli believed the settlement still could happen "with a combination of resources including the insurance company and the cooperation of your client."[64] That same day, July 29, Morelli and Brian Wing verified the Complaint in this action.

On August 5, 2013, the day that the Complaint was filed, Mathiason again contacted Schaedel. It is clear from that point on the newly requested changes to Geller's Mediation Declaration were being sought for use in this litigation. After stating that "[t]he original declaration and the suggested enhanced declaration must be truthful," Mathiason wrote: "The reason for the declaration is the ongoing conflict between Waite et al. and Morelli. . . . Anything that can be added to the declaration to show contact and encouragement from Waite, Horn [sic], and others is valued and appreciated."[65] Morelli, it seems, offered personally to pay a portion of the settlement, contingent on an acceptable declaration for use in this proceeding. Mathiason's email continues: "If we can agree on a truthful expanded declaration such as we have proposed, Morelli is prepared to personally participate in its funding consistent with the [divorce] court imposed restrictions on the use of his personal assets. Morelli views Waite, Horn [sic] et al. as setting in motion events that resulted in Geller's ultimate departure from the

---

[63]  It appears that Mathiason also represented the Company. Tr. 531 (Morelli).

[64]  JX 822.0001.

[65]  JX 831.0001.

31

Company."[66]  According to Morelli, his willingness to fund the settlement depended on the acceptability, to him, of the declaration and its "truthfulness,"[67] of which he apparently was the arbiter.[68]

As the negotiations continued, Plaintiffs supplied documents to Geller to support the language they had drafted for and were seeking from her.[69]  Meanwhile, Geller's counsel undertook to avoid discussing any of the matters with any of Defendants, thus

---

[66]    *Id.*

[67]    Tr. 531-33.

[68]    *E.g.*, JX 838.0001 (8/9/14 email from Mathiason to Schaedel and others: "Since Alan views your client as having been manipulated into making a claim by Waite et al, receiving a truthful declaration that more specifically shows his direct and indirect involvement would be helpful for the overall litigation.").  Morelli stated that the truthfulness was "determined by the facts that we were continuing to gather as we were able to recover more and more forensic data."  *Id.* at 533.  By the time this lawsuit was filed, two separate committees of the Morelli-controlled board were investigating the facts of this case.  There is no evidence, however, that either of those committees ever issued a written report or formal findings of its "investigation."

[69]    *E.g.*, JX 846.0001 (8/23/13 email from Plaintiffs' counsel to Schaedel: "I sincerely hope that the documents and information we shared will help develop an expanded declaration that your client can fully embrace as an accurate statement of what occurred."); JX 848.0001 (8/26/14 email from Schaedel to Plaintiffs' counsel: "Thank you again for taking the time to come to Pasadena last week and to share relevant information and documentation with us . . . ."); JX 887.0001 (11/7/13 email from Mathiason to Schaedel: "Scott McKee firmly recalls the phone conversations and the corresponding text message.  It is entirely reasonable that Tina would have had this conversation with Scott given that she recalls a similar call with David [Hwang].  What we want to avoid are unnecessary credibility conflicts between Tina, David, and Scott.").

ensuring a one-sided presentation of "facts" from Plaintiffs to Geller.[70] Furthermore, the final Geller Settlement precluded Geller from communicating with any of Defendants, at least absent a court order.[71]

The discussions reveal that the payments were tied directly to the *content* of Geller's declaration, which was to be sworn and used in this proceeding.[72] When the declaration did not implicate Defendants sufficiently, Plaintiffs pushed for more.[73] When Geller either could not recall or, presumably, lacked personal knowledge of the language Plaintiffs wanted, they offered to "refresh" her recollection.[74] In Plaintiffs' own words

---

[70] JX 848.0001 ("I instructed Tina not to speak with Will [Horne] or anyone else about any of this. . . . While we are working on resolving this agreement, I am certainly not going to communicate with Will, Waite et al, or their counsel.").

[71] JX 920.0003 ("Geller will not communicate with, cooperate with, aid or assist any person or entity who is named as an adverse party to Optimis or Morelli in any Corporate Action, or whose interests are adverse or potentially adverse to Optimis or Morelli in any actual or potential Corporate Action . . . .").

[72] Indeed, Morelli also contemplated using Geller's Mediation Declaration in this litigation. In a July 11, 2013 email to James L. Patton, Jr., Esq., the Court-appointed monitor from the previous 225 Action, Morelli wrote: "We reached a confidential settlement with Geller, which includes a statement that will be signed when it is completed, which is crystal clear in exonerating me and acknowledging that she was recruited by Waite in an effort to change control of the company." JX 809.0001.

[73] JX 849.0002-3 (8/29/13 email from Mathiason to Schaedel: "The primary concern is to provide more detail on exchanges with Godges and Horne, as well as others including Brys, Eastman, Gunn and Kreile. . . . Our goal is to finalize the Geller declaration and agree upon a consideration package with Alan's personal financial support that will not be contingent on insurance funding . . . .").

[74] JX 885.0001 (11/1/13 email from Mathiason to Schaedel: "If we have included any attributions that Tina does not remember or disputes, the supporting documentation will be provided.").

33

and formatting, there was a "**Correlation Between Payments and Declarations:** The usefulness and truthful transparency of the Geller declaration correlates to the amount of the initial payment."[75] On certain subjects, Plaintiffs repeatedly attempted to include language that Geller had rejected as false, notwithstanding the promise of hundreds of thousands of dollars.[76] Indeed, Schaedel testified at his deposition that Plaintiffs asked Geller "to swear to statements that were not true."[77]

When the money was not enough to get Geller to agree to the language, Plaintiffs resorted to threats. Plaintiffs reminded Geller that the "most valuable consideration in the Agreement" is that "Geller is released from being a named defendant in a $25 million or greater claim against those who have illegally harmed Optimis and Morelli,"[78] which refers to this lawsuit.

This process continued *for six months*. Very early on, Geller's lawyer, Schaedel, recognized that there was a serious risk that repeatedly asking Geller to agree to the same

---

[75] JX 886.0002 (11/15/13 email from Mathiason to Schaedel).

[76] JX 880 (10/8/13 email from Schaedel to Plaintiffs' counsel: "Today, I was told that in order for Alan to 'support' the settlement (implicitly, at some level less than 100%), there needs to be information in the Declaration that you've already requested and we've already rejected: (1) that someone told Tina to make the recording, and (2) an admission that she initiated sexual contact with Alan. . . On (2), it's the height of audacity for you to bring this demand up again, 4+ months into the settlement discussions, when this was demanded and rejected in May, and we've made clear all along that Tina's position is that Alan forced Tina into sexual conduct.").

[77] Schaedel Dep. 77. *See also id.* at 76-77 & errata sheet.

[78] JX 886.0001.

language over and over again, all the while presenting her with only Plaintiffs' supporting documents, and increasing the payments if Geller agreed to the language would lead to Geller surrendering and saying whatever Plaintiffs wanted.[79] The statements to which Geller nevertheless refused to swear apparently were placed in the Summary Statement. In Plaintiffs' own words and formatting, they told Geller's attorney that: "Since the Summary Statement is **not** part of the Geller Declaration **nor given under oath**, she should simply sign the Summary Statement since it is written as coming from her."[80] Geller did sign the Summary Statement, and the parties incorporated it into the Geller Settlement. And, Geller's attorney signed the Schaedel Declaration, a questionable and highly speculative document in its own right, but something Plaintiffs considered to be "an important part of the total settlement" without which "the case will not settle."[81] On December 2, 2013, the Geller Settlement was signed. The next day, Plaintiffs served their First Request for Production of Documents[82] in this case, which essentially had been dormant since I denied Plaintiffs' motion to expedite on August 16, 2013.[83]

---

[79]   JX 852.0001 (9/2/13 email from Schaedel to Plaintiffs' counsel: "At some point, I think we might start to get only what we're asking for; I am not a skilled enough interrogator to know how to re-ask the same questions again and again and get 'new' information that is more than a desire to satisfy me. (And that would withstand anticipated cross-examination.)").

[80]   JX 918.0001 (11/29/13 email from Mathiason to Schaedel).

[81]   JX 886.0001.

[82]   D.I. 26.

[83]   D.I. 15, D.I. 16.

At her depositions on September 16 and October 6, 2014, Geller essentially abandoned significant portions of the Final Geller Declaration. She described the statements directly alleging a conspiracy, for example, as "speculation." I will not detail all of those statements, but they include many of the bulleted points I listed *supra*.[84] At other points, Geller disagreed with the most natural reading of the Declaration and instead included extensive undisclosed caveats and background understandings that completely change the meaning of the statements.[85] Many of the "clarifications" related to terms that Geller said were manipulated during the negotiations.[86]

Asked why she signed the Final Geller Declaration, Geller testified that she signed it "Because I wanted to settle and get this over with. And I was afraid that [Morelli] would drag me through the mud and prolong our trial forever and ever and run out of money."[87] She also stated that her relationship with Morelli eventually became "very fear-based"[88] and that "Alan uses the law to come after people even when he's in the

---

[84]      *E.g.*, Geller Dep. 179, 201-03 (¶ 7); 354-58 (¶ 13); 363 (¶ 15); 366-67 (¶ 10).

[85]      *E.g.*, *id.* at 185-86, 359-60, 364-65.

[86]      *E.g.*, *id.* at 359 (clarifying paragraph 14 as Horne providing "more of an encouragement to do what was best for me" and stating that the Final Geller Declaration language "was twisted in the negotiations into that [resulting] statement" by Plaintiffs' lawyers).

[87]      *Id.* at 77.

[88]      *Id.* at 20.

36

wrong."[89] Geller apparently concluded that she could sign the Final Geller Declaration notwithstanding that she was under penalty of perjury based on her own self-serving and idiosyncratic, to say the least, understanding of the meaning of perjury. Specifically, she understands "speculation," which she seems to equate with "opinion," to be okay in sworn documents, so long as she does *not know* the statement is a lie.[90] How Geller, who was represented by counsel throughout the negotiations, arrived at this "not perjury unless you know it's false" understanding is a mystery, but I consider the prospect of a $550,000 payment to be a prime suspect.

## 4.    The "settlement" with Geller undermined the integrity of these proceedings

As previously discussed, the Delaware Supreme Court observed in *Weber* that the $85 payments to three witnesses were "disgraceful"[91] and that, even if the payments did not constitute outright bribery, they "certainly violate the spirit of the law and cast into doubt the integrity of the proceedings."[92] This was the case even though "there was no

---

[89]     *Id.* at 55; *id.* at 59 ("I have a fear that Alan can get away with anything he wants to by using the law to do so. He's bragged about that and shown that to many people throughout the time that I've known him.").

[90]     *E.g.*, *id.* at 202 ("I had no facts to back up that statement. So it was opinion, and it is not a lie, because I have no facts to dispute it and I have no facts to back it up."); *id.* at 203 ("I swore that it was neither true or untrue. It's an opinion and it's speculation."); *id.* at 368 ("It was a negotiated statement, as I said. I didn't agree nor did I disagree with the statement, so I allowed it to be in there because it was not untruthful.").

[91]     *Weber*, 457 A.2d at 682

[92]     *Id.* at 679 n.6.

37

evidence that the cash payments influenced [the] testimony."[93]   Cases in other

jurisdictions have held similarly.[94]

Additionally, DLRPC Rule 3.4(b) prohibits lawyers from offering an "inducement

to a witness that is prohibited by law."   In August 2003, the Delaware State Bar

Association Committee on Professional Ethics issued an advisory opinion reviewing the

issue of compensating fact witnesses for testifying.   According to the advisory opinion,

the minority view in the United States is that fact witnesses cannot be compensated at all.

The Committee instead adopted the more liberal majority view, which is that of the

American Bar Association, that holds that fact witnesses can be compensated for their

time, but that such payments *cannot* be compensation for the *content* of their testimony.[95]

---

[93]   *Id.* at 678-79.  Plaintiffs argue that the primary concern in *Weber* was the family's lack of candor with respect to the payments.  While that lack of candor certainly played a role in the Supreme Court's condemnation of what happened, the comments quoted above were directed at the payments themselves.

[94]   *See, e.g.*, *HomeDirect, Inc. v. H.E.P. Direct, Inc.*, 2013 WL 1815979, at *4 (N.D. Ill. Apr. 29, 2013) ("In the federal courts it makes no difference whether the purchased testimony is truthful. . . . [California Rule of Professional Conduct 5-310] bars payment contingent on the content of the testimony, truthful or not."); *Holmes v. U.S. Bank*, 2009 WL 1542786, at *5 (S.D. Ohio May 28, 2009) ("It is immaterial that Plaintiff may have only intended to pay [the witness] to provide truthful testimony.  It is a criminal violation of federal law to offer to a person anything of a value—except a witness fee—for or because of that person's testimony under oath. . . . This is true even if the offeror only seeks to elicit truthful testimony.") (citing 18 U.S.C. § 201(c)(2) and *United States v. Blaszak*, 349 F.3d 881, 886-87 (6th Cir. 2003)).

[95]   Del. State Bar Assoc. Comm. on Prof'l Ethics Op. 2003-3 (Aug. 14, 2003), *available at* http://media.dsba.org/ethics/pdfs/2003-3.pdf.

It is beyond the scope of this Opinion and I do not address whether Plaintiffs committed criminal acts of bribery or witness tampering. I do find that the evidence clearly and convincingly shows that Plaintiffs, and in particular Morelli, paid Geller for the content of her testimony, in the form of the Final Geller Declaration and the Summary Statement, which, although not under oath, is signed and misleadingly made to appear as though it is a truthful statement by Geller. Although they now call her a perjurer, Plaintiffs cited the Final Geller Declaration in their opposition to the Director Defendants' motion for summary judgment and, as discussed *infra*, Plaintiffs submitted that Declaration to the Los Angeles Police Department ("LAPD") in an attempt to open a criminal investigation against Defendants. Although lawyers have an obligation as advocates to "zealously assert[] the client's position," they must do so "under the rules of the adversary system."[96] Geller's credibility is of paramount importance in this case and Plaintiffs' conduct has cast into doubt any finding based on her testimony.[97] Thus, I find

---

[96] DLRPC, Preamble ¶2.

[97] *See HomeDirect, Inc.*, 2013 WL 1815979, at *4 ("There are sanctions precedents that concern the settlement of an unrelated case in exchange for a witness's agreement not to testify in another case. . . . Bribing a witness, of course, is a sanctionable event. . . . This is especially true when the witness is very close to being absolutely essential to the opponent's case.") (citing *Synergistics, Inc. v. Hurst*, 2007 WL 2422871 (E.D. Mo. Aug. 21, 2007) and *Ty Inc. v. Softbelly's, Inc.*, 353 F.3d 528 (7th Cir. 2003) (Posner, J.)).

that Plaintiffs' actions regarding the Geller Settlement have compromised the integrity of these proceedings.[98]

The troubling actions taken as to Geller's testimony are exacerbated by the fact that, as the following Subsections show, this theme of threaten, pay, and settle for the use of evidence favorable to Plaintiffs reoccurred, to varying degrees, with other witnesses.

### E. The Fearon and Levine Settlements

Helene Fearon and Stephen Levine have worked for Optimis since their consulting firm became a wholly owned subsidiary of the Company in December 2008. Although not physical therapists themselves, Fearon and Levine were well-known, and well-respected, consultants in the regulatory sphere. They lent their professional images to Optimis' software products. As a result of the 2008 stock-for-stock transaction, Fearon and Levine took pay cuts on the scale of $100,000 each, which in Fearon's case was on the order of a sixty-percent reduction in pay.[99] By 2012, with their employment agreements expiring in December, they actively were seeking pay raises. In fact, they directly addressed the issue on October 6, 2012, in a letter to Morelli, Waite, and Horne—Optimis' CEO, COO, and CFO, respectively—outlining their compensation

---

[98]    Horne makes numerous other complaints about the Geller Settlement. For example, he contends that the non-cooperation provisions denied him the ability to conduct informal discovery of Geller and prejudiced him in violation of DLRPC Rule 3.4(f). These non-cooperation provisions are troubling, but I do not consider it necessary to reach them based on my conclusions on the issue of witness tampering. Even if I were to find in favor of Horne on that issue, it would not cause me to alter my disposition of Defendants' request for sanctions.

[99]    Tr. 748 (Fearon); *id.* at 1618 (Levine).

demands and complaints about how the business was being run.[100] The letter suggests that, if their demands were not met, they "would then propose to negotiate a separation agreement from Optimis*Corp*."[101]

Presumably because of his purported ouster two weeks after this letter was sent, Morelli never met with Fearon and Levine. After October 20, however, Waite, then acting-CEO, and Horne agreed to the pay raises and other demands in the letter.[102] As a result of the subsequently filed 225 Action, however, the raises were undone and Fearon and Levine's salaries reverted to $65,000.[103] Once the 225 Action settled in late March, 2013, Morelli was restored to power as CEO. But, Fearon and Levine did not get their raises in 2013. Nevertheless, despite their earlier threat to leave, Fearon and Levine remained at Optimis, because they had staked their personal reputations on OptimisPT.[104] Departing from the Company would have left them without input to a product tied to their reputational capital in the marketplace.

In fact, it was not until May 2014 that Fearon and Levine "settled" with the Company. By that time, Plaintiffs had the Geller Settlement and Levine was on the brink

---

[100] JX 317.

[101] *Id.* at 0002.

[102] Tr. 773 (Fearon).

[103] *Id.* at 774 (Fearon).

[104] *Id.* at 743 (Fearon); *id.* at 1576 (Levine).

41

of personal bankruptcy.[105]  Plaintiffs aggressively pursued a "settlement" with Fearon and Levine.  In an April 6, 2014 email, Laurent O'Shea, the Chairman of Optimis' Board's purported "Independent Committee," emailed Fearon and Levine that the Company has "many documents and witnesses that prove that Waite, Horne and their faction tried to illegally seize control of the Company."[106]  Plaintiffs contended that Fearon and Levine were members of this faction,[107] and effectively threatened litigation against them.[108]  Levine testified that, at an April 17, 2014 meeting, he and Fearon were shown a "large stack of e-mails that were being attributed to us, yet we were only given one to review."[109]  Evidently, neither Levine nor Fearon was represented by counsel during this process.[110]

To sum up, Fearon and Levine's reputations were tied to Optimis' physical therapy software, Levine faced personal bankruptcy, from as early as September 2013

---

[105]    *Id.* at 1618 (Levine).

[106]    JX 964.0001.

[107]    Later, after settling with Fearon and Levine, Plaintiffs attempted to amend their Complaint to assert that Fearon and Levine were members of the conspiracy with Defendants.  Plaintiffs did not seek to name Fearon and Levine as defendants; instead, they sought to expand the scope of Defendants' vicarious liability.  *See OptimisCorp*, 2015 WL 357675, at *5.

[108]    Tr. 1628 (Levine: "I believe that I said to [Plaintiffs' counsel] that he was threatening litigation; and he, in turn, said that that's not what he was threatening and gave me a sort of legal maneuvering around that.").

[109]    *Id.* at 1628-29, 1654 (Levine); JX 976.0003 (4/21/14 email from Levine to Fearon with proposed email to Optimis Board).

[110]    Tr. at 1627 (Levine).

Fearon had expressed a fear of any lawsuits relating to separating from the Company,[111] and Plaintiffs were threatening to sue them while alleging that the Company had extensive evidence implicating Fearon and Levine in wrongdoing, but apparently not letting them review it. In May 2014, Fearon and Levine settled.[112] They executed mutual releases with the Company. There is no evidence, however, that, as of that time, either Fearon or Levine understood what, if any, legitimate claims the Company might have against them.

Contemporaneous documents from before the settlement make clear that both Fearon and Levine disliked Morelli.[113] Indeed, Fearon said she "never disliked a person

---

[111]    JX 877.0001 (9/26/13 email from Fearon to Levine: "Biggest thing is I do not want any lawsuits..losing ground financially has already happened..costing us money going forward is not acceptable . . . .").

[112]    Levine testified that Optimis' actions to meet his financial demands and provide his back pay were separate from and unrelated to the mutual releases. Tr. 1622-23. This testimony was not credible. Fearon and Levine made their financial demand as early as fall 2012, but Morelli did not meet those demands until he sought their assistance in this litigation. I infer from the close temporal relationship between the mutual releases and salary increases that the two were a package deal, even if they occurred with some minor gap in time.

[113]    *E.g.*, JX 186.0001 (4/21/12 email from Fearon to Gunn) ("[unquotable profanity]"); JX 267.0001 (8/21/12 email from Fearon to Gunn) ("Alan is the master manipulator."); JX 295.0001 (8/27/12 email from Fearon to Levine: "He is such a f---ing manipulative a--hole . . . how can I trust a single thing he says in this e-mail"); *id.* at .0001 (8/27/12 email from Levine to Fearon: "Yep . . . my thoughts as well . . . He has destroyed any relationships that he has had in this company . . . and those that rally around him do so only for their own benefit, and not for the company . . . since those that built the company will all be gone at some point.").

as much as" Morelli "ever in [her] life."[114] As a result of the settlement, however, Fearon and Levine's salaries were raised to $150,000 each, and they each received substantial back pay.[115] Fearon and Levine then provided highly favorable affidavits to the Company,[116] all of which Plaintiffs concealed for months.[117] Those affidavits, which are nearly identical, aver that Fearon and Levine were members of a group attempting to take control of Optimis, and, like the Final Geller Declaration, are closely keyed to the allegations in this action.[118]

For example, both deceptively state: "Prior to February 2012, several individuals at Optimis, including John Waite, George Rohlinger, Jeanine Gunn and Will Horne, as

---

[114] JX 547.0001 (11/6/12 email from Fearon to Gunn, which goes on: "Total disregard for anyone or thing other than his own self interest. . . . I really cannot believe I was such a poor judge of character"); Tr. 750-51.

[115] Tr. 775-77 (Fearon); *id.* at 1618-23 (Levine).

[116] JX 1001 [hereinafter "Levine Aff."]; JX 1002 [hereinafter "Fearon Aff."].

[117] This issue was dealt with in my previous Memorandum Opinion, *OptimisCorp v. Waite*, 2015 WL 357675 (Del. Ch. Jan. 28, 2015) (concluding that Plaintiffs' actions amounted to a knowing concealment).

[118] *E.g.*, Levine Aff. ¶ 6 ("This plan [to 'give Alan a nudge'] was discussed regularly among executives and employees of the company, including Waite, Rohlinger, Horne, Gunn, Tom DiAngeles (Gunn's husband), Fearon and me. At some point, Waite also told me that, if Morelli insisted on remaining as CEO, he (Morelli) might have to be removed against his will."); Fearon Aff. ¶ 6 (nearly identical); Levine Aff. ¶ 10 ("Despite Morelli's status as CEO, and his authority under the Stockholders Agreement to control the company, Waite, Rohlinger, Horne and Gunn encouraged Fearon and me to do whatever was necessary to oppose the directions given by Morelli, in spite of his leadership position at Optimis."); Fearon Aff. ¶ 10 (nearly identical). As shown *infra*, at least this latter statement is false.

44

well as Fearon and I, had an interest in taking control of Optimis away from Morelli . . . ."[119] Fearon and Levine's testimony at trial, however, indicated that their concerns focused on having sufficient resources allocated to the OptimisPT software and the difficulty they and others were having convincing Morelli of that. In that context, they discussed removing Morelli's oversight of the product, not taking control of the Company.[120] As described in Section II *infra*, there is an important difference between the two.

### F. Other Questionable Conduct by Plaintiffs

Geller, Fearon, and Levine were not the only instances of Plaintiffs threatening or attempting to threaten or pay witnesses in connection with testimony. Chris Olsen, Rancho's controller, credibly testified that there was a "litigation atmosphere at the company" following the Director Defendants' termination,[121] and that siding with the Director Defendants essentially meant that you would be added to this lawsuit.[122]

Olsen attended a meeting at a Starbucks in Anaheim, California with Morelli, O'Shea, and an individual identified as Mr. Lin. According to Olsen, "the gist of the discussion was they knew I was complicit. They knew that I was involved in these self-dealing situations. And if I come clean and if I provide them all the information, that

---

[119]    Levine Aff. ¶ 3; Fearon Aff. ¶ 3 (identical, but "Fearon" reads "Levine").

[120]    *E.g.*, Tr. 697-98, 714, 718, 727-28, 782-83 (Fearon); *id.* at 1571-72, 1577, 1578-79, 1604, 1609 (Levine).

[121]    *Id.* at 1221.

[122]    *Id.* at 1217.

they'll give me a cooperation agreement and resolve me of any liability."[123]  No evidence

in the voluminous record in this case implicates Olsen in any purported wrongdoing.

Nevertheless, and consistent with their actions with respect to Fearon, Levine, and Geller,

Plaintiffs asked Olsen to sign a pre-prepared declaration.  Olsen said he "crossed out the

majority of the declaration to where . . . I could, in good faith, sign as being true."[124]

There is no evidence of further communications between Optimis and Olsen on this

subject.  Olsen eventually left Rancho because "it was just an unbearable situation" that

included unknown individuals having "gone through everything in [his] office" and

"blam[ing] him for doing something wrong."[125]

Olsen, apparently after consulting with his attorney, had decided to record the

Starbucks meeting.[126]  The existence of that recording was not revealed until the middle

of trial.[127]  It was not played at trial or offered in evidence.  In cross-examining Olsen,

---

[123]  *Id.* at 1219.  Plaintiffs took a similar stance against Atkins, one of the Director
Defendants.  Sometime after he was fired from Rancho, Atkins was offered the
chance to return if he surrendered one million of his Optimis shares, which appear
to have been about one-third of his holdings, and admitted wrongdoing.  *Id.* at
1494-95 (Atkins).  Atkins declined.

[124]  *Id.* at 1220.

[125]  *Id.* at 1221.

[126]  *Id.* at 1230-31.

[127]  Olsen was a third-party witness and did not tell Defendants about the recording
until the day before he testified.  Tr. 1194 (counsel for Director Defendants).
Defendants promptly turned the tape over to Plaintiffs.  *Id.* at 1194-95.  Plaintiffs
attempted to use the existence of the audiotape as a basis for excluding Olsen's
testimony at trial, despite the fact that no one sought to admit the tape into
evidence.  *Id.* at 1192 (counsel for Plaintiffs).  I denied that request.  *Id.* at 1198.

46

Darius Ogloza, one of Plaintiffs' California attorneys who was admitted *pro hac vice*,[128] quickly embarked on a line of questioning that a reasonable lay person—and certainly one who, like Olsen, had experienced Plaintiffs' out-of-court threats of civil lawsuits— would perceive as threatening criminal charges.[129]  I perceived it as such, notwithstanding counsel's protestations that the questioning went to "bias."[130]

This is not the only instance of Plaintiffs arguably threatening criminal proceedings against a witness.  Another occurred in California against Geller.  In October or November of 2012, after Geller's sexual harassment claims had been reported, Morelli, through his California lawyers, had a private investigator contact Geller.[131]  She understood the import of the investigator's voicemail to be that "if I did not sit down and talk with him and basically try to work this out, that I would be sued by Alan."[132]  An

---

[128]   D.I. 32.

[129]   Tr. 1231 ("And do you understand that your making that recording may have violated California law?").

[130]   *Id.* at 1231-32.  The California Rules of Professional Conduct expressly prohibit lawyers from threatening "to present criminal, administrative, or disciplinary charges to obtain an advantage in a civil dispute."  Cal. Rules of Prof'l Conduct R. 5-100(a).  In Delaware, such threats may be permissible in certain instances.  *See* Del. State Bar Assoc. Comm. On Prof'l Ethics Op. 1995-2 (Dec. 2, 1995), *available at* http://media.dsba.org/ethics/pdfs/1995-2.pdf.

[131]   Geller Dep. 107-08.

[132]   *Id.* at 108.

audio recording of that voicemail was played at trial during cross-examination of Morelli.[133]  The investigator stated, in part:

> Evening, Tina. . . . I'm a retired FBI agent and a consultant . . . .  I've been retained by the law firm of Pepper Hamilton which is representing Alan Morelli to look into the dispute that concerns his purported ouster as CEO of your company . . . . And, you know, what I'm afraid is going to happen is that when it comes out, this videotape[134]—which I'm afraid it appears is made in violation of California law and could possibly subject you to some criminal prosecution for it. . . . [W]e should expect that Mr. Waite and the others are going to try to blame that whole thing on you to try to avoid any responsibility themselves for it. . . . I think you're too good of a person for that, and I'm worried about you.  I don't want to see that happen to you.  You don't deserve that.  And if you'll help me understand exactly what role these people played in putting you up to this . . . I think I can offer you some help, just to help you save yourself.  Because what I want to do basically is offer you a lifeline.[135]

Morelli, under cross-examination by Horne's counsel, expressed some discomfort with the voicemail at trial, stating that the "criminal prosecution" element "doesn't seem appropriate or could be misconstrued or misperceived as some sort of threat, potentially."[136]   Later that same day, under cross-examination by the Director Defendants' counsel, Morelli declared: "I don't read this as threatening at all."[137]

---

[133]  A transcript of the voicemail also is in the record.  JX 613.

[134]  Geller secretly recorded one physical therapy session with Morelli.  That tape is not in the record.

[135]  Tr. 624-26 (Mike McCall voicemail).

[136]  *Id.* at 526.

[137]  *Id.* at 628.

Finally, I note that Morelli ultimately did file a criminal complaint against Geller with the LAPD relating to the video recording she made.[138] On November 21, 2012, about a month after Morelli's temporary ouster, Geller emailed Nancy Kreile, the Company's Human Resources manager, that "Alan appears to be retaliating against me for filing the sexual harassment claim against him. A Detective Windsor from the LAPD left me a message to call him back" regarding a case filed by Morelli.[139]

Later, on March 4, 2014, by which time Plaintiffs had settled with Geller, they provided to the LAPD a lengthy letter (the "Criminal Complaint") that included, among other items, copies of the Final Geller Declaration, the misleading Summary Statement, and the Schaedel Declaration.[140] The Criminal Complaint includes a fourteen-page chronology of events about the actions that led to this lawsuit, but does not mention that Plaintiffs settled with Geller. Only in the annex listing the various actors does the Criminal Complaint state that "Tina has settled her lawsuit against Morelli and Optimis."[141] There is no indication, however, that the Final Geller Declaration, the Summary Statement, or the Schaedel Declaration resulted from that settlement. The Criminal Complaint requests that the LAPD investigate and prosecute the

---

[138] JX 569 (11/14/12 Morelli email to Holger Beckman, an Optimis employee, regarding the complaint); JX 582 (11/21/12 Morelli email to the LAPD).

[139] JX 583.0001.

[140] JX 944.0039-.0048.

[141] *Id.* at .0018.

49

"Insurgents,"[142] a defined term meaning "several high-ranking former executives and board members" that includes "John Waite, George Rohlinger, Laura Brys, Bill Atkins, Greg Smith and others."[143]

### G. The Integrity of These Proceedings Has Been Undermined

The foregoing review reveals a persistent and troubling course of conduct by Plaintiffs to gain an advantage in this proceeding. Plaintiffs threatened and paid Geller, eventually breaking her down over the course of six months, to acquire the language they wanted to use in this proceeding and then disowned her after she recanted the language in the Final Geller Declaration during her deposition. While she was still Plaintiffs' witness, however, they submitted that Declaration to the LAPD as "evidence" of Defendants' purported wrongdoing. In addition, after stringing them along for over a year, Plaintiffs met all of Fearon and Levine's financial demands in return for favorable testimony in this case. Plaintiffs also attempted to get Olsen to sign a declaration full of statements he believed were false, but he refused. After discovering that Olsen recorded the meeting in which Morelli threatened Olsen with a civil lawsuit, Plaintiffs arguably threatened him in open court with criminal proceedings.

---

[142]   *Id.* at .0002 ("We believe that the Insurgents violated the following federal laws and California Penal Code sections and, in some cases, are still violating them, in an attempt to regain control of Optimis and conceal evidence of their wrongdoing."); *id.* ("We have obtained evidence that the Insurgents and their co-conspirators not only engaged in an illegal recording of Mr. Morelli, but also violated federal and California law by engaging in commercial bribery, embezzlement, extortion, forgery, fraud, theft, perjury and related crimes.").

[143]   *Id.* at .0001.

I recognize that parties have a right to vigorously pursue their claims. I also assume that, misguided as I consider it to be, Morelli and his counsel believe their rhetoric regarding a vast conspiracy to take control of Optimis away from Morelli for the alleged insurgents' own self-serving motives. But, even so, the conduct I have described here is beyond the pale. Specifically, I find that Plaintiffs' conduct was "prejudicial to the administration of justice"[144] and has undermined the integrity of these proceedings by materially impacting the Court's ability reliably and accurately to find the facts. The *crucial allegation* underlying Plaintiffs' breach of loyalty claims is that Defendants used Geller as a pretext to take over the Company. When deposed, she demolished the reliability of the key statements in the Final Geller Declaration that might support a finding that Defendants engaged in a takeover conspiracy and used Geller's sexual harassment claims as a pretext. I, therefore, find it appropriate to disregard, in their entirety, all of the documents in the Geller Settlement and to reject any attempt by Plaintiffs to use those documents affirmatively to impeach Geller or any other witness. Relying on those documents is impossible based on the cynical context and manner in which they were created. As a result of Plaintiffs' improper conduct, I instead find credible and reliable what Geller said at her deposition and resolve any doubts about her credibility in favor of Defendants.[145]

---

[144]     DLRPC R. 8.4(d).

[145]     I have reviewed the relevant portions of the videotape of the Geller deposition and, in fact, I generally found her statements there cogent, credible, and consistent with the other evidence and testimony I found reliable. In addition, I note that Geller

51

With respect to Fearon and Levine, their affidavits attempted to prove the conspiracy Plaintiffs allege. Overall, however, I conclude that Plaintiffs essentially struck a hard bargain with them at a time when Levine, at least, was vulnerable financially. While there is less evidence of wrongdoing with respect to those settlements, I find that the manner and circumstances in which Plaintiffs obtained the two nearly identical affidavits from Fearon and Levine improperly influenced their testimony. I also find that portions of the affidavits Fearon and Levine submitted in this case were materially misleading, as was revealed by their testimony at trial. Upon close examination, I found their trial testimony, which differed in important ways from the affidavits, largely credible. Based on the course of events that led to them testifying for Plaintiffs at trial—and the stark contrast between their affidavits and trial testimony and their pre-trial views of Morelli and his management of Optimis—I have determined as a sanction for Plaintiffs' conduct to resolve any doubts in favor of Defendants in those instances where the reliability of the testimony of Fearon or Levine is questionable.[146]

---

had every financial incentive to stick to the Final Geller Declaration, particularly if it was true. I have seen no evidence of a countervailing interest that would cause her not to tell the truth at her deposition.

[146] I have no question about the credibility of Olsen's testimony. Plaintiffs' conduct relating to him, ranging from the seeming threat of criminal action in court to Morelli's bogus lawsuit threats and request for a favorable affidavit, is disturbing. It also is consistent with Morelli's repeated attempts to involve the LAPD in this matter. These actions bolster my conclusion to impose the sanctions I have in this action.

52

Defendants have requested that I dismiss this action in its entirety as a result of Plaintiffs' conduct. There is precedent for such a harsh sanction.[147] I am not convinced, however, that such a broad-brush remedy is appropriate here. Virtually all of the misconduct related to Plaintiffs' claim of a far-ranging and broad-based conspiracy to remove Morelli from his position as CEO of Optimis and strip him (and the Initial Stockholders he controls) of their ability to appoint five of the nine Optimis directors until 2015. Based on the serious and highly prejudicial nature of the witness tampering and other misconduct by Plaintiffs that I have found, I hold that the appropriate sanction for that misconduct also includes dismissal with prejudice of their conspiracy claim against all Defendants. I decline, however, to order dismissal on that basis of Plaintiffs' other claims. Instead, I conclude that the best course of action is to draw inferences related to the credibility of the affected witnesses against Plaintiffs to the extent described in this Section and Section V.F *infra*, and I have done so in the remainder of this Opinion. This relief is consistent with my findings that Plaintiffs' conduct has affected the reliability of certain witnesses and the fact that Plaintiffs bear the burden of proof.

Finally, and in the alternative, because I am making this decision after trial—and in the interest of completeness and judicial efficiency—I have considered fully Plaintiffs' conspiracy claims in the analysis that follows, notwithstanding my dismissal of that claim as a sanction. For the reasons stated in the analysis, I conclude that the Plaintiffs failed to

---

[147] *See Bessenyei v. Vermillion, Inc.*, 2012 WL 5830214 (Del. Ch. Nov. 16, 2012); *Parfi Hldg. AB v. Mirror Image Internet, Inc.*, 954 A.2d 911 (Del. Ch. 2008).

53

prove that claim as to any of the Defendants, which provides a separate and independent basis for its dismissal.

## II.   FACTUAL BACKGROUND

In the preceding Section, several of the relevant actors were introduced. This Section recites my remaining factual findings as to what happened in this case. The record is voluminous. Trial took place over six days, with thirteen witnesses testifying in person, including two experts. There were over 1,100 exhibits plus the depositions of thirty-two individuals, many of which lasted more than a single day.[148] Unfortunately, almost all of the key facts are disputed. In addition, each side has advanced numerous evidentiary objections and challenged the credibility of several of the witnesses who provided important testimony. The latter complication has been compounded by the fact that certain key witnesses, such as Geller and George Rohlinger, did not appear at trial, and the Court, therefore, has had to make credibility determinations on the basis of their video depositions.[149]

### A.   Threshold Evidentiary Issues

Before proceeding to the merits, I must address two additional threshold issues. First, Plaintiffs have moved for an adverse inference against Horne because he deleted an entire email account, comprising thousands of emails, from his computer. Plaintiffs did not brief their spoliation request after trial until their reply brief, preventing Horne from

---

[148]   The parties waived first-level hearsay objections to the deposition testimony of those witnesses. JS § VI.G.7.

[149]   The parties submitted video depositions of some twenty-three witnesses.

having an opportunity to respond to it. Thus, I find that Plaintiffs have waived this argument.[150]

Additionally, and as an independent holding, I find that the requested adverse inference is not warranted. "A party in litigation or who has reason to anticipate litigation has an affirmative duty to preserve evidence that might be relevant to issues in the lawsuit."[151] Here, Horne admittedly deleted his personal email account, comprising thousands of emails, from his work computer in May 2013 after he essentially was told he was about to be fired.[152] Plaintiffs request that I draw an adverse inference that the deleted emails would support Plaintiffs' claims.

"An adverse inference . . . is appropriate where a litigant intentionally or recklessly destroys evidence, when it knows that the item in question is relevant to a legal dispute or it was otherwise under a legal duty to preserve the item."[153] Here, an adverse inference is not appropriate for two reasons. First, there is no evidence that the allegedly

---

[150]    Plaintiffs originally moved for a spoliation adverse inference in a motion *in limine*, and I advised the parties in the Pre-Trial Conference that I intended to deny that motion unless Plaintiffs made a stronger showing at trial. Pre-Trial Conf. Tr. 7-8. Plaintiffs did not address that request in their opening post-trial brief and devoted only one page to it in their reply brief. In these circumstances, I conclude that Plaintiffs' request is waived and, in any event, has not been supported by the record. *Zutrau v. Jansing*, 2013 WL 1092817, at *6 (Del. Ch. Mar. 18, 2013); *Emerald P'rs v. Berlin*, 2003 WL 21003437, at *43 & n.144 (Del. Ch. Apr. 28, 2003).

[151]    *Beard Research, Inc. v. Kates*, 981 A.2d 1175, 1185 (Del. Ch. 2009).

[152]    I do not find credible Horne's testimony that he reviewed the emails before deleting them, at least not in any serious depth. Tr. 1374-75.

[153]    *Sears, Roebuck & Co. v. Midcap*, 893 A.2d 542, 552 (Del. 2006).

55

destroyed emails are not available to Plaintiffs. In originally moving for an adverse inference based on spoliation, Plaintiffs pointed to 23 emails from Horne's personal email account that allegedly were deleted; all preceded December 2012.[154] Horne deleted his personal email account from his Optimis computer shortly before being fired in May 2013 and having to turn in his computer. But, the Company's computers, including Horne's devices, were imaged for Plaintiffs in either December 2012 or January 2013.[155] Thus, Plaintiffs had a copy of the emails that allegedly were destroyed and there was no spoliation. Second, Plaintiffs have not shown that Horne, who was not represented by counsel in May 2013, had any reason to believe he would be sued in this action, which was not filed until August, three months later, or any other litigation. Horne was not an Optimis board member and the 225 Action, in which he *was not* a named defendant, settled in March 2013.[156] For all of these reasons, I deny Plaintiffs' request for an adverse inference against Horne based on spoliation.

Plaintiffs also have pled a conspiracy. In motion practice before trial, I limited the persons Plaintiffs could claim participated in that conspiracy to the Director Defendants,

---

[154]  D.I. 194, Ex. 10.

[155]  JX 645, 648; D.I. 200, Exs. A-B.

[156]  Tr. 1375-76 (Horne). I reject Plaintiffs' argument that Horne should have been aware of the possibility of litigation because he was a member of a far-reaching conspiracy, because, as discussed *infra*, Plaintiffs have not proven the existence of such a conspiracy.

Defendant Horne, Joe Godges, and George Rohlinger.[157] Whether a conspiracy exists affects the admissibility of certain statements by Rohlinger and Godges objected to by Defendants on grounds of hearsay.[158] I conclude in Section V.A *infra* that no conspiracy exists. Accordingly, I sustain Defendants' objections to several out-of-court statements attributed to either Rohlinger or Godges on the grounds that they are hearsay and inadmissible.

Because I conclude that there is no conspiracy, I use the term Director Defendants only when it is unambiguous and a helpful shorthand. Throughout their pleadings and briefing, Plaintiffs repeatedly and vaguely referred to allegedly wrongful actions by the Director Defendants or Defendants generally. At trial, it was shown that neither Defendants nor the Director Defendants were monolithic groups of actors as Plaintiffs alleged them to be.

### B.      Rancho Physical Therapy and the Director Defendants

William Atkins founded Rancho Physical Therapy in 1984 in Temecula, California. The business experienced rapid growth as the surrounding communities grew. Atkins knew John Waite and asked him to join Rancho, which Waite did in June 1990 after he finished graduate school. Greg Smith, Waite's roommate in college, also joined the business in September 1990. At that time "Rancho was one single office,"[159]

---

[157]    *OptimisCorp*, 2015 WL 357675, at \*12.

[158]    D.R.E. 801(d)(2)(E).

[159]    *Id.* at 1253 (Smith).

57

but under these three partners "it was exploding" in terms of growth.[160] By 2006, Rancho had nineteen offices. The business overall was quite successful. Atkins attributed Rancho's success to the Company's "corporate values" and "culture."[161]

Sometime in 2006, the Director Defendants met with Morelli and discussed a potential transaction with Optimis, which then was called Physical Therapy Holdings, Inc. This meeting occurred after Joe Godges—a man variously described as a "true expert in the field of orthopedics"[162] and an "icon" in the physical therapy profession[163]— suggested to Waite that they should meet with Morelli. According to Smith and Waite, Morelli's "concept was to try and have consistent care in all the different physical therapy practices,"[164] as opposed to the then-fragmented outpatient physical therapy environment; it was a plan to "change the physical therapy world."[165]

The parties negotiated an acquisition over a lengthy period of time. As a prospective seller, Atkins was "very, very hesitant"[166] because it was a stock-for-stock transaction with no cash consideration. According to Smith, around 2005, the Director

---

[160]     *Id.* at 1459 (Atkins); *id.* at 1013 (Waite).

[161]     *Id.* at 1461.

[162]     *Id.* at 1014 (Waite).

[163]     *Id.* at 1255 (Smith); *id.* at 1465 (Atkins).

[164]     *Id.* at 1254 (Smith).

[165]     *Id.* at 1014 (Waite).

[166]     *Id.* at 1461.

Defendants had been offered about $12 million for Rancho.[167]   An all-stock deal eventually was struck, however, and Rancho became a wholly owned subsidiary of Optimis as of June 14, 2007.  The Director Defendants each received Optimis shares, and they created a stock option pool so that Rancho's employees could share in the ultimate upside of the transaction.  The Director Defendants—as well as several of the other individuals who sold businesses to Morelli and Optimis—expected some sort of liquidity event in the relatively near future.[168]

The Rancho transaction included, in addition to the Stock Purchase Agreement,[169] two other elements.  The first was the Director Defendants' employment contracts, all three of which are substantively identical (the "Employment Agreements").[170]  Through these agreements, the Director Defendants tied their fortunes to Optimis' success or failure in another respect as well: they each took substantial pay cuts.  While operating Rancho, they were making between $500,000 and $700,000 a year.[171]  The Employment

---

[167]   *Id.* at 1254.

[168]   *E.g.*, *id.* at 1471 (Atkins: "The finish line was always our liquidity event. . . . We did this so that we could get Optimis to a point where it could be publicly traded or whatever or someone would buy us or something like that, so that we could get our money out of investing our entire company. . . .  [I]t was supposed to be maybe three, four years at the most."); Garlock Dep. 49 ("That liquidation [sic] event was to occur within three to five years, at the long range."); Jennings Dep. 14.

[169]   JX 61.

[170]   JX 64 (Smith); JX 65 (Atkins); JX 66 (Waite).  For convenience, when referring to a term in these identical agreements, I use the citation "Empl. Agmt."

[171]   Tr. 1020 (Waite).

59

Agreements set their base salaries initially at $100,000 and then at $150,000 two years later.[172] The Employment Agreements were between the Director Defendants and Rancho.[173]

Consistent with the vision of a near-term liquidity event, the Employment Agreements had four-year terms. Thereafter, the Employment Agreements could be extended for successive one-year terms by agreement of Rancho and the Director Defendants. The Employment Agreements also included protections for the Director Defendants. For example, they provided that:

> In the event that there has not been a liquidity event that would allow Employee to liquidate at least 30% of the total number of shares to which Employee is entitled to receive . . . and the Common Stock Value is less than or equal to $5.00 per share and the Employee has been in material compliance with the terms and conditions of this Agreement, then the [Rancho] board of directors shall have the discretion to extend the Initial Term [of four years] of this Agreement by one successive year and reevaluate these conditions in future years.[174]

The Rancho board consisted of five members, two appointed by Optimis and three appointed by the Director Defendants.[175]

---

[172] Empl. Agmt. § 3.1. Bonuses were available if certain EBITDA targets were achieved. *Id.* § 3.2.

[173] *Id.* Recital 1.

[174] *Id.* § 2.2.

[175] JX 63 (Rancho Operating Plan) § (b).

The final element of the Rancho-Optimis transaction was the stockholders agreement (the "Stockholders Agreement").[176]  That agreement gave the "Initial Stockholders" of Physical Therapy Holdings, *i.e.*, Optimis, the right to appoint five members to the nine-member Optimis Board of Directors (the "Board")[177] for a period of seven years.[178]  Morelli, individually and by virtue of controlling Plaintiff Analog, controls the overwhelming majority of the shares held by the Initial Stockholders. Accordingly, the Board appointment rights effectively belonged to Morelli.  The Stockholders Agreement granted the Director Defendants the right to appoint two members to the Optimis Board.[179]  At all relevant times, however, all three Director Defendants served on the Optimis Board.

### C.     Optimis: The Company's Business and Structure

Optimis, then called Physical Therapy Holdings, was founded in 2006 by Morelli, Scott McKee, and Holger Beckman.  Godges was one of the initial employees of the Company.  Morelli's goal was "to develop software that would increase the quality of care, starting with traditional rehabilitation, and then to build on that nucleus of software" to move "towards the health and wellness industry."[180]  Beginning with the acquisition of

---

[176]     JX 62 [hereinafter "SHA"].

[177]     *Id.* § 3.3(a).

[178]     *Id.* § 9(a).  The SHA later was amended and its term extended to February 25, 2015.

[179]     *Id*. § 3.3(b).

[180]     Tr. 274 (Morelli).

61

Rancho, the Company essentially had two divisions, which I will refer to as the "Clinical Services Division" and the "Software Division." They overlapped to a degree.

Morelli testified at trial that the Clinical Services Division consists of clinics that render traditional physical therapy rehabilitation care, which are primarily sports and orthopedic clinics. Optimis owns 51 such clinics, nineteen of which were operated by Rancho.[181] In addition to providing physical therapy, the clinics also helped beta test and develop the software. The Software Division develops the Company's software, which consists of two separate packages: OptimisPT and Optimis*Sport*.

OptimisPT primarily is a documentation program that deals with electronic medical records. The Company began developing this software immediately after its founding in 2006. The eventual goal for OptimisPT was to have its own billing program, which would allow "a physical therapy clinic [to] just have one piece of software," as opposed to being forced to license both an electronic medical records program and a billing program.[182] As of trial, Optimis still had not completed the billing component of OptimisPT. The PT software also helped physical therapy clinics comply with Medicare and other third-party regulations by providing the therapist "prompts and information about whether or not they're documented to be compliant with their services."[183]

---

[181]    *Id.* at 274-75 (Morelli).

[182]    *Id.* at 276 (Morelli).

[183]    *Id.* at 680 (Fearon).

62

Part of what made the PT software unique was that it "incorporated a way for the clinician to really communicate their clinical decision-making" and "took the clinician's information and gave them a decision tree to follow . . . and then document accordingly."[184] Fearon's belief that the potential for the PT software was "[h]uge" is what caused her to join the Company in the first place.[185] Levine also thought that OptimisPT was "the best thing on the market" and the only software product "that ha[d] embedded clinical decision support systems" and "embedded compliance elements."[186]

The Company began developing Optimis*Sport* around 2009. As such, it was not even under development when the Director Defendants joined the Company in 2007 or when Fearon and Levine joined in 2008. Morelli views the Sport software as the key product for the Company's long-term success and "doesn't see any comparison" between it and the PT software.[187] As will be shown, the Director Defendants—and basically everyone else alleged to have conspired with them—considered PT to be the crucial software that the Company needed to develop in the near term. The Sport software was designed to go beyond traditional rehabilitation into more of a health and wellness field.

It is not clear from the evidence exactly what the Sport software does beyond generally being a wellness program. It was not sufficiently developed during most of the

---

[184]    *Id.* at 679-80 (Fearon).

[185]    *Id.* at 681.

[186]    *Id.* at 1598.

[187]    *Id.* at 279 (Morelli).

63

time period relevant to this case even to be marketable.[188] Part of Sport involved weight management,[189] but the other wellness aspects of the software are not evident from the record, except that it was intended to be a continuation of the care begun under the PT program. "OptimisSport was to pick up where OptimisPT leaves off."[190] PT, however, was designed to document care largely or entirely paid for under third-party reimbursement regimes and Medicare in particular. Generally, it seems, once reimbursement from Medicare or private insurance has ended, "traditional rehabilitation . . . just stops."[191] Optimis*Sport* and clinical services rendered under that software, by contrast, would be paid for by the clients out-of-pocket or, perhaps, by some similar method such as a health savings account.[192]

Optimis' business structure contemplated a symbiotic relationship between the Clinical Services Division and the Software Division. The revenues from the Clinical Services Division financed the Software Division, which developed PT and Sport, and

---

[188]   *Id.* at 1474 (Atkins: describing an instance where he was attempting to promote Optimis*Sport* at a trade show and stating: "I had a lot of discomfort because we could not define OptimisSport. It was a lot of ideas but there was nothing concrete. . . . We had four boxes. There is a marketing component, a business component. There was nothing behind the boxes. Nothing was done on it.").

[189]   *Id.*

[190]   *Id.* at 370 (Morelli).

[191]   *Id.* at 369.

[192]   *Id.* at 372-73 (Morelli).

then the Clinical Services Division would beta test the software.[193]  As Waite testified,

"the business model was that the clinics spun off the revenue to pay for the development

of the software, but we also used the software every day."[194]  For example, Rancho, the

Company's largest clinical unit, "ran more than a million patient records through

Version 1" of OptimisPT.[195]  The Company's Pacific Palisades clinic, which was run by

Geller, was a testing ground for the Sport product,[196] but the Clinical Services Division

did not utilize the Sport software on a wide-scale basis.  One implication of the

interrelationship between the Software Division and the Clinical Services Division is that

a failure of OptimisPT could negatively affect the operation of the clinics that produce

the revenue needed to improve the software, potentially causing a downward spiral.[197]

The physical structure and geography of the Company bears emphasizing.

Optimis' headquarters is located in two houses on the same street in Pacific Palisades that

are owned by Morelli.  The houses, based on their location on the street, are known as the

"Upper Bubble" and the "Lower Bubble."  The "lower bubble is where all the

programmers worked, and then the upper bubble is where the admin work was done."[198]

---

[193]  *Id.* at 1039-40 (Waite); *id.* at 1264 (Atkins).

[194]  *Id.* at 1039.

[195]  *Id.* at 1036 (Waite).

[196]  *E.g.*, *id.* at 1476-77 (Atkins).

[197]  *Id.* at 1038-40 (Waite); *id.* at 1265-67 (Smith).

[198]  *Id.* at 44 (Owens).

The Upper Bubble also was Morelli's personal residence. His bedroom doubled as his office, and it was not uncommon to have meetings in Morelli's bedroom-office.[199]

Much of the Company's work was done remotely. The Director Defendants operated the Rancho clinics out of Murrieta, California, which is roughly two hours away from Pacific Palisades. The Company's other clinics were even farther away, with the exception of the Palisades clinic. The Achieve physical therapy clinics, for example, are in Chicago. The MVP clinics are located in Washington State.

Many of the key employees in the Company also were geographically remote from Optimis' Pacific Palisades headquarters. Fearon, who became an employee in 2008, after she and Levine sold their consulting firm to Optimis, is the Executive Vice President of Business Strategy. She oversees OptimisPT and assists with development, upkeep, and market placement, as well as compliance with regulations such as HIPAA. Fearon is based in Phoenix, Arizona. Levine, Fearon's business partner, is based in South Florida. He is Optimis' Executive Vice President of Compliance and Consulting Services. George Rohlinger, the Company's former Chief Business Development Officer, was based out of Idaho. Jeannine Gunn, who worked for Optimis from January 2010 until June 21, 2013, was the Director of Implementation for OptimisPT. She was based in both Tacoma, Washington and Cincinnati, Ohio. Accordingly, a substantial amount of the Company's work was done remotely, whether telephonically or electronically, through email, for example.

---

[199]    Brys Dep. 32.

Some relevant employees, however, spent a substantial amount of time at the Upper Bubble. Geller is one; Horne is another. Horne started with Optimis as a consultant in the summer of 2006 and eventually became the Company's CFO. Although originally based in Seattle, Washington, he later acquired an apartment in Pacific Palisades. Horne apparently did not use his apartment much, because he was staying with Terry Doherty, Morelli's former wife, whom he started dating in the fall of 2010.[200] Laura Brys was Optimis' General Counsel from around April 30, 2012 through January 15, 2013; she also appears to have spent a fair amount of time in the Upper Bubble.

### D. Alan Morelli: The Man and His Management of Optimis

Morelli unquestionably is the driving force behind this litigation. He claims to be the victim of a vast conspiracy that undermined his authority and attempted to seize control of Optimis from him. As a result of the Stockholders Agreement, Morelli had the power to appoint five of the nine Optimis Board members. He also has served as Optimis' CEO and Chairman of the Board since its inception. Defendants characterize him as a narcissist, in that he has, among other things, an inflated sense of self-importance and a lack of empathy for others.[201] Defendants further argue that Morelli's character affects his credibility, explains the series of events that led to this lawsuit, and

---

[200]    Tr. 1311-12, 1319, 1339-41 (Horne).

[201]    Post-Trial Arg. 105-06.

67

even provides a rationale for how the litigation has been conducted.[202] Because, to some degree, that may be true, I briefly review here Morelli's background and his management of Optimis.

Morelli has a J.D. from Georgetown University and worked as a corporate attorney for the Wilmington office of Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"). Skadden serves as Plaintiffs' lead counsel in this action. Morelli later moved to Los Angeles and became a partner at the law firm of Manatt, Phelps & Phillips.

Although not a physical therapist, Morelli is an athlete, as were many Optimis employees. In fact, Morelli is a tri-athlete and at one time won the "Member of the Year" award from the LA Tri Club for having led that club of tri-athletes to its first national championship.[203] Several witnesses described Morelli as a visionary and an ideas-man,

---

[202] According to Horne, this litigation is economically irrational and its purpose is "annihilation of those who disagreed with" Morelli. Horne's Post-Trial Answering Br. [hereinafter "HAB"] 70. Plaintiffs' damages expert testified that Optimis has spent $10 million pursuing this case. Tr. 916 (Bratic). Horne further argues that this lawsuit is all about control of the Company. There may be some truth to the latter position. Before this litigation, the Director Defendants and Morelli each controlled about one-third of the outstanding shares of Optimis' stock. As a result of the 225 Action, Morelli, apparently at the suggestion of the Board he controls, caused the Company to provide him advancement in the form of 1.6 to 2 million shares of stock. *Id.* at 588-98, 668-69 (Morelli). In a similar vein of trying to increase Morelli's ownership share, one condition the Company sought for "forgiving" Atkins was that he would need to surrender a million of his shares. *Id.* at 1494-95 (Atkins).

[203] Tr. 338 (Morelli).

68

with big goals for the future of the physical therapy industry.[204] Morelli also was extremely successful in selling his vision to others and getting them to join him. Fearon and Levine sold their successful consulting company to Optimis in an all-stock transaction, and the Director Defendants did likewise with respect to Rancho. All of the Company's other acquisitions of physical therapy businesses appear to have been stock-for-stock transactions as well.

On the other hand, numerous witnesses convincingly testified that Morelli was controlling, belittling to others, dismissive, intolerant of dissent or criticism, and had poor communication skills. Indeed, some of the most striking testimony came from Plaintiffs' own witnesses. Kevin Owens, Plaintiffs' first witness, is illustrative. Owens competed in international athletic events and had a marketing background. He began consulting for the Company in 2007 or 2008 and remained until May 2011. He was married at the time to Joan Lynch, an employee of ESPN who also consulted for Optimis. Owens admired Morelli and viewed him as a mentor. While at Optimis, Owens worked with the OptimisSport team and assisted with some of the Company's events, such as the Distance

---

[204]     *E.g.*, *id.* at 1503 (Atkins: stating that he wanted Morelli to remain a consultant even after being fired as CEO because "I wanted to have access to his mind, his vision, those kind of things"); *id.* at 1568 (Levine: "Alan is a CEO, he's a visionary . . . his talent is not in operations. . . . But he is a great visionary."). Rohlinger characterized Morelli as "a very smart man" who "had great vision for" Optimis. Rohlinger Dep. 285.

Swim Challenge (the "DSC").[205] He was to be paid for his work entirely in stock options, but he apparently never received any.[206]

After moving to L.A. in early 2011, Owens worked out of the Upper Bubble. Although he tried to become more involved with selling the Sport and PT products, Morelli forced Owens to focus only on the DSC. According to Owens, Morelli "put me in . . . literally a back room with a phone and said, 'You are to call swim sponsorships and get them.'"[207] On at least one occasion, Morelli actually screamed at Owens to go and find sponsorships.[208] Owens understandably "was not very happy with this, being belittled or treated in that way."[209] Although he had learned that others in the Company opposed the DSC as a waste of money, Owens did not bother telling Morelli because Morelli "wasn't listening to a single word I said, and it wouldn't have mattered, so I didn't bring it up."[210] When Owens attempted to follow up on customer contacts, Morelli either prevented him from doing so or else insisted that any emails to customers be

---

[205] Tr. 6-22, 39 (Owens). I describe the DSC *infra*. In brief, it was a marketing event that Optimis held three consecutive years that was designed to draw attention to the Company and the *Sport* product. The event involved mainly a long-distance swim, but participants also could do shorter swims.

[206] *Id.* at 24. The Company also refused to pay for Owens's expenses to relocate from the East Coast to L.A. *Id.* at 78.

[207] *Id.* at 58.

[208] *Id.* at 122.

[209] *Id.* at 58.

[210] *Id.* at 70.

cleared by him first. Owens found, however, that Morelli was slow or nonresponsive in replying to his draft emails.[211]

Owens described the situation as "demoralizing at best" and the working environment at Optimis as "utterly dysfunctional."[212] After yet another instance where Morelli told Owens not to deal with potential customers, but instead just to sell swim sponsorships, Owens attempted suicide.[213] Yet, even after that, Owens determined to make one last effort with Optimis.

In late April or early May 2011, Owens sent Morelli a proposal (the "Owens Proposal") that would shift Owens from selling swim sponsorships to running sales for Optimis, which is how Owens believed he would be most beneficial to the Company. In exchange, Owens proposed that he receive up to 10% of revenue.[214] The relative merit of the Owens Proposal is immaterial. What is relevant is Morelli's reaction to it.

In an email to Horne, Waite, and Rohlinger, Morelli referred to the Proposal as "Kevin's bizarre ultimatum" and viewed it as a "very blunt power play" by Owens and his wife that they "intended to use . . . to exert undue influence to coerce me/us into

---

[211]    *Id.* at 131-32.

[212]    *Id.* at 78, 79.

[213]    *Id.* at 81.

[214]    *Id.* at 85-87; JX 101.

71

giving Kevin an inappropriate amount of power and compensation and her a direct stock option deal."[215] Morelli, who was the best man at Owens's wedding in 2010, continued:

> Don't be misled by the fact that it resembles a Unabomber-type manifesto, written by a slow 5th grader; it is an ultimatum, designed to use (read: mis-use) the authority given to Joan . . . as a way to pressure us to give Kevin 10% of all our sales, whether or not he is involved, and be able to exert contractual rights that manipulate our ability to hire, etc., restricting the company's ability to make sound business decisions due to his undue influence. This might not be so bad except for the fact that Kevin is child-like, never does what he says and he craves power like Will craves Starbucks coffee. . . . That itch you are feeling to push the green button is all part of a coercive, Pavlovian divide-and-conquer strategy by Joan and Kevin, which is a little bit juvenile and a lot of bit corrupt.[216]

At trial, Morelli reiterated that he viewed the Owens Proposal as a corrupt blackmail attempt.[217] After Morelli rejected his proposal, Owens left the Company.

Other witnesses for Plaintiffs echoed some of Owens's concerns. Fearon complained about Morelli's non-direct management style and "very poor" communication, testifying that "communication would often be diverted, or you'd send communication and then not hear anything and then not know how to direct your actions."[218] Others at the Company counseled Fearon against directly voicing complaints to Morelli, warning her "that this is not something that is going to go well if you try to

---

[215]   JX 102.0001 (5/4, 5/5 emails from Morelli to Waite, Horne, and Rohlinger).

[216]   *Id.* at .0002.

[217]   Tr. 510, 513-14.

[218]   *Id.* at 690, 749.

address it head on."[219] Levine confirmed that it was difficult or impossible to approach Morelli directly with problems, particularly alone.[220] Morelli on at least one occasion discouraged him from attending a board meeting and, on multiple occasions, chewed Levine out for raising concerns.[221]

Levine also observed what he "believed to be paranoid behavior" and discussed the concept of "Alan's shiny penny." The "shiny pennies" were new people "with new ideas, and they would have Alan's ear for a while. And then, typically, most of those individuals either fell into bad graces or would challenge Alan to a direction, different than he wanted to go," and then Morelli would move on to a new "shiny penny."[222]

Olsen, a non-party witness called by Defendants, also testified about Morelli's behavior. As previously noted, he believed a "very threatening type of atmosphere" existed at Optimis following the Director Defendants' termination.[223] In addition, Olsen

---

[219] *Id.* at 703-04 (Fearon). Her contemporaneous emails comport with this testimony. JX 196.0001 (5/2/11 email from Fearon to Gunn: "I have nothing to lose . . . if Alan goes off . . it is just one more incidence where he discounts a key individual in the company . . . further weakening the structure."); *see also supra* notes 113-14.

[220] Tr. 1613 ("I think my deposition lays out several very what I would call volatile conversations between Alan and myself. . . . And so I knew for me, specifically, that . . . I was not going to put myself in that situation again. Certainly not alone.").

[221] *Id.* at 1614 (Levine).

[222] *Id.* at 1614-15. *See also* Gunn Dep. 63 ("The running term around the office are [sic] 'new shiny pennies,' whether those are new individuals or new projects.").

[223] Tr. 1214.

73

described a meeting where one of the Rancho therapists asked Morelli when the Director Defendants were going to come back and "Morelli pretty much exploded on [the person]. And it was at that point that kind of everybody was taken aback. At that point, communication, all communication stopped."[224] This testimony is consistent with Atkins's recollection of a Board meeting where Godges, a revered figure in the physical therapy community, asked some questions about Optimis*Sport* and Morelli "really went off on him in a way that was almost shocking. I've never seen someone treated that way in a professional setting."[225] Smith similarly described the incident, testifying that Morelli "completely unloaded on him. I was—frankly, I was taken back by how rude and how condescending and how mean he was to Mr. Godges. . . . I mean, the meeting got deathly quiet. He just—he humiliated him in front of us."[226] As a result, Smith stated: "I don't think anybody really wanted to step up and confront [Morelli], you know, with anything at any of the board meetings for fear that he was going to lambaste you and basically put you in your place."[227] Although Defendants obviously have a fair amount

---

[224]     *Id.* at 1215.

[225]     *Id.* at 1465.

[226]     *Id.* at 1260.

[227]     *Id.* at 1260-61. Horne testified that "Alan had a way of alienating people that he was upset with." *Id.* at 1319. Waite also stated that Morelli "doesn't take disagreement very well. He doesn't like it very much when people disagree with what he's doing or question sort of how things are being run." *Id.* at 1041. Consistent with these descriptions, Geller testified that "I could have an opinion that went against him, but I think that became less tolerable as it went along. . . . I

74

of animosity towards Morelli, I credit their testimony on his management style, because it comports with that of Plaintiffs' own witnesses.

### E.     Optimis Grows, Software Development Lags, Frustration Begins

The record contains little information on the early years of Optimis following the Rancho acquisition in June 2007. Olsen described Rancho's performance as an Optimis subsidiary as "[s]tellar."[228] The Director Defendants received all of the incentive bonuses under their Employment Agreements.[229] After Rancho, the Company completed several other acquisitions and eventually grew to fifty-one clinics.[230]

In early 2009, Morelli asked Waite to serve as the COO of Optimis, and Waite agreed. In November of that same year, the Company launched OptimisPT at the largest annual conference of private practice physical therapists.[231] According to Waite, "it

---

just had to say what he thought I should say, or he would react poorly. . . . He would almost try to punish somebody in a juvenile way." Geller Dep. 21.

[228]   Tr. 1206.

[229]   Morelli now believes that "those [bonus] calculations are highly suspect in hindsight" and contends that "those calculations are very much in dispute." *Id.* at 576. But, there are not any claims in this litigation challenging those payments.

[230]   Between 2007 and 2009, the Company acquired nine physical therapy companies: Rancho Physical Therapy, MVP Physical Therapy, Achieve Physical Therapy, Fortney's Physical Therapy, Fearon Physical Therapy—which was owned by Helene Fearon's husband—Beachside Physical Therapy, Cascade Physical Therapy, Sovereign Physical Therapy, and Schrier Physical Therapy. *Id.* at 282 (Morelli). Fearon, Schrier, and Sovereign exercised their rescission rights under their acquisition agreements and left the Company. I excluded claims relating to those rescissions from this action in my previous Memorandum Opinion. *OptimisCorp*, 2015 WL 357675, at \*12.

[231]   Tr. 687 (Fearon).

exceeded all of our expectations in terms of the reception that we got in the marketplace."[232]  Later in 2009, Optimis started raising capital, using a private placement memorandum ("PPM").[233]  Waite participated and also sold his family and friends on Optimis.  Smith similarly raised funds for the Company from his family, with his mother investing $80,000, his younger brother investing $200,000, and some of his friends investing a total of $50,000.[234]

The early years of the Company appear to have been successful.  Fearon described the atmosphere then as good and the relationships among the executives as "collaborative, friendly, a lot of joking around."[235]  Trouble began in the latter half of 2010.  By that time, both the PT and Sport products were in development and were competing for limited resources.  The Director Defendants had been with the Company for three years, and the promised liquidity event was nowhere in sight.  Additionally, the Company began spending its limited money on marketing events, geared more for the then-conceptual Sport product.

One of those events was the Optimis*Sport* DSC.  The DSC, which was conceived of by Morelli and promoted as the world's longest open-water swim, took place in Santa Monica Bay.  The purpose of this product-branding event was to "show the general

---

[232]     *Id.* at 1025 (Waite).

[233]     JX 75.

[234]     *Id.* at 1257-58.

[235]     *Id.* at 686.

population what the human body can do" and encourage people to "just get up and move."[236] The capstone of the event was the 12.6 mile swim, although it also included shorter swims of 4.8 and 1.2 miles. Tapping Joan Lynch's contacts at ESPN, the 2010 event received significant coverage, both in advance and of the actual event itself, including from sources other than ESPN. Between 150 and 200 swimmers participated in the inaugural event, which was held in October 2010.[237] Overall, Owens thought the 2010 event went "very well," and Morelli considered it a success.[238]

Plaintiffs claim that Defendants tortiously interfered with the DSC. The event was held for three consecutive years: 2010, 2011, and 2012. Plaintiffs' allegations with respect to this claim are vague and it remains unclear whether they allege tortious interference as to all three years or one year in particular. The only evidence relating to potential interference with the 2010 event relates to Waite. He swam the 1.2 mile distance in the 2010 DSC.[239] According to Owens, he met Waite at the event and said to him, "This is great" to which Waite replied "Yeah, but this is a big waste of money and we're not going to do it again." Waite denied Owens's account, but even assuming Owens's recollection is correct, I find it immaterial. It is undisputed that Waite did

---

[236] *Id.* at 33 (Owens).

[237] *Generally id.* at 30-39.

[238] *Id.* at 33 (Owens); *id.* at 338 (Morelli).

[239] *Id.* at 1030-31 (Waite).

77

participate in 2010 and there is no evidence that he did anything to interfere with the event that Morelli agreed was successful.

The bigger problems at Optimis in 2010 related to the software. Although the launch of the PT product in 2009 was successful, Optimis struggled to improve upon it. In November 2010, the Company's employees again displayed the PT product at the private practices conference where they had received a good reception the previous year. The Company had added certain new aspects to the PT product, but they apparently were not entirely ready for release. As Fearon testified: "[A]t that meeting, I experienced being very disappointed in how we presented our product, because part of our product was really good, and the public was asking for more. And the other part of our product . . . it was kind of not well-formed or it was half-baked . . . ."[240] Fearon and Levine were highly respected consultants to the physical therapy market, and their recommendation of the PT product was likely to cause more therapists to acquire it. By the same token, Fearon and Levine had a vested interest in seeing that the product succeeded, because they were putting their reputations on the line in standing behind PT. In that context, I consider it important that Fearon believed Morelli was devoting insufficient resources to PT to enable Optimis to meet market expectations.[241] Substantial resources were being devoted instead to Optimis*Sport* and the DSC.

---

[240] *Id.* at 687.

[241] *Id.* at 688-90.

Plaintiffs have accused Defendants and others of hiding their frustration with Optimis' resource allocation from Morelli and secretly opposing Sport. The evidence does not support these allegations. Morelli knew about the frustration. Plaintiffs' witness David Hwang was Optimis' Director of Branding and worked on marketing and graphic design for the Sport product. He told Morelli in 2010 that other employees had a negative view of Optimis*Sport*.[242] Morelli dismissed his concerns, however, and told Hwang he was being negative and needed to learn to work better with others.[243]

Plaintiffs also relied heavily on an email chain among the Director Defendants from November 30 through December 1, 2010 (the "2010 Emails").[244] According to Plaintiffs, this email chain evidences a conspiracy and reveals that the Director Defendants were plotting to seize the Company as early as November 30, 2010. The conspiracy allegedly came to fruition almost two years later with Morelli's ouster on October 20, 2012. In the email chain, Defendant Smith expressed concerns about the status of OptimisPT and suggested raising them directly at an upcoming Board meeting. Plaintiffs focus on the following two lines from Waite's response: "If we were to create that confrontation at the board level, then we must be in a position to do what would amount to a hostile take over. I am not sure that is what we want to do right now."[245]

---

[242]    *Id.* at 159-61 (Hwang).

[243]    *Id.* at 232.

[244]    JX 84.

[245]    *Id.* at .0001 (11/30/10 email from Waite to Smith and Atkins).

At trial, the Director Defendants testified—credibly, consistent with the text of the emails, and in accordance with Fearon's testimony—as to the context of the 2010 Emails. Kim Frost, a Rancho employee, had discussed with Smith and Atkins that the PT software was experiencing problems whereby Rancho was "actually losing charges."[246] Smith explained that the PT software was dropping charges and that "[d]ropped charges basically means you lose revenue. So if you drop charges and they go away, if they disappear, it's difficult to recapture that."[247] Accordingly, I find that in late 2010 instability of the PT software and slower than expected improvement of that product were serious problems for the Company.

The 2010 Emails, when read in full, actually demonstrate the opposite of what Plaintiffs contend. Because Plaintiffs relied on these emails as evidence of a conspiracy, I quote them at some length. The first email is a message Waite forwarded from Frost that discussed PT software errors relating to charges.[248] Smith then replied to Atkins and

---

[246]    Tr. 1038 (Waite).

[247]    *Id.* at 1265; *id.* at 1469 (Atkins: "And not that I'm a software genius in any shape or form, but I know that the entire company ran off of this software. And so it looked like this was going to explode. And this, in my mind, looking forward, was going to . . . have a tremendous negative effect on not only just Rancho. Since Rancho was about 70 percent of the income of the entire company, if this were to happen, this would be catastrophic.").

[248]    JX 84.0002 (11/30/10 email from Frost to Director Defendants and others: "Yesterday I found about 8 errors on the Charge approval screen . . . . Today I moved on to testing the batching process and have found some other errors that have been written up . . . .").

80

Waite. Smith first mentioned the "fragility of our current situation as it relates to our data bases in V1 and CS [OptimisPT] software" and then wrote:

> We also need to discuss our game plan for the board meeting. We are at a critical juncture and we need to address the concerns at the meeting. We also need to discuss the poor financial budgeting and lack of fiduciary responsibility as it relates to expenses Optimis is incurring. I know everyone is concerned and we should discuss how we plan on broaching this at the meeting. As the three largest shareholders, there is a lot at stake for all of us.[249]

Atkins testified that Smith is the most confrontational of the three Director Defendants.[250] This is consistent with Smith's demeanor at trial and his testimony.[251] Smith described Waite as someone who was less confrontational and would calm him down.[252]

Waite responded to Smith's email by advising against confronting Morelli directly. Waite's email stated, in part:

> I have come to believe that we need to think carefully about our approach and keep in mind our goal, which is to create a liquidity event for all of us. Upon reflection, I am not sure that confronting this situation at a board meeting with other[s] present is the best approach to getting us to our goal of liquidity. I am afraid that confronting Alan at a board meeting, in front of colleagues, embarrassing him in his home will make us feel better in the short term, but in the long run will likely result in some rapidly deteriorating issues of

---

[249] *Id.* at .0001-.0002 (11/30/10 email from Smith to Atkins and Waite).

[250] Tr. 1469.

[251] *Id.* at 1267 (Smith: "But I was really fired up. Frankly, I wanted to confront Mr. Morelli and confront the development team and say, you know, 'You guys got to figure this out.'").

[252] *Id.*

management which may create significant negative effects on operations which may include litigation, etc. If we were to create that confrontation at the board level, then we must be in a position to do what would amount to a hostile take over. I am not sure that is what we want to do right now.

Alan is hell bent on creating a listing of a class of equity in 2011. That is our goal as well. He has deep connections which are likely to make that process go more smoothly and get us a better outcome.[253]

Atkins wrote back: "I have to agree that now is the time to keep the wheels on so we can get to the finish line," which was always the liquidity event.[254]

Atkins further testified that "John [Waite] was our conduit to Optimis. If we wanted to have a connection to the Optimis folks, John was that."[255] As COO of Optimis, Waite had the most interactions with Morelli and was most aware of Morelli's character and behavior, which I described at length *supra*. I find nothing nefarious, therefore, in Waite's counseling against confronting Morelli directly about development of the PT software, for which Morelli, as CEO, was responsible, and fearing that a confrontation would be counterproductive. Conversely, I reject Plaintiffs' assertion that the 2010 Emails reveal a conspiracy. Instead, particularly against the backdrop of the other evidence, those emails show three large stockholders frustrated with the CEO and concerned that the PT software's instability could threaten the Company's future. I also

---

[253] JX 84.0001 (11/30/10 email from Waite to Smith and Atkins).

[254] *Id.* (12/1/10 email from Atkins to Smith and Waite). *See also* Tr. 1471 (Atkins); *id.* at 1267-68 (Smith).

[255] Tr. at 1470.

82

do not view the 2010 Emails as suggesting that the Director Defendants were hoping to take control of Optimis for their own self-interest or otherwise seeking to gain a benefit not available to all stockholders. Rather, the most reasonable inference from those emails is that the Director Defendants' primary interest was in continuing to work to achieve a liquidity event that would benefit everyone, which included working with Morelli on raising capital.

In sum, based on the foregoing evidence, I find that none of the evidence regarding events that occurred in 2010 provides any material support for Plaintiffs' various theories of liability.

### F. 2011: Software Development Stalls, Employees Battle Over Resource Allocation, Frustration with Morelli Increases

The state of affairs at Optimis continued going downhill in 2011. Much of the evidence in this case focuses on 2012, but Plaintiffs contend that Defendants, and particularly the Director Defendants, were engaged in a conspiracy during the entirety of 2011. Despite this allegedly ongoing conspiracy, there is little evidence of any purportedly wrongful action in 2011.

Virtually no significant improvements were made on OptimisPT during 2011.[256] Hwang testified that he was told in 2011 not to work with the developers on Sport, which he understood to mean that the developers were being shifted to PT, and he reported that

---

[256] *Id.* at 756 (Fearon).

to Morelli.[257] According to Hwang, "[e]verybody reported directly to Mr. Morelli."[258]  In these circumstances, I find that, more likely than not, Morelli did know in 2011 about the unhappiness among some of the Company's employees over allocating resources to Optimis*Sport* instead of OptimisPT.

Owens also testified about 2011.  While he was working on the DSC, Owens met with Horne, the CFO, at Starbucks in March 2011.  Horne allegedly told Owens: "The swim is not going to happen this year.  The board's not behind the swim.  It's a waste of money."[259]  Horne further allegedly said "Alan will be out in six months if we don't go public. . . . So just keep your head down and keep your mouth shut."[260]  Horne denied saying these things.[261]  Regardless, Owens testified that, notwithstanding what Horne allegedly told him, he continued to work on the 2011 DSC to the best of his ability.[262]

---

[257]     *Id.* at 255-56.

[258]     *Id.* at 255.

[259]     *Id.* at 54 (Owens).

[260]     *Id.* at 56.

[261]     *Id.* at 1321-22.  In many respects, Owens's testimony on behalf of Plaintiffs, and especially Morelli, did more harm than good.  I found Owens to be a well-meaning, but easily manipulated person.  Despite the extremely poor work environment at Optimis, including Morelli's demeaning treatment of him personally, Owens later emailed Morelli in April 2013 offering unsolicited aid and stating "you are and always have been a friend."  JX 743 (4/18/13 email from Owens to Morelli).  To the extent Owens offered testimony favorable to Morelli, I found that evidence unreliable and biased.

[262]     Tr. 127-28.

As further evidence that Defendants allegedly interfered with the 2011 DSC, Plaintiffs point to the fact that the LA Tri Club withdrew their sponsorship of the event. Owens testified that he met with Paul Hekimian, an Optimis consultant and the head of the LA Tri Club, regarding the 2011 DSC. Rohlinger participated in that meeting by phone and Owens allegedly heard Rohlinger say "We're not even going to have that event this year."[263] Plaintiffs aver that Rohlinger's comment caused the LA Tri Club to withdraw their sponsorship, but they failed to prove that such a causal connection exists. The LA Tri Club not only withdrew their sponsorship of the DSC for 2011, but also revoked Morelli's membership.[264] Indeed, several members from the LA Tri Club sued Morelli because they never received the stock options they were promised for assisting with the 2010 DSC.[265]

As previously mentioned, Owens had left Optimis by May 2011. The DSC happened later that year. Waite again swam in the event, participating in the 2.4 mile swim.[266] Morelli again described the event as successful, with about 400 participants, including some celebrities, and some television coverage as well.[267]

---

[263]     *Id.* at 63-66.

[264]     *Id.* at 344-45 (Morelli).

[265]     *Id.* at 345 (Morelli).

[266]     *Id.* at 1031.

[267]     *Id.* at 346-47.

The other event of note in 2011 was the opening of a physical therapy clinic in Pacific Palisades. Morelli knew Tina Geller through the LA Tri Club and he recruited her to join the Company in February 2010. In October or November 2011, Optimis opened the Pacific Palisades clinic that was to be run by Geller. That clinic "was Alan's idea to promote the OptimisSport software . . . . He called it a Petri dish for the OptimisSport software."[268]

At the end of 2011, the Company again was in need of capital. In December 2011, Optimis had another PPM prepared. The Director Defendants—who, according to Plaintiffs, were over a year into their conspiracy to "sabotage[e] the Company's strategic plan"[269]—again answered the call. Optimis raised about $860,000, almost all of which came from two people: a friend of Waite's and Atkins's brother-in-law.[270]

### G.  The February 2012 Chicago Conference

In 2012, the alleged conspiracy gained speed. The first activity occurred in February 2012. Although the Company largely operated remotely, employees and executives would meet at various times throughout the year at conferences and conventions. One of those conferences was the combined sections meeting, a physical therapy conference, in February 2012 in Chicago (the "February 2012 Conference"). Attendees included Horne, Rohlinger, Geller, Morelli, Gunn, Fearon, and Levine.

---

[268]   Geller Dep. 13.

[269]   POB 45.

[270]   Tr. 1322, 1335-36 (Horne); *id.* at 1467 (Atkins).

Before Geller became the director of the Pacific Palisades clinic, her position at the Company was not entirely clear.[271] She apparently was involved in Optimis*Sport*, but also seems to have functioned as Morelli's personal physical therapist. The oral sex incidents began in mid- to late-2011 and gradually ended as she started working more at the Palisades clinic in spring of 2012. Geller began working at the clinic part time when it opened in late 2011 and worked there full time by April 2012.[272]

Geller described the February 2012 Conference at her deposition. I find her account credible and largely consistent with Horne's recollection. One evening at the conference, Morelli asked Geller to perform physical therapy on him and then he "tried making sexual advances," but Geller avoided them, saying she had to meet the rest of the Optimis employees downstairs.[273] She ended up at the hotel bar. A group of employees was returning from dinner and Horne apparently was among them. He saw Geller at the bar and, according to Horne, she motioned for him to join her. He did.[274] The two spoke for a period of time, which Horne described as 20-30 minutes[275] and Geller recalled being about an hour.[276]

---

[271] Geller Dep. 11 (describing unclear job duties and stating that Optimis was her "first corporate job" so she did not know that this was unusual).

[272] *Id.* at 19, 29.

[273] *Id.* at 51-52.

[274] Tr. 1338, 1409-13 (Horne).

[275] *Id.* at 1412.

[276] Geller Dep. 52.

According to Geller, Morelli was mentioned while she and Horne were talking and she commented to the effect that "if he ever lays his hands on me again, I might just kill him."[277] Horne's recollection is that Geller said that "while she was at his [Morelli's] house in Palisades, the upper bubble, Alan had inappropriately touched her during a PT session. She said he was incredibly upset at her and threw her out of the room when she questioned him on his behavior."[278] Horne also testified that he explicitly asked Geller whether it was sexual harassment, which he had an obligation to report.[279] Geller did not mention that, but they both testified that Geller asked Horne not to tell anyone, to which Horne agreed.[280] Horne attributed Geller's remarks about Morelli to "a one-time event, a misunderstanding. I didn't believe it was sexual harassment. I didn't believe Alan would have done anything."[281] He then offered Geller the use of his apartment in Pacific Palisades. He confided in her that he was not using it because he was staying with Morelli's former wife. According to Horne, he "just figured if [Geller] was using it, that would eliminate any possibility of this happening in the future and just eliminate the situation."[282] Geller similarly testified that she believed Horne offered her the apartment

---

[277]    *Id.* at 51.

[278]    Tr. 1339.

[279]    *Id.* at 1339, 1413.

[280]    *Id.* at 1339; Geller Dep. 55.

[281]    Tr. 1340.

[282]    *Id.*

"to get me to not to have to stay at Alan's place anymore."[283]  Horne evidently allowed Geller to use his apartment rent-free.

Notwithstanding Horne's promise not to tell anyone what Geller told him, he soon told Rohlinger.  Horne testified that this conversation—which he allegedly forgot to disclose in his interrogatory answers in this case—occurred within days, or at most two weeks, of the February 2012 Conference.[284]  Horne said that he called Rohlinger to determine whether he should report the incident to Kreile in HR.  According to Horne, Rohlinger told him to report it, but he convinced himself not to.[285]  Rohlinger vaguely recalled the conversation with Horne when asked about it at his deposition.  He testified that it occurred in Chicago at the conference, possibly in person, and that Horne mentioned inappropriate touching.  Rohlinger did not remember any further details, and said that he concluded that he personally had no obligation to report the matter.[286]

Levine also attended the February 2012 Conference and testified about a matter unrelated to Geller.  According to Levine, he spoke with Waite, who told him that, shortly after Rancho became a subsidiary of Optimis, Morelli had told Waite that "at some point he would need to step away as managing the company, but that that was

---

[283]  Geller Dep. 84.  Geller's husband also worked for Optimis.  His exact job is unclear, but he appears to have been involved in Optimis*Sport*.  The record does not indicate where the Gellers lived, but it seems that, at least on some occasions, Geller stayed at the Upper Bubble when working late.

[284]  Tr. 1414-15.

[285]  *Id.* at 1342-44.

[286]  Rohlinger Dep. 50-55.

89

going to be hard.  Alan recognized his control issues, and that he may need to be sort of assisted out of that role, or sort of, you know, pushed out of that role if he continued to take control."[287]  According to Levine, Waite then said: "You know, we may just need to give Alan a nudge."[288]

## H.    Suspicious Events Immediately After the February 2012 Conference

According to Plaintiffs, after Horne told Rohlinger about the sexual harassment allegations, Rohlinger told Waite, but that is heavily disputed.  Based on the latter allegation, Plaintiffs suggest that Waite and his alleged co-conspirators waited seven months until September 2012 to use those allegations as a pretext to remove Morelli from power.

As the reader may have noticed, there is little, if any, evidence tying either Atkins or Smith to the actions taken by Waite or evidence tying Horne to any of the Director Defendants.  Rohlinger, according to Plaintiffs, is the link.  Rohlinger was the Company's Idaho-based Chief Business Development Officer.  He is not a defendant, but allegedly is a member of the conspiracy.  He did not testify at trial, but he was deposed.  Plaintiffs' position is that Rohlinger was Waite's close friend and that Rohlinger, therefore, would have told Waite about what Horne told him.

Rohlinger is a former investment banker with an MBA from Harvard Business School.  He, too, met Morelli through the LA Tri Club and worked for the Company from

---

[287]    Tr. 1568.

[288]    *Id.*

90

April 2009 through June 2013.[289] Initially, Rohlinger worked with the Software Division and was tasked with overseeing the development of OptimisPT. In late 2010 or early 2011, however, he was reassigned to the Clinical Services Division. According to Morelli, Rohlinger thereafter had no technical duties "based on the reporting structure" of the Company, but he "crept back into it almost like an alternative management team."[290] Rohlinger, by contrast, did not view the transition as "that black and white."[291] Like other witnesses, he testified that the Company lacked a formal organization chart.[292] Once Rohlinger joined the Clinical Services Division, he and Waite developed a "very good professional relationship" and they spoke almost daily.[293]

Rohlinger did not recall discussing with Waite, or anyone else, the incident that Geller told Horne about and Horne subsequently relayed to Rohlinger.[294] Likewise, Waite denied that Rohlinger ever told him about his conversation with Horne.[295] Plaintiffs contend that the most reasonable inference from the evidence is that Rohlinger did tell Waite. I return to this issue later, but I note that, even if Waite was told, the

---

[289]   Rohlinger Dep. 14-16.

[290]   Tr. 359.

[291]   Rohlinger Dep. 17.

[292]   *Id.* at 19; *e.g.*, Gunn Dep. 22-23.

[293]   Rohlinger Dep. 287-88.

[294]   *Id.* at 56, 95-96, 337.

[295]   Tr. 1120-21.

evidence at most would support a finding that he was aware of one incident of inappropriate touching between Morelli and Geller. The actions that Geller later revealed to Solomon were more explicit and there is no evidence that Waite, Horne, or Rohlinger knew of those allegations before the investigation into Geller's claims.

Two other events occurred shortly after the February 2012 Conference that Plaintiffs contend support both the Horne-Rohlinger-Waite inference and a conspiracy generally. Defendants offer neutral explanations for these events. Plaintiffs have the burden of proof.

### 1. Circulation of the Optimis Sexual Harassment Policy

The first event relates to Waite allegedly finding out from Rohlinger about Geller's complaint regarding Morelli's behavior. Shortly after the February 2012 Conference, sexual harassment compliance materials were circulated around the Company. Plaintiffs contend that Defendants caused these materials to be circulated. Their theory appears to be that Defendants were attempting to alert Geller to the possibility that she could bring a claim against Morelli. The problem with this theory, despite the suspicious timing, is that the sexual harassment policy apparently was circulated largely by Kreile, in her Human Resources role, and Jessica Eastman, Morelli's assistant.[296] Additionally, Morelli was copied on one of the emails circulating

---

[296]  JX 123 (2/15/12 Kreile Memo re: Sexual Harassment Procedures); JX 124 (2/15/12 email from Kreile to Waite and Rohlinger); JX 133.0001 (2/21/12 email from Kreile to Horne: "Hi Will, attached is our sexual harassment policy. The first attachment describes our policy and you can use your judgment whether you wish to distribute it to Optimis managers. Required is the distribution of the actual

the sexual harassment policy, so this distribution was not secretive.[297] Waite described

Kreile's email as routine, annual sexual harassment training.[298] Rohlinger recalled

nothing about this subject.[299] Kreile testified at her deposition that "ideally every year the

sexual harassment pamphlet and policy would go out," and she attributed her email to

Rohlinger and Waite as being related to that goal.[300] There are emails from both 2010

and 2011 relating to sexual harassment training, but not a circulation of the sexual

harassment policy.[301]

---

policy to all employees. Please let me know if you prefer that I send to Jessica [Eastman, Morelli's assistant,] for distribution or if you wish to handle. This is required by California law and we need to proceed asap. . . . I ask that Jessica collect the signature sheets from all Optimis employees and return to me . . . ."); JX 137.0001 (3/2/12 email from Eastman to Horne, Kreile, and Waite: "Hi Nancy – I'll get this started on our end. If you could handle the team in Murrieta, that would be great.").

[297] JX 138 (3/2/12 email from Eastman to Morelli and many others). Notably, Kreile specifically acknowledged receipt of Geller's signature. JX 139.0001 (3/2/12 email from Kreile to Eastman, Waite, and Horne: "I already have this back from Tina, as she was included in the Rancho directors distribution."). Given the events that unfolded, this specific mention seems suspicious. But, by virtue of running the Pacific Palisades clinic, Geller also was the only Optimis employee working at a clinic; all of the other clinics were run by the subsidiaries. Waite, as COO, had primary responsibility for the clinics.

[298] Tr. 1051-52.

[299] Rohlinger Dep. 89-99.

[300] Kreile Dep. 119.

[301] JX 1113 (8/11/10 email from Morelli to Kreile and others regarding sexual harassment training); JX 1115 (1/21/11 email from Kreile to Eastman regarding Morelli's sexual harassment training).

## 2.    Circulation of the Stockholders Agreement

The other event relates to the Stockholders Agreement.  On February 20, 2012, Horne sent the Stockholders Agreement to Rohlinger as an attachment to an email sent from Horne's personal email account to Rohlinger's personal email account.  The email contains no text.[302]  Later that day, Rohlinger forwarded the email to Waite's personal email account, also without text.[303]  Plaintiffs contend that these emails show members of the conspiracy planning their next moves on how to remove Morelli from power.

Waite did not recall why the Stockholders Agreement was being circulated.[304] Horne testified that he sent the document to Rohlinger, because Rohlinger had just discovered its existence, considered it material, and was unhappy that it had not been disclosed in the Company's previous PPMs.[305]  Horne believes he used his personal email because it was the one that was open when Rohlinger called him and asked about the Stockholders Agreement.  To the extent Rohlinger had any recall about the February 2012 circulation of the Stockholders Agreement, he testified that he was surprised when he found out about the existence of the Stockholders Agreement.[306]  Additionally,

---

[302]    JX 130.

[303]    JX 129.  Waite responded to this email the next day, writing: "I don't see the changes as significant.  Compare the MVP doc to this one which is Rancho and see what you think." JX 132.0001.  The record contains no explanation of the subject to which Waite was referring.

[304]    Tr. 1144-46.

[305]    *Id.* at 1335-38.

[306]    Rohlinger Dep. 100-05.  *See also id.* at 78-79 (discussing PPMs).

differences in the PPMs themselves comport with Horne's testimony. Neither the 2009 PPM nor the 2011 PPM disclosed the Stockholders Agreements, but the June 2012 PPM did.[307]

## I. During 2012 Tensions Over the Company's Direction Approach the Breaking Point

### 1. No confidence in Morelli

By spring 2012, many key employees had lost faith in Morelli's ability to manage the Company successfully. A group of at least five people—Gunn, Rohlinger, Waite, Fearon, and Levine—appear to have been engaging in a regular practice of using personal emails to gripe about their unhappiness about Morelli.[308] Resource allocation issues were high on the list of concerns, and morale was low.[309] The goal of these back-channel

---

[307] *Compare* JX 75 (2009 PPM), *and* JX 37 (2011 PPM), *with* JX 229.0012 (June 2012 PPM disclosing the Stockholders Agreement). The disclosure, listed under the "Risk Factors" section of the PPM, includes the subheading: "The majority of our shareholders have entered into a Stockholders Agreement which provides our Chief Executive Officer with the right to designate the majority of our Board of Directors." JX 229.0012.

[308] *E.g.*, JX 192.0001 (4/29/12 email from Gunn to Waite, Rohlinger, Levine, and Fearon: "I have used our non Optimis emails for this type of communication and would request we continue to use those as we have this discussion."). Waite could offer no explanation for the use of personal emails. I find Gunn the most credible witness on this point. She testified at her deposition that by spring 2012 she felt Morelli "was more than likely monitoring emails." Gunn Dep. 75. *See also* Jim Lynch Dep. 27 ("I felt uncomfortable having those conversations on work e-mail. At some point, I was told that it would not be unusual to have someone go through those e-mails and look at them.").

[309] JX 192 ("Alan is focussing [sic] on all products that do not involve OptimisPT and is treating this team poorly."); Tr. 695-97 (Fearon). One line of questioning of Fearon misleadingly suggested that it was the back-channel criticisms of Morelli that were bringing down morale. Tr. 701. Further questioning, however, clarified

discussions, according to Fearon, was trying to "effect change" and "[t]rying to get something done that would help us accomplish the goal of the OptimisPT product."[310]

Fearon provided the clearest testimony on the problems in this timeframe. She began holding off on pursuing various opportunities that could have been good for the Company because she "didn't feel confident in my CEO because of . . . the way he communicated."[311] For example, Fearon had business contacts with a company named WorkWell, but the business relationship with WorkWell failed because "Alan had difficulty communicating in some of our meetings with their executives."[312] Fearon also described an opportunity for Optimis at a university-based hospital system that did not materialize "because we couldn't get our act together to be able to have the software be at

---

that she perceived morale to be low because of decisions about product "development or resources" that were the responsibility of Morelli. *Id.* at 702.

[310] Tr. 697-98. In May 2012, Fearon emailed Gunn that Rohlinger had told her that he was "undertaking an effort to see what actually would be involved in taking control of parts of the company and leaving others to those that are engaged there." JX 196 (5/2/12 email from Fearon to Gunn). Though they have highlighted this email's existence, Plaintiffs have failed to offer a cogent explanation of its import. Additionally, because I find that there is no conspiracy, use of this email to prove a takeover plot by Defendants would make it hearsay and, therefore, inadmissible.

[311] Tr. 707.

[312] *Id.*

96

a level where we could actually do that type of integration."[313]   She provided other examples as well.[314]

It also seems that several opportunities failed because OptimisPT had not reached the desired level of development, which Fearon blamed on the resource allocation decisions made by Morelli.  In her words, she held off on pursuing opportunities because "what I was watching was the chief executives of the company basically having zero to no confidence in the CEO and actually trying to do something about that."[315]

## 2.    The Director Defendants extend their Employment Agreements

The Director Defendants renewed their Employment Agreements in spring 2012.[316]  The Director Defendants had renewed the Employment Agreements in 2011 on the same terms that had existed in 2010.[317]  Morelli had disagreements with the Director Defendants over extending the Employment Agreements in 2012.[318]   Because the Director Defendants viewed the Employment Agreements as their safety net, they were

---

[313]    *Id.* at 709.

[314]    *Id.* at 709-10.

[315]    *Id.* at 744.

[316]    This factual section is abbreviated, because Plaintiffs have abandoned all claims directly related to the Employment Agreements.  Alternatively, I consider them waived.  *Emerald P'rs v. Berlin*, 2003 WL 21003437, at *43 & n.144 (Del. Ch. Apr. 28, 2003).

[317]    JX 64.0012-.0013; JX 65.0012-.0013; JX 66.0012-.0013.

[318]    JX 176 (4/9/12 email from Morelli to Director Defendants regarding extensions).

quite unhappy about Morelli's resistance.[319]  A Rancho board meeting was necessary to extend the Employment Agreements; such a meeting had not been held in years.  On or about April 26, 2012, the Director Defendants, without telling Morelli, purportedly removed him from the Rancho board on the basis that, under Rancho's bylaws, he could not be a board member because he was not a physical therapist.[320]  As Plaintiffs since have pointed out, Rancho's bylaws also required that the Rancho directors be stockholders of Rancho.  Because Optimis owned all of the shares of Rancho, none of the Director Defendants technically could have been on the Rancho board either.[321]

At the April 26, 2012 Rancho board meeting, the Director Defendants and the remaining Rancho director, Joe Godges, approved the extension of the Employment Agreements.[322]  Under that extension, the base salaries of the Director Defendants remained the same as they were in 2009 and 2010, and the EBITDA targets they needed to meet to earn bonuses were increased.  The change to the bonus provision appears consistent with the alterations Morelli was demanding in exchange for renewing the agreements.[323]

---

[319]  *E.g.*, JX 185 (4/20/12 email from Smith to Waite and Atkins: "I do not want the comp committee making the decisions on my employment contract do you?").

[320]  JX 58.0002; JX 190.0003.

[321]  JX 58.0002.

[322]  JX 190.0003-.0004.  Plaintiffs dispute whether such a meeting actually was held.

[323]  *Id.* at .0004, JX 191 (4/26/12 email from Waite to Morelli: "I have had a chance to review these terms with Greg and Bill and we look good to go.  I appreciate your and Will's work on getting this completed . . . .").

### 3. The June 2012 Meeting: A "conspiracy" of inaction

By the middle of 2012, the problems already described continued to fester. A June email chain shows not only the frustrations of the employees, but also demonstrates Morelli's awareness of the problem. Gunn apparently suggested to Morelli that the software developers go to Rancho and work on site so that they could understand how the software functioned in the real ebb and flow of a physical therapy office.[324] Morelli responded: "Under no circumstances are we going to have these developers go out to Rancho. Aside from the big loss in productivity, I have also observed—the [sic] *for the last couple of years*—that our staff never comes back the same from those trips . . . likely due to confusing messages that they get."[325]

Gunn forwarded these messages to Waite, who then wrote to Rohlinger, describing the situation as "f---ing ridiculous and clearly about control. He [Morelli] is losing his grip on this company and can feel who he is losing it too."[326] The import of the second sentence is unclear because of one of two typos.[327] Plaintiffs focus on the end of Waite's email, which reads: "I don't expect there is much time left. We must

---

[324] JX 233.0002.

[325] JX 233.0003 (6/17/12 email from Morelli to Gunn) (emphasis added).

[326] JX 233.0001 (6/18/12 email from Waite to Rohlinger).

[327] It is unclear if the typo is the "too" or the inclusion of the word "who." The sentence either reads "He is losing grip on this company and can feel . . . he is losing it too" or "He is losing grip on this company and can feel who he is losing it to[]." The meaning of the sentence is quite different depending on which reading is correct. Waite remembered nothing about this email. Tr. 1165-73 (Waite).

99

individually and collectively stay focused on doing the right thing. Set a clear path and execute. I realize my role in this approach and am committed."[328] Plaintiffs contend that this indicates a conspiracy, the same conspiracy that allegedly began in late 2010, with the end goal approaching.

At some point during 2012, there was another conference in Tampa, Florida. Levine recalled a conversation with Waite in which Waite listened to Levine's concerns and basically placated him and told him that he would attempt to deal with it. Much like Smith's testimony regarding Waite, Levine observed that "John was very good at sort of making—certainly me feel that he understood and he empathized with what I was feeling."[329] According to Levine, however, by June of 2012 he had "been hearing the same thing for over a year" from Waite and no progress was occurring.[330]

Plaintiffs repeatedly asked questions of Levine consistent with the misleading affidavits he and Fearon filed about a conspiracy bent on "taking control" from Morelli to achieve some self-interested goal of the conspirators. When the Court asked Levine directly what the goal of this group of individuals was, he answered:

---

[328] JX 233.0001. Waite testified unconvincingly that the final sentences of this email likely refer to him staying focused and running the Clinical Services Division, but he remembered nothing specific about the email.

[329] Tr. 1570; *id.* at 1575 ("I always felt a little better when I talked to John. I mean, he has a way of soothing you."). *See also* Jim Lynch Dep. 41 ("Mr. Waite provided an environment where I felt comfortable objecting with anything. . . . He encouraged me to express my opinions, and if I had concerns, he reaffirmed them and made me feel that it was okay to feel a certain way.").

[330] Tr. 1572.

100

My sense was there was a constant understanding that there were resources being diverted away from what we thought was our primary mission, was moving OptimisPT forward in the market. We had very strong projections for the future. And Alan's—almost Alan's entire focus seemed to be on OptimisSport. And while OptimisSport was certainly part of the vision, it was not something that we—that I felt, that I believed, that we were ready to move into without making sure that we were credible in the industry for OptimisPT. And every time we would bring this up [to Morelli] . . . Alan would start to pontificate on the vision, which was wellness and OptimisSport services.[331]

Levine further explained that he "and the group that [he] was working with, wanted [Morelli] out of the way of any day-to-day working at OptimisPT, because it just seemed like . . . everything was getting diverted."[332] Having carefully considered this evidence, I find that Levine's testimony supports the view that the goal he, Fearon, Waite, and others had was to salvage the PT product in the marketplace and prevent Morelli from interfering with its development. The goal was not to engage in a hostile takeover for the sake of harming Morelli or some other unexplained reason unique to Defendants and not shared by the Optimis stockholders generally (other than Morelli, perhaps). As Fearon testified, all of the actions she took during the relevant time period were because she believed they were in the best interests of the Company.[333]

---

[331]    *Id.* at 1571.

[332]    *Id.* at 1572.

[333]    *Id.* at 782-83.

The evidence does not support a finding that Fearon, Levine, Waite, or Rohlinger were involved in a takeover conspiracy. In this regard, Levine's testimony about the pro-PT group again is illuminating: "And it just seemed like every time we got together it was nothing but a gripe session. We didn't have a plan. We didn't have a strategy. We didn't have anything. And it just became more and more frustrating."[334] This evidence, from Plaintiffs' own witnesses, is inconsistent with the self-serving, disloyal conspiracy Plaintiffs contend existed.

On June 15, 2012, Levine wrote to Waite, Rohlinger, Gunn, and Fearon, stating that he and Fearon were questioning their long-term affiliation with Optimis and requesting a face-to-face meeting.[335] Plaintiffs highlight this email, because Levine referred to it in a text message to Rohlinger as his "coup d'état"[336] email and because it includes the following lines:

> If we have any hopes of a positive outcome for all of us [presumably the long-awaited liquidity event], we will need to take some drastic measures, and things will have to be different moving forward. We have all spent too much political and reputational capital thus far, and we either need to stop the bleeding or amputate the effected [sic] limb in which ever way could save this company from itself. Or, as I said to John, we either need to take the bull by horns or recognize it is going to the slaughterhouse and figure out how to save ourselves![337]

---

[334]    *Id.* at 1573.

[335]    JX 230.

[336]    JX 28.0010.

[337]    JX 230.0001.

The language is colorful and direct, but I do not read Levine's email as stating much more than what I just described. Virtually all of the actors he addressed had a vested interest in the success of Optimis. In several cases, the actors had staked their reputations and financial well-being on OptimisPT. In addition, they all shared the view that the Company was in difficulty, largely due to Morelli's poor leadership and his refusal to allocate sufficient resources to Optimis PT to ensure its success.

By the time of trial, Fearon and Levine had settled with Optimis and Morelli, and received the higher salaries Morelli previously had denied them. Fearon and Levine both appeared as witnesses for Plaintiffs. Nevertheless, Fearon acknowledged that she understood Levine's email to mean "changing the things that were wrong by stopping them and trying to improve the things that needed to be done—or the methodologies that needed to be taken to get OptimisPT in a different place."[338] Levine testified that "I thought we needed to get Alan out of the way. I didn't know how to do it. . . . But clearly, for me, it was a revolution. For me, in my mind, it was about getting rid of the current administration and putting somebody else in power."[339] As a stockholder of Optimis and a professional heavily invested in its success, Levine was entitled to hold

---

[338] *Id.* at 714.

[339] Tr. 1583.

those views. I do not find his statement to be cogent and reliable evidence of the state of mind of Waite and the other Defendants, however.[340]

The meeting did occur on June 26, 2012, with Fearon and Levine participating from separate remote locations.[341] The testimony about the meeting does not support Plaintiffs' claim that there was a plot to seize control of the Company illegally. According to Levine, he advocated sitting down "together with Alan to tell him what our concerns were and to tell him that we expected something different."[342] Rohlinger was "emphatically shaking his head no" and Waite disagreed with that course of action, saying "don't poke the tiger."[343] I also note, however, that the June 26 meeting also appears to be the first time Levine learned of the Stockholders Agreement.[344]

The only concrete action that emerged from the June 26, 2012 meeting was taken independently by Fearon and Levine, neither of whom is a defendant in this action. As described in Section I.E *supra*, their Employment Agreements expired in December 2012 and they took it upon themselves to send a letter to Morelli, dated October 6, 2012, outlining their demands, including for raises and improvements to OptimisPT.[345] Levine

---

[340]    Levine is not a defendant in this action.

[341]    *Id.* at 1584-85 (Levine).

[342]    *Id.* at 1586.

[343]    *Id.* at 1587 (Levine).

[344]    *Id.* at 1588 (Levine).

[345]    JX 317.

sent a draft of that letter to Waite in June, who, apparently anticipating Morelli's reaction, forwarded the draft to Rohlinger in an email that states: "FYI eeek."[346] Although Levine and Fearon sought input on the letter from Waite and others, they did not receive any.[347] There were changes between the draft and the letter sent in October. According to Fearon, "those were things that we added, thinking to ourselves, well, we need to do this. No one's giving us direction. We asked, they're ignoring us."[348]

In sum, the end result of the June 26 meeting was an October letter by two individuals not on trial. At the meeting, Waite, the only Defendant in attendance, advised against "poking the tiger." Fearon and Levine then proceeded on their own.

### 4. The Company struggles to raise capital and again hosts the DSC

By the end of the summer of 2012, the Company again sought to raise capital in the equities market. Although originally looking for an investment of $4 million, the Company was unsuccessful despite attending "a lot of meetings in August and September."[349] The Company also was in discussions with Wells Fargo for a loan in the amount of $1 million unsecured and $2.5 million secured by Rancho's accounts receivable and a personal guarantee by Morelli. That loan was at roughly 3%, as opposed to a competing loan from the Bank of the Internet ("B of I") at 6.75%. Morelli, however,

---

[346]    JX 239.0001.

[347]    Tr. 724 (Fearon).

[348]    *Id.* at 723-24.

[349]    *Id.* at 1323 (Horne); JX 289 (Sept. 2012 PPM). The September 2012 PPM, like the June 2012 PPM, disclosed the Stockholders Agreement. *Id.* at .0017-.0018.

was unable or unwilling to execute a personal guarantee, so the Wells Fargo deal was not pursued.[350]

Notwithstanding the Company's financial challenges, Optimis again held the DSC sometime in mid-August.[351] Waite again participated in the event.[352] Morelli appears to accuse Defendants of sabotaging the American Lung Association's ("ALA") sponsorship of the 2012 event. The testimony on this issue is unclear, but it seems that the ALA, in late 2011, agreed to sponsor the 2012 DSC, or that Morelli believed they were sponsoring it.[353] The ALA dropped their sponsorship, however, and Morelli blames that on misinformation allegedly provided to the ALA by Defendants.[354] But, the relevant testimony was all speculative. In fact, the documentary record contradicts Morelli's testimony. A May 4 email to Morelli from a representative of the ALA stated that the ALA never had reached a sponsorship agreement with Optimis and spelled out several irreconcilable differences, such as ALA limits on cross-promotions with a for-profit company and budgeting problems for the event.[355] Morelli contemplated suing the

---

[350] Tr. 1207-09 (Olsen).

[351] *Id.* at 730 (Fearon).

[352] *Id.* at 1031 (Waite). Horne and Atkins also swam in the event at least once, but it is not clear which years they participated. *Id.* at 1384 (Horne); *id.* at 1475-76 (Atkins).

[353] *Id.* at 348-49 (Morelli).

[354] *Id.* at 350-52.

[355] JX 1086; Tr. 500-02 (Morelli).

106

ALA.[356]  Nevertheless, he testified that the 2012 DSC was a success, but claimed it lost money because of the lack of the ALA sponsorship.[357]  In any event, Plaintiffs failed to prove by a preponderance of the evidence that Defendants collectively or any of them individually caused the loss of that sponsorship.

## J.    The Geller Sexual Harassment Allegations and Subsequent Investigation

In a September 21, 2012 phone call with Waite, Geller told him about some inappropriate conduct by Morelli.  Defendants' version of events is that, upon hearing that she might be reassigned to work in close proximity to Morelli, Geller became concerned, contacted Waite and told him about the inappropriate contact by Morelli, and that Waite then turned the matter over to Kreile in Human Resources with minimal involvement thereafter.  Plaintiffs contend that Defendants bribed Geller and coaxed her to bring the sexual harassment complaint against Morelli and then Defendants manipulated the investigation.  In the following Subsections, I find Defendants' version of the facts to be more accurate.

### 1.    Knowledge of Geller's allegations and the call to Waite

Plaintiffs contend that several individuals knew of Geller's allegations before she made them to Waite in September.  The implication is that the claims were stale—indeed, Plaintiffs contend they are false—and instead were used by Defendants as a pretext to oust Morelli.

---

[356]    Brys Dep. 33-34.

[357]    *Id.* at 658-59.  The DSC was never designed to be a money-making event, and there is no evidence that it ever broke even.

At trial, Fearon testified that by mid-August 2012 she had heard from Gunn about an inappropriate sexual relationship between Geller and Morelli—though Fearon did not provide details of what she had heard.[358] Geller testified that she had made remarks to Gunn "in general passing" about Morelli's behavior.[359] Gunn admitted that she learned of the allegations from Geller herself, but testified that did not occur until late September at a conference.[360] Thus, Gunn denied telling Fearon about those allegations in or before the middle of August.[361] Levine also claims to have been aware of the allegations in mid-August, presumably because Fearon told him.[362] In Section I.F *supra*, I concluded that it would be appropriate to resolve doubts against Fearon and Levine. At the same time, however, I consider Gunn's credibility rather questionable and note that she, like Rohlinger, did not testify at trial, had limited recall at key moments of her deposition, or was evasive in responding to Plaintiffs' questioning. I return to this matter *infra*, but, even if Fearon and Levine did know something about Geller's situation, there is no evidence that Waite knew or that Fearon or Levine told Waite themselves.

---

[358]     *Id.* at 729-30.

[359]     Geller Dep. 56.

[360]     Gunn Dep. 50.

[361]     *Id.* at 91.

[362]     Tr. 1589-91.

Two people were aware of Geller's allegations early on: Horne and Rohlinger. At his deposition, Rohlinger claimed to have heard Horne's story and put it out of his mind. He could not recall discussing the matter with anyone else or telling anyone else.

Plaintiffs assert that Horne suddenly became much more friendly and helpful to Geller after learning of her allegations. After their conversation in February 2012, Horne did let Geller use his apartment rent-free while he was staying with Doherty. The record is unclear on how frequently Geller made use of the apartment. Plaintiffs also allege that Horne promised Geller a share of the profits of the Pacific Palisades clinic to induce her to make false accusations against Morelli. The basis for this proposition appears to be the interview notes of Nancy Solomon, the attorney who investigated the sexual harassment claims. According to those notes, Geller told Solomon that Horne discussed a proposed salary change with Geller in March or April 2012. Specifically, Horne mentioned a reduction in salary in exchange for a percentage of the profits from the Pacific Palisades clinic. I note, however, that that clinic had never had profits. Apparently this change was never implemented.[363]

Based on this evidence, I find unpersuasive Plaintiffs' suggestion that Horne bribed Geller to bring false sexual harassment claims against Morelli in September 2012. As to the apartment, Plaintiffs have not proven any link between Horne allowing Geller to use his apartment beginning in February and Geller telling Waite about Morelli's allegedly inappropriate conduct in September. Plaintiffs have not shown that Horne

---

[363]    JX 54.0005.

encouraged Geller to make the complaints or that Horne asked anything of Geller for using his apartment.[364]

## 2. Geller's version of events

I carefully reviewed Geller's video deposition with respect to the chain of events that led to the October 20, 2012 board meeting. I find that account persuasive, consistent with the other evidence, and credible.

Geller began providing physical therapy services to Morelli in late 2010. Geller described the incidents involving oral sex as occurring at nighttime in Morelli's office-bedroom. According to her, "[Morelli] would generally be at night naked already because he had just [sic] a massage, and then he would ask me to work on him after the massage, so he would still be naked."[365] Though he would be wearing a sheet, Morelli often had a noticeable erection. Morelli would motion or otherwise suggest to her that he wanted oral sex. On some instances, Geller would initiate because she "could tell that he was in that kind of mood" and it "was easier to initiate and get it over with than to try and reject it and go through a whole world of trouble."[366] According to Geller, these incidents ended once she left the Upper Bubble and began working in the Pacific Palisades clinic. The clinic opened in October or November of 2011 and she was there

---

[364]   Horne also had given another employee, Jessica Eastman, a key to his apartment so that she could "shower in the morning" after working out and "[wouldn't] have to shower at Alan's houses." Eastman Dep. 48.

[365]   Geller Dep. 26.

[366]   *Id.*

110

increasingly from that time onwards. By early 2012, Geller was spending almost all of her time at the clinic. The incidents of oral sex apparently began in October 2011, with only physical touching before that.[367] According to Geller, she acquiesced to Morelli's fondling of her and his requests for oral sex because if she did not, he would ostracize her socially or threaten her and her husband's jobs.[368]

Morelli allegedly also made advances on Geller at the February 2012 Conference, as she described in her conversation with Horne, recounted *supra*. The incidents with Morelli had stopped entirely by summer 2012, if not somewhat sooner. In the September 21 phone conversation with Waite, Geller said that she had heard Morelli was going to hire a new physical therapist for the Pacific Palisades clinic and that this might result in Geller returning to the Upper Bubble. Geller testified: "I was afraid that . . . I'd be forced to be back at the house and be forced to be subjected to the inappropriate touching and sexual manner that I did not want. And I couldn't stand to be put back in that situation again."[369] This explanation for Geller's telling Waite about her concerns regarding the interaction between her and Morelli is consistent with Solomon's notes of her interviews

---

[367] *Id.* at 126.

[368] *Id.* at 104-05.

[369] *Id.* at 63.

111

with Geller.[370] It also is consistent with Waite's testimony regarding his initial phone conversation with Geller.[371]

Consistent with how others have described Waite's management style, he told Geller that the she would be okay and that everything would be alright.[372] That first substantive call happened on the morning of September 21, a Friday. Waite promptly reported the matter to Kreile.[373] Kreile contacted the Company's insurer, Professional Liability Insurance Services, Inc. ("PLIS"), the same day.[374]

### 3. The investigation

Plaintiffs allege that Defendants manipulated the investigation. But, the evidence does not support that allegation. Plaintiffs also criticize Waite for not reporting Geller's claims to the Board. The record strongly suggests, however, that it would have been futile for Waite to do that. After Morelli was terminated, he fired every director he could that voted to remove him, installed a new board, re-appointed himself CEO, and began investigating Defendants and litigating against them.

After receiving the claim, PLIS apparently contacted Leonid Zilberman, a California employment lawyer with sixteen years of experience working for the firm

---

[370] JX 54.0001, .0005.

[371] Tr. 1066-67.

[372] Geller Dep. 63.

[373] Tr. 1069-70 (Waite); JX 285.0001 (9/21/12 email from Waite to Kreile referencing the "potentially volatile HR issue" just discussed by telephone).

[374] Kreile Dep. 56-61; JX 282 ("Notification of Claim or Potential Claim").

112

Wilson Turner Kosmo LLP.[375] He previously had handled an entirely unrelated dispute involving two Rancho employees; Kreile was Zilberman's contact for that matter as well. Zilberman first contacted Kreile on September 24, 2012, a Monday and the first business day after Kreile filed a notice of potential claim with PLIS.[376] Zilberman testified at his deposition that, in the case of allegations of harassment against senior management, and the CEO in particular, the "three things that are the most important are that the investigation be done promptly, that the investigation be thorough and that the investigation be impartial."[377] After concluding that no one internally at Optimis could run the investigation without being accused of bias, Zilberman hired an outside investigator: Nancy Solomon.[378] This was the beginning of the "Geller Investigation."

There is no evidence that Defendants, or anyone at the Company, had any involvement in Solomon's retention. In fact, her retention agreement is with the Wilson Kosmo Turner law firm, not with Optimis.[379] Solomon interviewed nine employees, some more than once. The result of that investigation was sixty-seven pages of single-spaced typed notes and a thirty-four page report listing her factual findings, including credibility determinations. Morelli admitted that Geller provided oral sex to him, but

---

[375]   Zilberman Dep. 9-10.

[376]   JX 305.

[377]   Zilberman Dep. 24-25.

[378]   *Id.* at 25. Zilberman's concern about bias related to the fact that the other employees all reported to Morelli as CEO and thus might fear losing their jobs.

[379]   *Id.* at 30-33; JX 291 ("Engagement Agreement").

113

contended that she initiated it.[380]   Solomon did not find Morelli to be a credible

witness.[381]   Similarly, I did not find credible many of Morelli's statements regarding

Geller.

It is not necessary to detail every aspect of the investigation.  Rather, I note several

salient points.  Optimis has a specific sexual harassment training program for supervisors.

Morelli received a "certificate of completion," but he never completed the training.  He

had his assistant, Eastman, complete it for him.[382]   Unburdened by such training, Morelli

testified that it "did not occur to me at that time" that receiving oral sex from a

subordinate in his bedroom-office, while she was performing work duties, created a risk

of sexual harassment.[383]

Morelli's behavior during the investigation also casts doubt on his credibility.  On

or about October 3, 2012, Morelli met for about an hour and a half in his bedroom-office

with the Company's General Counsel, Brys, and CFO, Horne.  According to Brys,

---

[380]   Tr. 404 (Morelli: denying he ever initiated the sex and testifying that, "It wasn't ever different.  It was Tina Geller who initiated it."); Solomon Dep. 40.

[381]   Solomon Dep. 46-48; *id.* at 47 ("It seems more he was trying to build an explanation for the things as the interview went on . . . ."); JX 401.0032 [hereinafter "Solomon Report"].  There is a dispute among the parties as to the usage of the Solomon Report.  I do not rely on it for the truth of the matter asserted, but I conclude that the report is not hearsay when used for another purpose, such as showing the apparent thoroughness of the investigation or the statements upon which the Board relied when it met on October 20, 2012.  *See* 801(c).  Therefore, I overrule Plaintiffs' objection to the use of the Solomon Report.

[382]   Tr. 485-87 (Morelli); Eastman Dep. 50-53.

[383]   Tr. 476.

Morelli "told me to call Ms. Geller and tell her to withdraw the claim" because it would be expensive and bad for the Company.[384] Horne also recalls Morelli asking them to convince Geller to drop her claims.[385] Brys and Horne told Zilberman about this meeting and Zilberman advised them that it would not serve the Company well if they pressured Geller to drop the claim.[386]

In addition, Morelli met with Solomon on October 10 in person and then spoke with her by phone on October 17. According to Morelli, Solomon was being rushed to complete her report, and although he had lots of evidence to support his claims that he wanted to provide her, she did not provide him sufficient time to do so. This is contrary to the overwhelming weight of the evidence. The only witness who asserts that Solomon was rushed is Morelli.[387] I find Morelli's testimony on this point unreliable, in part because, in my view, it reflects his mistaken perception that Solomon was part of, or actively being manipulated by, a conspiracy out to get him, which included at least seventeen people.[388] Nor did Morelli ever provide to Solomon any of the additional

---

[384]    Brys Dep. 20.

[385]    Tr. 1348-51 (Horne).

[386]    Zilberman Dep. 60-62.

[387]    Tr. 406-10.

[388]    *Id.* at 605-06.    This conspiratorial mindset surfaced repeatedly throughout Morelli's testimony. *E.g.*, *id.* at 515-16 ("I mean, it was a bittersweet situation e-mailing Nancy Kreile, who was working closely with John Waite, who I suspected might be involved. I mean, even e-mailing the general counsel was, in hindsight, a mistake, because she just took my e-mails and immediately forwarded them to John Waite, as Nancy Kreile did."); *id.* at 613 ("So was he hired—was Zilberman

115

exonerating information he allegedly had. Moreover, Solomon repeatedly denied being rushed, and Zilberman did not perceive her to be rushed.[389]

As part of his defensive strategy, Morelli also filed his own sexual harassment complaint against Geller on October 17.[390] Indeed, he anticipated making that claim as early as October 11, one day after his first meeting with Solomon.[391] I conclude that this counter-complaint was part of Morelli's overall defensive strategy with the objective of maintaining his position as Optimis' CEO, because he thought "it was the best hope for the company for [him] to remain CEO."[392]

Plaintiffs also contend that Horne's interviews with Solomon evidence a conspiracy. At his deposition in May and July 2014, Horne testified that he and Morelli

---

hired before PLIS was notified? I don't know that we know that conclusively. It was a very, very unusual set of circumstances that led to Mr. Zilberman and Ms. Solomon either appointing themselves or being appointed by the insurance company.").

[389] Solomon Dep. 23-24; JX 402 (sworn declaration of Solomon stating that she was not rushed and that Morelli's claim to the contrary was a fabrication); Zilberman Dep. 64-66, 80-81, 92-96. Plaintiffs' counsel also attempted to "prove" Solomon was rushed or manipulated in a lengthy and contentious portion of her deposition that reviewed virtually every one of a large number of typos and purported grammatical errors in her report. This questioning does show Solomon could use a proofreader and would benefit from reading over her work more carefully. It does not negate the thoroughness of the Solomon Report, however. The findings of that report are consistent with the testimony of everyone except Morelli.

[390] JX 376.

[391] JX 337 (10/12/12 email from Morelli to Kreile referencing a conversation with Brys the previous day).

[392] Tr. 479.

116

had a "great working relationship" and that he considered Morelli "a good friend."[393] But, Horne never revealed to Morelli that since 2010 Horne had been involved with Morelli's former wife. In addition, Plaintiffs point out that Horne, referring to Morelli, told Solomon that "[P]ersonally I hate the mother f-cker"[394] and that he asked Solomon not to include the fact that he was involved with Doherty, and she complied.[395] Plaintiffs argue that this and other evidence shows that Horne is a liar and has a motive to undermine Morelli.

I agree that Horne's contradictory testimony is troubling, but I do not see the situation to be as clear cut as Plaintiffs. Solomon's interview notes also reveal that Horne stated that he "would never [have] assumed Alan would have been capable of anything [Geller had] accused him of."[396] At trial, Horne attributed his stated hatred of Morelli to his belief that the sexual harassment allegations were hurting the Company: "We spent six years building a company, and I saw it all crumbling, and I was incredibly upset at Mr. Morelli at that time."[397] Solomon "did not feel in any way that [Horne] was trying to bury Mr. Morelli."[398] And, by telling Solomon about his relationship with Doherty,

---

[393]    *Id.* at 1445 (Horne testifying about his deposition statements).

[394]    JX 54.0024; Tr. 1446 (Horne).

[395]    Tr. 1455-56 (Horne).

[396]    JX 54.0020; Tr. 1448 (Horne).

[397]    Tr. 1447 (Horne).

[398]    Solomon Dep. 50.

117

Horne at least revealed to her a bias he may have had. Taking account of all the evidence regarding Horne, I do not consider it appropriate to disregard all of his testimony as not credible, but I agree that it is important to examine anything he said with a degree of skepticism.

Plaintiffs also contend the investigation was tainted because Geller communicated with Defendants several times during the investigation, despite being told by Solomon not to talk to anyone about it. Although this allegedly shows that Geller was in cahoots with Defendants, I do not find these contacts to be material.

Geller called Waite—the ranking officer at the Company aside from Morelli and the person to whom Geller first reported the allegations in September 2012—numerous times during the course of the investigation. Geller's phone records indicate that she and Waite had thirty-seven phone calls totaling more than three hours during the relevant period.[399] In one of his shakiest moments on the stand, Waite testified that he only recalled two phone calls.[400] Geller testified that she repeatedly called Waite and others because she was looking for reassurance. She was "in a highly emotional state and really scared for [her] life" because she was afraid of what Morelli was going to do to her.[401]

---

[399]  JX 278.

[400]  Tr. 1097-108. Waite also did not disclose any calls beyond those two in his interrogatory responses.

[401]  Geller Dep. 307. This testimony, which I find credible, is consistent with Solomon's notes, which are replete with statements that Geller was afraid of Morelli. JX 54.0004 ("'john [Waite] promised this would be quiet that we wouldn't be approaching Alan. Otherwise I would have never met with you. So if

The phone records show that many of the calls were only one or two minutes long, suggesting missed calls or voicemails, which I exclude, and the overwhelming majority were from Geller to Waite. There were nine calls of five minutes or longer between September 19 and October 2.[402] On September 24, the next business day after Geller told Waite about Morelli's inappropriate touching, Geller had two calls with Waite each in excess of thirty minutes. On September 25, Geller had a five-minute call and a six-minute call with Waite. Geller had her first interview with Solomon on September 27 and talked with Waite for thirteen minutes that day.

This pattern of phone calls comports with Geller being concerned about what was going to happen to her. During the same time period, she also called Horne, who testified: "She was scared of Alan. She was scared of retaliation. She was scared about her job. She was scared about Mo's [her husband's] job."[403]

Plaintiffs emphasize that Geller talked to Solomon, but did not tell her everything, and then scheduled another interview to tell her the entire story. After her first interview,

---

this comes out and he finds out and I get screwed in all this…' she starts to cry again."); *id.* at .0005 ("'I don't know what he'll do but I know he'll go ape sh-t'"); *id.* at .0006 ("she is quiet and then whispers 'He can't find out.'"). Numerous additional examples follow in the next nine pages of notes. D.R.E. 801(d)(1)(B); D.R.E. 803(2)-(3); D.R.E. 807.

[402]  JX 278. One of the calls, on October 1, is seven minutes long and appears to be call-waiting. I excluded that call from my tabulations.

[403]  Tr. 1346. This is consistent with Geller's testimony. Geller Dep. 100-01.

Geller, as noted, talked to several people,[404] including Gunn, who encouraged her to tell the whole story, whatever it may be.[405] Geller soon decided to schedule a second interview with Solomon to tell her everything. Plaintiffs contend that this shows that Waite and Horne, among others, either convinced Geller to change her story or were telling Geller what to say.

Plaintiffs' argument is unpersuasive. Solomon's notes indicate that during the first interview, Geller stated that Morelli touched her inappropriately and requested that Geller provide physical therapy while he was naked under a sheet with a visible erection. During the second interview, Geller added more detail and disclosed the oral sex.[406] Accordingly, it is not true that Geller did an about face between the first and second

---

[404] There were only three calls of any significance with Waite between the first and second interviews: the thirteen-minute call on September 27 and calls of sixteen and five minutes on October 1. JX 278.

[405] Gunn Dep. 50-52, 95-96; Geller Dep. 316-17.

[406] JX 54. Solomon's interview notes are not hearsay when used for this purpose. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." D.R.E. 801(c). Here, I rely on the notes only because they indicate *what* Geller said to Solomon. Delaware Rule of Evidence 801(c) tracks Federal Rule of Evidence 801(c). In the comments to Federal Rule of Evidence 801, the advisory committee noted: "If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay." F.R.E. 801 cmt. c (1972). To the extent there is a double hearsay objection based on the fact that the interview notes represent an out of court statement by Solomon that Geller made the statements Solomon recorded, I hold that the notes qualify under the exception to the hearsay rules for records of regularly conducted activity. *See* D.R.E. 803(c); Solomon Dep. 14-27, 67-68.

120

interviews on September 27 and October 2 and told two different stories or that the two interviews are inconsistent on key points.[407]

At her deposition, Geller repeatedly denied that anyone encouraged her to bring the allegations or told her what to say to Solomon.[408] Overall, Geller's story is consistent and cohesive: she became concerned after hearing that a new therapist would be going to the Pacific Palisades clinic, meaning she could be working back in the Upper Bubble with Morelli; in the course of discussing that concern with Waite, she told him something about Morelli's prior behavior; Waite notified Kreile in HR, who began the investigative process; Geller was interviewed once, was nervous, and presumably did not tell Solomon the facts about which she was most embarrassed; because Geller remained afraid that Morelli would find out and punish her, she called others at the Company to seek solace, and then, after talking to Gunn, she resolved to tell Solomon the rest of the story, which she did.

---

[407] Solomon testified that it is not unusual in sexual harassment investigations for the witnesses to be reluctant during interviews. Solomon Dep. 42.

[408] Geller Dep. 298 ("Mr. Waite or Mr. Horne or Mr. Smith or Mr. Atkins never, ever had me—hinted to me that I should bring allegations against Alan, ever."); *id.* at 310 ("It is my testimony that Mr. Waite never gave me any incentive at all to ever file a harassment case or to tell Nancy [Solomon] anything that he wanted me to tell her."); *id.* at 314 ("I didn't know what was going on. Nobody asked me to file a harassment case. Nobody asked me to tell Nancy Solomon anything. Nobody asked me to do anything. I just want to know what is going to happen to me. I didn't give a sh-t about what was happening to the company at that point. It wasn't my concern.").

Plaintiffs, at trial, essentially attempted to prove the sexual harassment allegations were false or, at least, that the sexual contact between Geller and Morelli was consensual by portraying Geller as promiscuous and putting on the stand David Hwang, with whom she had an affair while working at Optimis.[409]   Hwang offered numerous hearsay statements purportedly made by Geller that Plaintiffs have attempted to introduce into evidence by arguing that they were statements against interest.   I need not reach Defendants' hearsay objections to these statements, however, because I do not find credible Hwang's testimony with respect to Geller and Morelli.   Hwang said that, when he heard about the sexual harassment claim, he "thought it was probably made up" and that "it was something that [Geller] was doing either to get money or to get what she wants."[410]   Hwang reached these conclusions without knowing that Geller and Morelli admittedly had engaged in sexual activity.[411]   Hwang testified that he *knew* Geller's complaint was false, even before he began investigating it as a member of one of the special investigative committees the Company formed after the abortive attempt to oust Morelli.[412]  Thus, I find Hwang too biased against Geller to be credible on this issue.[413]

---

[409]   This affair occurred from March 2011 to October 2011.  Tr. 162 (Hwang).

[410]   *Id.* at 189.

[411]   *Id.* at 251-52.

[412]   *Id.* at 262.  Hwang's comments also support Defendants' contention that the Company's investigative committees were looking for facts to support their own pre-formed conclusions.

[413]   Hwang also filed with HR a vaguely worded complaint against Geller shortly after Morelli's ouster.  JX 544 (11/5/12 email from Hwang to Kreile).  Hwang testified

## K.     Contingency Planning by the Optimis Executives

Plaintiffs make much of the fact that certain Optimis executives were engaging in contingency planning in case Morelli was terminated as a result of the sexual harassment investigation. Considering the seriousness of the allegations and Zilberman's emphasis on the need to move quickly, I consider Defendants' actions to be reasonable.

Zilberman and Solomon were not the only attorneys involved with the sexual harassment claims at this time. Following a conversation in which Zilberman indicated that there could be a situation where PLIS's interests and the Company's interests deviate, Brys, the Company's General Counsel, retained Tom Kaufman of the law firm Sheppard Mullin to serve as outside counsel for Optimis. "He was there to provide a resource to the board of directors, to provide his recommendations and opinions to the extent it was requested, whether or not Mr. Zilberman was capable of doing so, based on any perceived conflict of interest on the part of Mr. Zilberman."[414] According to Brys, Kaufman's retention was not a reflection of dissatisfaction with Zilberman and "to the extent [she] ever sought advice from both counsel, they agreed."[415]

---

that he did not mention Geller by name because he did not like to think about her, then or now. Tr. 241.

[414]   Brys Dep. 103. Because Brys is in separate litigation against the Company, she has a potential bias, but having reviewed her deposition, I found her credible.

[415]   *Id.* at 104.

123

Throughout the process, Waite and Brys received periodic updates from Zilberman.[416] Horne received only one update. That occurred during the conversation in which Horne and Brys discussed with Zilberman the meeting in which Morelli asked Horne and Brys to convince Geller to withdraw the complaint.

Entering the week of October 14-20, the chronology becomes less clear. Zilberman had advised Waite that a board meeting should be held promptly to discuss the investigation and Solomon's report, which would be ready later in the week.[417] Waite began setting up a board meeting, which eventually was scheduled for Saturday, October 20 (the "October 20 Meeting"). Zilberman did not think that was too soon.[418]

Two things needed to be done in preparation for the special meeting of the Board on October 20. The first involved the Stockholders Agreement. The second was dissemination of a notice for a special meeting.

Horne attended a meeting at some point before October 20 in which Waite or Brys said that, based on the outcome of the investigation, Morelli may need to be fired. Horne then pointed out that the Stockholders Agreement probably would need to be amended. He reasoned that: "If the board decided that Mr. Morelli needed to be removed as CEO,

---

[416]   Tr. 1072 (Waite).

[417]   *Id.* at 1073-75 (Waite).

[418]   Zilberman Dep. 90-91. Brys testified similarly: "To my knowledge, at the advice of Mr. Zilberman and Mr. Kaufman, who were acting as employment counsel for the company, they recommended having the board of directors meeting based on a very sensitive report as soon as possible." Brys Dep. 166.

124

then if he had the ability to just turn around, appoint new board members and reappoint himself as CEO, I think that would go against the spirit of what needed to be done."[419] This led to the development of Amendment No. 2 to the Stockholders Agreement, but Horne had no further involvement with that amendment.

Amendment No. 2 appears to have been drafted by Waite's personal counsel.[420] Waite understood Amendment No. 2 to require a two-step process, in that he needed to have it approved by the vote of the holders of a majority of Optimis' stock and have the Board approve the amendment. According to Waite, in the days before the October 20 Meeting, he contacted other stockholders in the following manner:

> I was very careful not to describe to them that this was anything related to Mr. Morelli's sexual harassment investigation. I simply told them that, as a stockholder, I was interested in changing the provisions of the stockholders' agreement to put the control of . . . who's elected to the board in the hands of the . . . broader shareholder base.[421]

This approach does not appear to satisfy Delaware law, but it is largely moot, because Amendment No. 2 was vacated on or about March 21, 2013, in connection with the 225 Action.

A notice of the special meeting also had to be prepared. At this point, another attorney, Allen Sussman, becomes important. Sussman is a partner at the law firm of

---

[419]   Tr. 1357-58; Brys Dep. 157.

[420]   Brys Dep. 150-52.

[421]   Tr. 1084; JX 411.

125

Loeb & Loeb in Los Angeles and practices corporate and securities law from a transactional standpoint. He is a friend of Morelli and, at the time of the October 20 Meeting, he had represented Optimis for some time, was serving as Optimis' corporate secretary, and previously had represented Morelli personally. Horne called Sussman on October 7 and told him about the ongoing investigation.[422] Sussman testified that he told Horne that the Company was his client, but that he "was not comfortable acting as the company's counsel with respect to this matter because of [his] personal relationship with Alan."[423] Sussman allegedly made this clear to Waite and Brys as well.[424] Nevertheless, Sussman agreed to continue acting as corporate secretary. I find as a fact that at least Waite and Brys were confused about Sussman's role and attempted to rely on him to a limited extent for legal advice, which resulted in a faulty notice for the special meeting. The insufficiency of the notice was one of the reasons Morelli succeeded in settling the 225 Action on favorable terms.[425]

Brys and Waite, the two employees involved in preparing for the October 20 Meeting, believed Sussman could provide them some legal advice. According to Brys,

---

[422]    Tr. 810-12 (Sussman).

[423]    *Id.* at 813.

[424]    *Id.* at 815-16.

[425]    JX 454 (special meeting notice); JX 684 (Settlement of 225 Action). This problem might have been avoided if Sussman had advised the Company in writing about the scope of his representation. *See* Cal. R. of Prof'l Conduct R. 3-310. Sussman admitted that he did not inform Waite, Brys, Horne, or anyone else in writing of the conflict or the scope of his representation. Sussman denied that he was providing legal advice. Tr. 857-59.

126

Sussman advised her that "he could review documents and advise as to whether or not the documents that were presented complied with the Delaware law and the company documents already to date," but that "any actions taken subsequently that would be involved in the termination of Mr. Morelli, he did not feel like he could render advice on."[426] Waite initially understood that Sussman was providing legal advice to the Company, but during the week before the meeting he told Waite to get another attorney.[427] As discussed below, Waite did hire another attorney and explained in a November 4, 2012 email that the attorney was hired "specifically because Allen Sussman informed Laura [Brys] and I that he would not be able to provide any advice to the company because of his conflict with his friendship with Morelli."[428]

It is unclear from the contemporaneous documents when Waite concluded that Sussman was conflicted, but the emails comport with Brys's understanding that Sussman could provide limited legal advice. On October 15, Brys sent emails to Sussman attaching for his review the Bylaws, the existing Stockholders Agreement, Amendment No. 1, and the draft notice of the special meeting. The communications are labeled "confidential attorney-client communication and attorney work product" and specifically ask Sussman if he has any revisions or questions.[429] This evidence undermines Plaintiffs'

---

[426]    Brys Dep. 181; *see also id.* at 115-16.

[427]    Tr. 1076 (Waite).

[428]    JX 539.0001.

[429]    JX 362.

position and Sussman's testimony that Waite and Brys understood Sussman was completely conflicted and unable to help them prepare for the meeting.[430] Plaintiffs have pointed to no evidence that Sussman attempted to dispel Brys's belief that he would review the corporate documents she was sending him. In the end, Waite sent out a Notice of a Special Meeting of the Board of Directors on October 18 scheduling the October 20 Meeting.[431] That Notice lacked an agenda of the topics to be covered at the meeting and, therefore, was defective.[432]

Brys, who was pregnant, was admitted to the hospital by the evening of October 18. That same day, Waite "literally pulled David Robbins' name out of the newspaper," called him at his firm at the time, Bingham McCutchen, and begged him to represent the Company. Robbins apparently agreed to get the Company through the October 20

---

[430]   *See also* JX 358 (10/16/12 email from Brys to Sussman attaching Certificate of Incorporation); JX 365 (10/17/12 email from Waite to Sussman attaching Amendment No. 2 to the Stockholders Agreement and asking Sussman to "review and provide me with any feedback about whether you see any issues").

[431]   JX 392 (10/18/12 email from Waite to Board).

[432]   After listening to Sussman's testimony at trial, Waite implausibly testified that he specifically asked Sussman whether he needed an agenda for the meeting notice and that Sussman said "I checked Delaware law. It's not required to have an agenda." Tr. 1076. Based on all the evidence, I have disregarded this aspect of Waite's testimony as unreliable. *See id.* at 1077.

128

Meeting.[433]  It appears from the record that Robbins's role was to attend the October 20 Meeting and represent a Special Committee of the Board (which did not yet exist).[434]

### L.        The October 20, 2012 Meeting

The October 20 Meeting bears few of the hallmarks of good governance.  Brys, the General Counsel, was still in the hospital and did not attend the meeting.  Sussman, the conflicted outside attorney, attended and acted as Corporate Secretary.  Zilberman participated and presented Solomon's report, among other things.  Kaufman was present, representing the Company.  Robbins also attended the meeting in the role described above.

The Board then consisted of nine directors: Waite, Atkins, Smith, Ashraf Abdelhamid, Morelli, Brian Wing, Maureen Fahey, Terrence O'Keefe, and Godges.  The latter five individuals were Morelli appointees.  The Director Defendants served, in part, by virtue of their own appointment rights under the Stockholders Agreement.  Abdelhamid also had a contractual right to serve on the Board as a result of Optimis' acquisition of his physical therapy practice.

The October 20 Meeting was held at the offices of Sussman's firm.  He arrived around 11:30 am.  Eight directors attended in person; O'Keefe participated by telephone.

---

433     *Id.* at 1077-78 (Waite).

434     JX 398.  Robbins's October 18 engagement letter is addressed to Godges as the leader of the Special Committee.  The letter was signed, however, by John Waite on October 31.  It states that Robbins would represent "the Special Committee only" for the purpose of assisting in the "evaluation, review and possible termination of Alan Morelli." *Id.* at .0001.

Robbins and Kaufman were present from the beginning, as was Tim Miller, Waite's personal attorney.[435] The full board had assembled, with Waite leading the meeting, and it was convened once Morelli arrived.[436] Although he did not come with his own counsel, Morelli immediately denied knowing what the meeting was about because there was no agenda with the notice. He then moved to adjourn the meeting so that he could get his personal counsel. That motion failed by a divided vote.[437] I find that Morelli, a former corporate litigation partner, knew the purpose of the meeting in advance,[438] and took advantage of the defective notice to create a defense for himself in future litigation.

A series of initial objections were made. Fahey, who apparently had served on "Fortune 25" corporate boards before, complained that the Board should have been contacted earlier and that an independent committee should have investigated the

---

[435]   Tr. 817-20 (Sussman).

[436]   *Id.* at 417 (Morelli); *id.* at 1079-80 (Waite).

[437]   *Id.* at 416-18 (Morelli); *id.* at 821-23 (Sussman); *id.* at 1080 (Waite).

[438]   Morelli's actions in the days immediately preceding the October 20 Meeting, including the fact that he had been interviewed for several hours by Solomon, show that he knew about the meeting and its purpose. In an email to Brys the day before the meeting notice was sent, Morelli wrote: "To hold a Board of Directors meeting this Saturday would preclude me from seeking to defend the false claims that Tina Geller has alleged against me." JX 372.0001. Similarly, on October 17, Morelli emailed Brian Wing asking to speak with him and bring him "up to speed on some developments." JX 403.0002. The next day, Morelli emailed Wing: "Thank you again for catching up with me, Brian. I would greatly appreciate any assistance you are willing to provide." Morelli then provided Wing with the phone numbers or contact information for all the other directors, except Atkins. Morelli concluded his email: "Also, don't think for one minute that this power struggle is going to prevent us from doing our swim to Africa next summer. . . ." JX 403.0001.

complaint.[439] Wing mistakenly objected that the investigator was not independent because she was hired by Waite.[440] The Board then created an ad hoc committee, comprised of everyone except Morelli, to discuss the Solomon Report and the sexual harassment allegations in a different room (the "Ad Hoc Committee").[441]

According to Morelli, *before* the Board entered the Ad Hoc Committee, he tried to circulate a written consent "to replace members of the board pursuant to the stockholders agreement."[442] This testimony is incorrect. First, it is inconsistent with Morelli's repeated claim that he had no idea why the meeting was occurring.[443] Giving Morelli the benefit of the doubt, he may have brought the written consents as a fall-back position, if his lack of notice ploy failed. In that case, he waited too long to raise the consents, because the record indicates that no one understood him to be talking about written consents before the Ad Hoc Committee convened.[444]

---

[439]  Tr. 823-24 (Sussman); JX 431.0001.

[440]  Tr. 824 (Sussman); JX 431.0001.

[441]  Tr. 420-21 (Morelli); *id.* at 825-29 (Sussman); *id.* at 1080 (Waite) ("And this whole process was led on the advice of Lonny Zilberman of how this should be run. He stated he told me that Mr. Morelli was not allowed to be in the subcommittee."). This Ad Hoc Committee appears to correspond to the special committee that Robbins undertook to represent.

[442]  *Id*. at 420.

[443]  That Morelli made that claim is borne out by the testimony of the Director Defendants. *Id.* at 1080 (Waite); *id.* at 1480 (Atkins).

[444]  Sussman testified that Morelli was saying something about the Stockholders Agreement as the Board broke to convene the Ad Hoc Committee meeting, but Sussman "didn't have the details of exactly what he was saying." *Id.* at 827.

With Morelli excluded, the Ad Hoc Committee began discussing the results of the sexual harassment investigation. Zilberman led the discussion and reviewed the Solomon Report with the Committee. He described his job as being to "report and summarize the investigation, the process, and the results or findings and then give my advice."[445] He summarized the investigation and the findings, provided the Committee members with a copy of the Solomon Report and the Solomon Declaration, and provided three recommendations to the Board: (1) move Optimis' business out of Morelli's house; (2) terminate Morelli as CEO; and (3) aggressively and quickly negotiate a settlement with Geller.[446] Zilberman recommended that Morelli be fired because, in his professional opinion, based on Morelli's admissions and the findings of the investigator, "nothing short of termination was the appropriate remedial measure."[447] Zilberman stated that not terminating Morelli seriously could compromise the Company's ability to defend a

---

Also, Sussman's contemporaneous notes, which are fairly detailed, lack any indication that Morelli attempted to circulate a written consent during the first part of the Board meeting or that Morelli even said anything about the Stockholders Agreement. JX 431.0001-.0002. Consistent with the fact that Morelli *later* attempted to circulate a written consent, Sussman's notes reflect that effort, *id.* at .0006, and are consistent with the rest of the testimony, as discussed *infra*.

[445] Zilberman Dep. 106.

[446] *Id.* at 109-13.

[447] *Id.* at 113.

subsequent sexual harassment suit by Geller.[448]  After providing this advice, Zilberman gave his number to the Ad Hoc Committee and left the meeting.

Zilberman's account is consistent with Sussman's recollection and notes and the testimony of Waite, Smith, and Atkins.[449]  Both Smith and Waite recalled that either Zilberman or Robbins made a comment to the effect that this was either "the most clear-cut case for termination of a CEO that I've seen in my entire career"[450] or "the worst case of sexual harassment I've seen."[451]

Under Robbins's guidance, the Ad Hoc Committee then debated the presentation by Zilberman.[452]  Kaufman's role in this process is unclear, but he apparently seconded Zilberman's advice.[453]  Wing attempted to defend Morelli and wanted to put him on a leave of absence, but Robbins advised that the Board basically had no choice but to fire Morelli.[454]  At one point, the Ad Hoc Committee also discussed Optimis' excessive expenses, which included massages, treadmills, landscaping, and a housekeeper at the

---

[448]    *Id.* at 113-16.  Zilberman also gave other real world examples of CEOs being terminated for sexual misconduct.  *Id.* at 117-18.

[449]    Tr. 829-35 (Sussman); JX 431.0002-.0004; Tr. 1081-82 (Waite); *id.* at 1282-83 (Smith); *id.* at 1481-83 (Atkins).

[450]    Tr. 1082 (Waite).  Sussman's notes reference the same comment.  *Id.* at 836 (Sussman); JX 431.0005.

[451]    Tr. 1283 (Smith).

[452]    *Id.* at 836, 839 (Sussman).

[453]    *Id.* at 1483 (Atkins).

[454]    *Id.* at 836 (Sussman).

133

Upper Bubble.[455] Ultimately, the Committee passed a series of motions to: (1) appoint Godges the chairman of the Committee (7-0-1, Wing abstained); (2) approve the engagement of Bingham McCutchen and hire Robbins (8-0); (3) recommend the full Board terminate Morelli (7-1, Wing abstained or opposed); and (4) appoint Waite as interim CEO with no additional compensation (8-0).[456]

The full Board then reconvened. Wing went downstairs to get Morelli and came back without him, because Morelli apparently was consulting with his lawyer. After waiting a few minutes, the Board reconvened. Waite then moved to approve Amendment No. 2. Although Wing objected to proceeding without Morelli, the Board proceeded and approved the amendment 7-1-0, with Wing opposed and Morelli not present.[457] Sussman understood Amendment No. 2 to strip Morelli of his ability to appoint a majority of the Board.[458] The amendment also stripped the Director Defendants and Abdelhamid of their Board-appointment rights.[459] Smith and Atkins understood that Amendment No. 2 was necessary so that Morelli could not undo the Board's actions and re-appoint himself, which would endanger the Company in a subsequent sexual harassment lawsuit.[460]

---

[455]    *Id.* at 837-38 (Sussman).

[456]    *Id.* at 840-42 (Sussman); JX 431.0005.

[457]    Tr. 843-47 (Sussman).

[458]    *Id.* at 846.

[459]    *Id.* at 1085 (Waite).

[460]    *Id.* at 1283-85 (Smith); *id.* at 1483-84 (Atkins).

134

When he returned to the Board meeting, Morelli raised numerous objections and attempted to circulate written consents to remove all of the Board members he had appointed; Sussman, however, told him it was too late.[461] Robbins then read portions of the Solomon Report aloud and the full Board voted to terminate Morelli, with Wing again not voting or voting against and Morelli not voting. A series of other pre-prepared motions were considered as well.[462]

## M. Morelli's Shadow Board and the Section 225 Action

Soon after the meeting, Sussman met with Wing, Morelli's supporter on the Board, to fill in his (Sussman's) notes.[463] Sussman also had frequent contacts with Morelli in the aftermath of the meeting. One of the more perplexing documents in the record, JX 432, is a draft of Sussman's contemporaneous notes being converted into a more formal document. On the second and third pages, the draft switches to Morelli writing in the first person. Either Sussman gave Morelli the October 20 Meeting notes and let him embellish them, or Sussman incorporated Morelli's first-person notes wholesale.

Morelli rapidly moved to reassert control over the Company. Sometime shortly after the October 20 Meeting, Doherty told Morelli that she had been in a relationship

---

[461]  *Id.* at 424-27 (Morelli); *id.* at 847-48 (Sussman); *id.* at 1086 (Waite); *id.* at 1287 (Smith); *id.* at 1484 (Atkins); JX 431.0006 ("Alan handed out written consent and request for electing 5 directors.").

[462]  Tr. 849-50 (Sussman).

[463]  *Id.* at 877. Interestingly, Sussman did not compare notes with anyone else.

with Horne.[464]  Morelli noticed a special meeting of the Board on October 23.[465]  Before that, Morelli removed Fahey, O'Keefe, and Godges—all of whom voted against him—and replaced them with Bert Camp, Larry O'Shea, and Scott Schroeder.  In a trial full of questionable testimony, Morelli astonishingly denied that he removed Fahey, O'Keefe, and Godges because they voted to terminate him, but he offered no other explanation for that action.[466]  Morelli's reconstituted Board met on October 25.  At this meeting, Morelli "suggested that [the board] investigate this purported claim of sexual harassment, which made no sense, and then . . . investigate the circumstances surrounding this coup attempt five days earlier."[467]  Thereafter, a special committee was created that included Hwang and others, who spent the next two years reviewing internal Company documents and emails.[468]

Litigation followed, first in California, which was voluntarily dismissed, and then in Delaware.  Morelli filed the 225 Action on November 1, 2012, against Waite, Godges, O'Keefe, and Fahey.  This Court entered a status quo order in that action on December

---

[464]     Tr. 1320 (Horne).

[465]     JX 454.

[466]     Tr. 599-601.  Morelli also denied that he controlled the Board, despite the fact that he is the largest Initial Stockholder and the Initial Stockholders had the right to appoint five of the nine Board members.  *Id.* at 592, 599.  These sorts of statements undermined Morelli's credibility.

[467]     *Id.* at 436.

[468]     *Id.* at 216-17, 223 (Hwang).  If Hwang's timeline is accurate, the special committee continued to investigate Morelli's termination until shortly after the filing of the Complaint in this action on August 5, 2013.

27, 2012. As a part of the 225 Action, the Company's computers were imaged to preserve documents.

### N. Suspicious Post-October 20 Activities

In support of their conspiracy theory, Plaintiffs emphasize the Director Defendants' treatment of Geller after Morelli was ousted on October 20. The evidence indicates that the Pacific Palisades clinic was the worst-performing clinic in the Company and that Geller was not a great employee.[469] The Pacific Palisades clinic, however, was a testing ground for Optimis*Sport*, so that clinic is not exactly comparable to the others. Regardless, financially, the Pacific Palisades clinic performed poorly. In November 2012, Geller received a pay raise that was approved by Waite to equalize her salary with that of other clinical directors.[470] Plaintiffs contend that raise was payment for Geller's role in the conspiracy.

Plaintiffs also note that Geller missed an in-house residency exam on September 20, 2012, but later received permission to join the remediation program and complete the residency.[471] Waite testified that Geller's clinic, being an unusual setup, had low patient volume, which made it difficult for her to complete the number of clinical hours required for the residency, and that Godges, Geller's mentor, recommended she be allowed to

---

[469] *Id.* at 1116 (Waite).

[470] *Id.* at 1131-32, 1180-81 (Waite). Kreile Dep. 172-76; JX 594 (11/28/12 email from Kreile to Waite: pointing out that Geller makes $5 to $7 an hour less than others).

[471] Tr. 1130 (Waite). At least one other Optimis physical therapist had been offered remediation. *Id.* at 1182 (Waite).

137

remediate.[472]  Additionally, a September 21, 2012 email from Kreile to Waite suggested that dropping Geller from the residency program would be a bad idea based on her allegations.[473]

## O.    Terminations, Resignations, and Lawsuits

Following the October 20 Meeting, Waite controlled Optimis in terms of day-to-day operations, but only for a short while.  On December 27, 2012, this Court entered a status quo order in the 225 Action restoring Optimis, in part, to the conditions that existed before the October 20 Meeting: Morelli continued as CEO; Waite remained COO; and the Board consisted of the same nine members as on October 20.  But, the status quo order also required the appointment of an Interim Chief Administrative Officer, a role filled by James Patton, who was granted "full authority to act for the Company and who shall be responsible for running the Company on a day-to-day basis."[474]  The order placed restrictions on transactions and activities out of the ordinary course of business.  Thus, for all practical purposes, control of the Company during this time was split between Waite and Morelli as any deviations from the status quo order required consent of both parties.

The 225 Action settled on March 21, 2013, and Amendment No. 2 was invalidated.  Morelli returned to power as CEO.  The parties to the 225 Action agreed to

---

[472]    *Id.* at 1130, 1182 (Waite); *see also id.* at 1277-78 (Atkins: describing remediation program and Geller's clinic).

[473]    JX 284.

[474]    Status Quo Order, *Morelli v. Waite*, C.A. No. 8001-VCP, D.I. 31 ¶ 3 (Dec. 27, 2012).  The Status Quo Order was amended slightly on January 17, 2013.  *Id.* at D.I. 36.  Another amendment followed on March 8, 2013.  *Id.* at D.I. 60.

form a special committee comprised of Wing and Abdelhamid to investigate the circumstances leading to the October 20 Action (the "225 Committee"). The relation of the 225 Committee to Morelli's separate investigative committee (the "Special Committee") is unclear, but every member of the Special Committee was appointed to the Board by Morelli, making its independence and neutrality highly questionable. Neither the 225 Committee nor the Special Committee has issued a report of its findings.

On March 22, 2013, PLIS denied coverage on Geller's sexual harassment claims. On March 25, the Board—including Horne's alleged co-conspirators, the Director Defendants—voted to remove all authority from Horne.[475] Geller commenced the first of her lawsuits on March 26, 2013, by filing a complaint with the Department of Fair Employment & Housing.[476] On April 10, Geller filed a suit for sexual harassment in the Superior Court of Los Angeles.[477] The Board formally suspended Horne on April 16, 2013, and officially terminated him on May 10, 2013. Shortly before he was terminated, Horne deleted his personal email account from his computer, as discussed in Section II.A *supra*.

The financial condition of the Company in early 2013 bears noting. At various points in this litigation, Plaintiffs have accused Defendants of attempting to drive the Company into bankruptcy. The evidence indicates that, as of year-end 2012 and first-

---

[475]    JX 699.0009.

[476]    JX 703.

[477]    JX 726.

quarter 2013, the Company's cash position had declined to roughly $600,000 and it faced a risk of running out of funds.[478] Accordingly, the Company was looking for financing and was negotiating with B of I toward that end.

On June 25, 2013, the same day the B of I loan was supposed to close, the Director Defendants resigned from the Board, and Waite resigned as COO. In a letter to the Board, they stated that the corporate structure of Rancho violated California law—because it was a professional corporation—and they listed pages of alleged misdeeds and incidents of mismanagement by Morelli.[479] The next day the Director Defendants filed an action in California seeking to rescind the 2007 Rancho transaction (the "Rescission Action").[480] On July 1, 2013, the Director Defendants were removed from the Rancho Board. Plaintiffs deride the Rescission Action as bad faith litigation, but, in its wake and on the same day, July 1, they restructured Optimis by assigning Rancho to Edwin Tinoco.[481] This restructuring seemingly cured the defect complained of in the Rescission Action. As a result of the assignment, however, Optimis no longer wholly owns Rancho. Instead, it now receives 55 percent of Rancho's revenues.[482]

---

[478]   *Id.* at 1224-25 (Olsen); *id.* at 1382-83 (Horne); JX 682 (3/5/13 email from Horne to the Board and others: laying out financial concerns and basically attributing the Company's problems to Morelli).

[479]   JX 784.

[480]   JX 790.

[481]   JX 800.

[482]   *Id.* at .0014.

140

Tinoco appears to be a friendly third party to Plaintiffs. Olsen described him as inexperienced and not respected by the Rancho staff.[483] Yet, four days into his job, on July 5, 2013, Tinoco terminated the Director Defendants' employment with Rancho, ending their successful careers as physical therapists there.[484] Predictably, Morelli denied having anything to do with the decision to terminate the Director Defendants.[485] Smith and Atkins, in particular, described the firing as extremely painful.[486] On August 23, 2013, the Rescission Action was voluntarily dismissed without prejudice.[487]

## P. History of This Lawsuit

This brings the story full circle to the events detailed in Section I. Plaintiffs filed the Complaint in this action on August 5, 2013. The Board, now entirely under Morelli's control, previously had authorized the Company to sue the Director Defendants.[488] On August 16, I denied a motion to expedite. On October 17, 2013, the Company sued Zilberman, his law firm, and Brys, as well as 100 unnamed Does, in a California action,

---

[483]  Tr. 1216-17.

[484]  JX 805.

[485]  Tr. 644. There is no evidence that Tinoco ever met any of the Director Defendants. *Id.* at 1089 (Waite).

[486]  *Id.* at 1289 (Smith); *id.* at 1492-93 (Atkins).

[487]  JX 845.

[488]  JX 808. There is no evidence that the Company ever authorized suit against Horne.

141

alleging malpractice and breaches of fiduciary duty.[489] This case before me essentially remained inactive until Plaintiffs finalized the Geller Settlement in December 2013, after which discovery began in earnest. In May 2014, Plaintiffs settled with Fearon and Levine. Continuing on the warpath, Optimis sued PLIS in California for bad faith breach of insurance contract, negligent retention of counsel, and aiding and abetting breaches of fiduciary duty.[490]

The Director Defendants and Horne separately moved for summary judgment in August and September 2014. Plaintiffs responded to those motions by submitting the affidavits of Fearon and Levine, who had not been identified as likely witnesses before that point. The related briefing was extensive. Plaintiffs then moved to amend their complaint and the parties briefed numerous motions *in limine*. When it became clear that this case was not ready for trial, I rescheduled the trial, for the third time, to early February 2015. On January 28, 2015, I denied the summary judgment motions. That same day, I issued a Memorandum Opinion denying Plaintiffs' motion to amend and granting in part Defendants' motion *in limine* to exclude certain undisclosed causes of action.[491] Although I concluded that the Complaint adequately pled a conspiracy, I held that Plaintiffs' discovery conduct effectively amounted to a knowing concealment of the

---

[489]   JX 884. Brys previously had filed suit against the Company in February 2013 for retaliation and wrongful termination. JX 43.

[490]   JX 948.

[491]   *OptimisCorp v. Waite*, 2015 WL 357675 (Del. Ch. Jan. 28, 2015).

142

scope of their claims. Based on that, and as a sanction for Plaintiffs' failure to supplement their interrogatory responses under Rule 26(e)(1)(A), I ordered that: Fearon, Levine, and Gunn would be excluded from any alleged conspiracy; claims relating to the Fearon Rescission would be excluded from this case; and Plaintiffs would be barred from attempting to impose liability on Defendants for any acts not then disclosed in the record.

I presided over a six-day trial from February 6-13, 2015. The parties extensively briefed the issues and I heard post-trial argument on April 30, 2015.

## III.   STANDARD OF REVIEW

Plaintiffs have the burden of proving each element, including damages, of each of their causes of action against each Defendant by a preponderance of the evidence. "'Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not.'"[492] By implication, the preponderance of the evidence standard also means that if the evidence is in equipoise, Plaintiffs lose.

## IV.   PARTIES' CONTENTIONS & STATE OF THE LITIGATION

Defendants' main contention is that they have done nothing wrong. The Director Defendants contend that there is no conspiracy and that Plaintiffs' litigation strategy has forced them to try to prove a negative. Once the conspiracy is eliminated, it is clear that

---

[492]    *Agilent Techs., Inc. v. Kirkland*, 2010 WL 610725, at *13 (Del. Ch. Feb. 18, 2010) (quoting *Del. Express Shuttle, Inc. v. Older*, 2002 WL 31458243, at *17 (Del. Ch. Oct. 23, 2002)).

Atkins and Smith had virtually no involvement in the most of the alleged fiduciary duty breaches. The Director Defendants further argue that the duty of loyalty claims fail, that the breach of contract claims are legally insufficient, and that the Rescission Action was a good faith, privileged action that cannot give rise to liability. Defendant Horne denies that he was involved in any wrongdoing. Horne repeatedly has emphasized that there is no evidence the Board ever authorized suit against him. Horne argues, therefore, that this lawsuit is a vendetta by Morelli against him because of his relationship with Morelli's former wife, and that Morelli's pursuit of this lawsuit against him on behalf of Optimis, but without Board authority, is an improper use of corporate funds for personal purposes.[493] Plaintiffs' primary claims against Horne at this point are for aiding and abetting.

All Defendants strenuously have complained that the claims against them have been a shifting target and impossible to defend against without enormous expense. They contend that it was not until Plaintiffs filed their final post-trial brief that it was possible to ascertain exactly what claims were being pursued in this litigation.

In addition to the sprawling conspiracy and the rescission claims I previously excluded, Plaintiffs have abandoned their claims for at least the following alleged wrongs: (1) Horne wrongfully disclosed confidential Company information to Doherty for use in her divorce proceedings against Morelli; (2) Horne improperly set a $2 million

---

[493] Based on my dismissal of the claims against Horne on the merits, I do not reach the lack of authority to sue defense.

144

reserve for Geller's claims; (3) Horne, and possibly the Director Defendants, deliberately attempted to drive the Company into bankruptcy so that he (or they) could buy its assets at fire-sale prices; (4) the Director Defendants wrongfully extended their Employment Agreements with Rancho; (5) the Director Defendants have unfairly competed with Rancho by working at All-Star Physical Therapy; (6) the Director Defendants stole reams of confidential information from Rancho shortly before they left; (7) the Director Defendants wrongfully poached employees from Rancho; (8) Defendants tortiously interfered with at least eight contracts or business opportunities in addition to the three still at issue and discussed in this Opinion; and (9) duty of care violations by some or all of Defendants. To the extent Plaintiffs contend that they have not abandoned these claims, I hereby deem them waived.[494]

With only the slightest risk of oversimplification, a fair summary of Plaintiffs' position is that everything that has gone wrong at Optimis since at least 2012 is Defendants' fault. Plaintiffs seek over $50 million in damages and an extension of the Stockholders Agreement (and thus Morelli's control) for two additional years. According to Plaintiffs, at least Horne, the Director Defendants, Rohlinger, and Godges conspired for years to breach their fiduciary duties. Those breaches include conspiring to: oust Morelli and seize control of the Company; sabotage the Company's strategic plan; attempt to gain control of Optimis by ambush; try to steal Rancho; and interfere with the

---

[494] *Emerald P'rs v. Berlin*, 2003 WL 21003437, at \*43 & n.144 (Del. Ch. Apr. 28, 2003).

145

B of I financing. Plaintiffs also contend that Defendants breached the Stockholders Agreement or the related implied covenant of good faith and fair dealing. Finally, Plaintiffs assert that Defendants tortiously interfered with the DSC, the B of I financing, and a potential relationship with the Preferred Therapy Provider Network. Horne is alleged to have at least aided and abetted these wrongs.

## V. LEGAL ANALYSIS

### A. There Is No Conspiracy

Since the summary judgment briefing, Defendants have contended that the conspiracy claims must be dismissed because they fail as a matter of law. Delaware law requires an independent tort underlying a civil conspiracy. As such, the breach of contract claims cannot serve as a predicate for the alleged civil conspiracy.[495] This leaves the breach of fiduciary duty claims and the tortious interference claims. While these claims can form the basis of a civil conspiracy, Defendants contend that the law precludes a conspiracy among fiduciaries to breach fiduciary duties.[496] In support of their position, Defendants cite cases such as *Albert v. Alex. Brown Management Services, Inc.*,

---

[495] *NACCO Indus., Inc. v. Applica Inc.*, 997 A.2d 1, 35 (Del. Ch. 2009) ("A breach of contract is not an underlying wrong that can give rise to a civil conspiracy claim."); *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 892 (Del. Ch. 2009) ("[U]nless the breach also constitutes an independent tort, a breach of contract cannot constitute an underlying wrong on which a claim for civil conspiracy could be based; similarly, a claim for civil conspiracy cannot be predicated on a breach of the implied *contractual* covenant of good faith and fair dealing unless the breach also constitutes an independent tort.") (emphasis original).

[496] In relation to Optimis, the alleged conspirators here, namely, the Director Defendants, Horne, Godges, and Rohlinger, all were directors or officers or, in the case of Waite, both.

146

which states: "[C]ivil conspiracy is vicarious liability. It holds a third party, not a fiduciary, responsible for a violation of fiduciary duty."[497]

Defendants have the stronger argument on this issue. The case law on vicarious liability and fiduciaries admittedly is less than crystalline. In the fiduciary duty context, conspiracy is treated essentially as coterminous with aiding and abetting.[498] It would make little sense, therefore, particularly given the vicarious liability that attaches to conspiracy,[499] for a lower standard to apply to conspiracy than aiding and abetting.[500] In

---

[497]   2005 WL 2130607, at *11 (Del. Ch. Aug. 26, 2005). Plaintiffs, by contrast, cited other cases that did not include the non-fiduciary requirement in their articulation of the conspiracy standard. *E.g.*, *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149-50 (Del. 1987) ("Plaintiffs must prove: (1) A confederation of two or more persons; (2) An unlawful act done in furtherance of the conspiracy; and (3) Actual damage."). *Nicolet* did not address the issue of a conspiracy among fiduciaries predicated on a breach of fiduciary duties.

[498]   *Allied Capital Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1038 (Del. Ch. 2006) ("Indeed, our state courts have noted that in cases involving the internal affairs of corporations, aiding and abetting claims represent a context-specific application of civil conspiracy law.") (collecting cases); *See also Gilbert v. El Paso Co.*, 490 A.2d 1050, 1057 (Del. Ch. 1984) (stating the elements of civil conspiracy as "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty and (3) knowing participation in that breach by the party not in direct fiduciary relationship . . . [and (4)] damages resulting from the action of the conspiracy parties"), *aff'd*, 575 A.2d 1131 (Del. 1990).

[499]   *Nicolet*, 525 A.2d at 150 ("Under Delaware law, a conspirator is jointly and severally liable for the acts of co-conspirators committed in furtherance of the conspiracy.").

[500]   *See Parfi Hldg. AB v. Mirror Image Internet, Inc.*, 794 A.2d 1211, 1238 (Del. Ch. 2001) ("Civil conspiracy thus provides a mechanism to impute liability to those not a direct party to the underlying tort. As such, it can be viewed as parallel to aiding and abetting."), *rev'd on other grounds*, 817 A.2d 149 (Del. 2002); *see also Allied Capital Corp.*, 910 A.2d at 1038-39 ("Like the test for civil conspiracy, the

147

those instances where a fiduciary takes actions that would amount to aiding and abetting by a non-fiduciary, that conduct amounts to a direct breach of fiduciary duties.[501] Presumably, the same would be true of a conspiracy: an actor's entry into a conspiracy to facilitate another actor's breach of fiduciary duty to an entity to which the first actor owed a fiduciary duty would itself be a breach of the first actor's fiduciary duties. This conceptual complexity, coupled with the minimal additional benefit likely to result from holding a fiduciary vicariously, rather than directly, liable for participating in another fiduciary's breach of duty suggests one reason why it is highly doubtful that a conspiracy of fiduciaries is a legally cognizable cause of action.[502]

Equally importantly, even if I were to recognize such a cause of action, Plaintiffs have not satisfied their burden of proving that a conspiracy existed. All of the recitations

---

test for stating an aiding and abetting claim is a stringent one, turning on proof of scienter—a plaintiff must prove: (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty and (3) knowing participation in that breach by the non-fiduciary.").

[501] *Gantler v. Stephens*, 965 A.2d 695, 708-09 (Del. 2009); *Higher Educ. Mgmt. Gp., Inc. v. Mathews*, 2014 WL 5573325, at *13 & n.78 (Del. Ch. Nov. 3, 2014) (citing *Gantler* for the proposition that any conduct of the CFO's "rising to the level of aiding and abetting would be a breach of his own fiduciary duties").

[502] *Cf. In re Nine Sys. Corp.*, 2014 WL 4383127, at *48 (Del. Ch. Sept. 4, 2014) (allowing aiding and abetting claim to be pled in the alternative and holding: "In other words, the Plaintiffs are limited to one recovery—breach of fiduciary duty or aiding and abetting"). I do not read *Microsoft Corp. v. Amphus, Inc.*, 2013 WL 5899003 (Del. Ch. Oct. 31, 2013), cited by Plaintiffs, as to the contrary. That case, at the pleadings stage, allowed a conspiracy claim to proceed as against a director, a separate entity operated by the director, and a third company. *Id.* at *2, *15-16. As such, it did not involve the situation here, where all alleged co-conspirators are fiduciaries.

148

of the elements of a conspiracy require a "confederation." Given the overlap with aiding

and abetting law in the context of alleged breaches of fiduciary duties, the confederation

requirement includes "knowing participation" in the conspiracy. Although it is true that

there need not be an explicit agreement, plaintiffs still must prove knowing participation

in a conspiracy.[503] They have failed to do so.

The main problem is that the evidence on which Plaintiffs chiefly rely simply does

not say what Plaintiffs argue it does. For example, Plaintiffs rely on the 2010 Emails as

evidence of the start of the conspiracy. The "hostile takeover" line to which Plaintiffs

point is taken entirely out of context.[504] Although the 2010 Emails indicate a group of

stockholders and directors coordinating their actions, the actions under discussion related

to concerns about one of the Company's primary products and the difficulty of airing

---

[503] *See Gilbert v. El Paso Co.*, 490 A.2d at 1057. Plaintiffs suggest that proof of a conspiracy "can be inferred from the behavior of the alleged conspirators." POB 42. That may be true, but Plaintiffs must prove the conspiracy or facts such that only a conspiracy could be inferred from them. *Malpiede v. Townson*, 780 A.2d 1075, 1097 (Del. 2001) (holding, in the analogous aiding and abetting context that: "Knowing participation in a board's fiduciary breach requires that the third party act with the knowledge that the conduct advocated or assisted constitutes such a breach"); *id.* at 1097 n.79 ("'It may be that some circumstances will arise in which the terms of the negotiated transaction themselves are so suspect as to permit, if proven, an inference of knowledge of an intended breach of trust.'") (quoting *Greenfield v. Tele-Commc'ns, Inc.*, 1989 WL 48738, 15 Del. J. Corp. L. 182, 188 (Del. Ch. May 10, 1989)). Accordingly, because Plaintiffs must prove every element of their claims, they similarly must prove that an inference is appropriate under the preponderance of the evidence standard.

[504] JX 84.

149

such concerns in a public setting with a CEO like Morelli.  Such discussions are a far cry from the disloyal takeover plot Plaintiffs allege.

Absent the 2010 Emails, there is no evidence suggesting a concerted group effort to take over the Company.  Based on the facts that I have found, the most reasonable interpretation of the evidence is that there were several independent groups of individuals in the Company, each focused on OptimisPT, but not operating in a confederation to commit a wrongful act.  Neither Atkins nor Smith had much involvement with the day-to-day operations of Optimis; they focused on running their Rancho clinics.  To the extent they had a unified goal with Waite, that goal was to improve the PT software and achieve a liquidity event, an outcome that would be shared with all stockholders.  Fearon and Levine similarly sought to improve OptimisPT, to which their reputations were linked, and also wanted their employment agreements extended and improved.  Contrary to pursuing some form of confederated action with one or more of Defendants, Fearon and Levine struck out on their own because Waite could not address their concerns. Horne only enters the alleged conspiracy because of an email that includes no text in February 2012.  That email was to Rohlinger.  Similarly, Horne's telling Rohlinger about Geller's allegations does not implicate him in a takeover plot.  Even if Rohlinger did later tell Waite, the only item tying Horne to the purported machinations by Waite is the February 2012 emailing of the Stockholders Agreement.  Defendants have proffered an innocent, non-conspiracy explanation for that email that is supported by the contemporaneous documents: disclosure of the Stockholders Agreement in the PPMs. But, even if the purpose of the email was to enable Horne and Rohlinger to review

150

Morelli's rights under the Stockholders Agreement to appoint five of the nine Optimis directors, as Plaintiffs imply, there is nothing improper about that.

Additionally, the June 2012 email from Waite to Rohlinger[505] on which Plaintiffs focus does nothing to implicate either Horne, Atkins, or Smith. The best reading of that email is Waite venting. Indeed, the most direct communication that plausibly could support a reading of an active plot to remove Morelli was written by Levine.[506] But, Plaintiffs settled with Levine and I have precluded Plaintiffs from contending he is part of the alleged conspiracy among Defendants. Moreover, even if he was part of the alleged conspiracy, Waite and Rohlinger both advised Levine at the June 2012 Meeting not to confront Morelli as Levine planned. Eventually, Fearon and Levine proceeded to contact Morelli on their own, without any assistance from any of Defendants.

Levine's testimony about the June 2012 Meeting—which is temporally close to the alleged fruition of the conspiracy—undermines the idea that there was a confederation, particularly one dating back to late 2010. At trial, Levine explained his frustration with the lack of progress on OptimisPT and on resolving his and Fearon's complaints.[507] The evidence does not support a finding that Defendants, or even Waite, Rohlinger, and Levine, considered as a group, participated in a confederation to undermine Morelli. Levine, Plaintiffs' witness, again is on point. He stated: "And it just

---

[505]    JX 233.

[506]    JX 230.

[507]    Tr. 1572.

151

seemed like every time we got together it was nothing but a gripe session. We didn't have a plan. We didn't have a strategy. We didn't have anything. And it just became more and more frustrating."[508] This lack of a plan, the absence of a strategy, and Waite's inability to resolve Fearon and Levine's concerns is what led Fearon and Levine to send their formal letter to Morelli threatening to leave the Company if their demands were not met. Such evidence cuts sharply against a finding that Defendants were in a conspiracy to breach their fiduciary duties by undermining Morelli and attempting to take control of Optimis.

Waite is the most active of any of Defendants in the alleged conspiracy. His activity, however, primarily involved assuaging others or advising others *against* doing things. The evidence does not show a plot between him and the other Director Defendants or any of the Director Defendants, Horne, and Rohlinger to commit the wrongs Plaintiffs allege. Rather, the facts indicate several individuals both independently and collectively discussing their complaints about Morelli. All of those individuals owed fiduciary duties to Optimis and cared deeply about the success of Optimis; they may have disliked Morelli and sincerely wanted him gone, not out of animus toward him (with the possible exception of Defendant Horne), but instead based on a belief that he was doing a poor job as CEO. As Defendants' briefing—and the preceding paragraphs—show, it is difficult to "disprove" a conspiracy. But, Plaintiffs have the burden of proof. They have not shown that Defendants participated in a confederation that involved breaches of

---

[508]    *Id.* at 1573.

fiduciary duty. The main evidence upon which they rely—the 2010 Emails and the June 2012 Meeting—does not support their position. Moreover, the key piece of the puzzle, Defendants allegedly having bribed and cajoled Geller to disclose her sexual harassment complaints, was not proven.

In sum, I seriously question whether a cause of action exists under Delaware law for a conspiracy among fiduciaries to breach a fiduciary duty. Even if such a cause of action exists, however, Plaintiffs have not met their burden of proving the existence of such a conspiracy in this case. As a result, I dismiss Plaintiffs' claim of conspiracy and proceed to examine the alleged wrongs committed by the various Defendants separately.

### B.    The Duty of Loyalty

Plaintiffs' arguments raise basic questions as to what the duty of loyalty requires. The classic formulation of that duty comes from *Guth v. Loft, Inc.*, in which the Delaware Supreme Court stated:

> Corporate officers and directors are not permitted to use their position of trust and confidence *to further their private interests*. . . . A public policy, existing through the years, and derived from a profound knowledge of human characteristics and motives, has established a rule that demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage which his skill and ability might properly bring to it, or to enable it to make in the reasonable and lawful exercise of its powers. . . . The occasions for the determination of honesty, good faith and loyal conduct are many and varied, and no hard and fast rule

153

can be formulated. The standard of loyalty is measured by no fixed scale.[509]

"Essentially, the duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder *and not shared by the stockholders generally*."[510] "In short, directors must eschew any conflict between duty and self-interest."[511]

Plaintiffs allege four duty of loyalty breaches: (1) undermining the Company's strategic plan; (2) attempting to gain control of Optimis by ambush; (3) attempting to steal Rancho from Optimis; and (4) interfering with the B of I financing. I address these purported wrongs in turn.

Plaintiffs' arguments suffer from two fatal flaws. The first is that Plaintiffs allege a takeover scheme bereft of a motive or interest not shared with the other stockholders generally. Defendants allegedly engaged in a years-long takeover effort. For what self-interested reason? Plaintiffs have offered no convincing explanation. The second problem, which may be the cause of the first, is that Plaintiffs seem to presume that Morelli has a right to be CEO. He does not. The facts instead show that, at least until the 225 Action, Defendants acted in the best interests of Optimis, the entity, which they believed coincided with their own interests as stockholders.

---

[509]    5 A.2d 503, 510 (Del. 1939) (emphasis added).

[510]    *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993), *modified in irrelevant part*, 636 A.2d 956 (Del. 1994) (emphasis added).

[511]    *Ivanhoe P'rs v. Newmont Mining Corp.*, 535 A.2d 1334, 1345 (Del. 1987).

154

### 1.    Sabotaging the Company's strategic plan

This is the most nebulous wrong Plaintiffs allege.  The claim seems to be that Optimis*Sport* was the long-run vision of the Company and Defendants undermined it.  The evidence clearly shows that Morelli believed Optimis*Sport* was the path forward.  The evidence also shows, however, that the Director Defendants, then the Company's largest stockholders and the managers of Rancho, the Company's largest asset and the generator of most of its cash, believed that the first priority should be to stabilize and perfect OptimisPT.  At least Fearon, Levine, and Gunn all believed similarly.  Plaintiffs' arguments on this point are convoluted, but appear to be that Defendants secretly opposed Optimis*Sport* and the DSC, reallocated resources to OptimisPT, undermined Morelli's authority, and hid all of this by communicating through private emails.  It is unclear whether Plaintiffs are asserting a violation of the duty of candor or the duty of loyalty, or some sort of hybrid claim.  They cite two cases in support of their sabotage argument: *HMG/Courtland Properties, Inc. v. Gray*[512] and *Hollinger International Inc. v. Black*.[513]  Neither supports the sweeping liability theory for which Plaintiffs advocate.

Both *HMG/Courtland* and *Hollinger* involved self-dealing transactions.  There is no self-dealing transaction in this case.  *HMG/Courtland Properties* involved a suit by a corporation against, principally, the corporation's former president and a former director.  The individual defendants stood on both sides of the challenged transactions, did not

---

[512]    749 A.2d 94 (Del. Ch. 1999).

[513]    844 A.2d 1022 (Del. Ch. 2004), *aff'd*, 872 A.2d 559 (Del. 2005).

disclose that interest, and later misled the company's board about their involvement.[514] In discussing a fraud claim, the Court noted that the "directors . . . had an 'unremitting obligation' to deal candidly with their fellow directors."[515] Thus, the directors had an affirmative obligation to disclose their conflicting interests in the transactions. The situation in *Hollinger* is even more factually inapposite to this case. There, the Court recounted at length the antics of Lord Conrad Black, who: deliberately undermined the board's ability to consider a transaction and instead diverted the opportunity to himself; misled the board as to his ongoing, secret efforts to sell pieces of the company; improperly used confidential information to advance his own interests; and effectively encouraged his secret buyers to try and bribe the financial advisor to approve the sale.[516]

Both *HMG/Courtland* and *Hollinger*, therefore, involved classic examples of conflicted transactions where an interest adverse to the company was not disclosed. In this case, there was no transaction at all and Plaintiffs have not shown some sort of self-

---

[514] *HMG/Courtland Props.*, 749 A.2d at 114 ("Gray's undisclosed, buy-side interest in the Transactions is a classic case of self-dealing.").

[515] *Id.* at 119 (quoting *Mills Acq. Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1283 (Del. 1989)).

[516] *Hollinger Int'l*, 844 A.2d at 1062 ("In sum, Black intentionally subverted the International Strategic Process he had pledged to support through a course of conduct involving misleading and deceptive conduct toward his fellow directors, all designed with the goal of presenting them with a 'fait accompli.' . . . It is difficult to conceive of a meaningful definition of the duty of loyalty that tolerates conduct of this kind.").

interest that led Defendants to engage in purportedly disloyal acts. The cases Plaintiffs rely on have no application to the facts of this case.

Plaintiffs also argue that the Company's strategic vision involved devoting resources to both OptimisPT and Optimis*Sport*, that Defendants sabotaged that plan, and that, accordingly, Defendants breached their duty of loyalty. This argument fails at several levels, but principally because Plaintiffs have not proven that Defendants acted in a manner that elevated any personal interest above the Company's interests, even considering idiosyncratic motivators like pride or greed. Plaintiffs have shown no special interest or benefit that accrued to Defendants that would not have accrued to all of Optimis' stockholders. In short, Plaintiffs have not shown the key element of disloyalty.

The factual record, as recounted above, indicates that the Company, in fact, did decide to pursue two products simultaneously. Plaintiffs rely heavily on the minutes of several meetings of the Optimis Board to suggest some sort of Board-approved strategy. But, this evidence is weak. It includes statements like "Optimis*PT*: George Rohlinger led a discussion about the developments in our beta program since the last Board of Directors meeting . . . ."[517] and "Mr. Morelli led a discussion about Optimis*Sport* and Optimis*Sport* Events."[518] Conspicuously absent from the Board minutes is any discussion of the resource allocation between the two products or any action on a resolution regarding that issue. Plaintiffs have pointed to no such Board-determined, specific allocation of

[517]  JX 30.0001.

[518]  *Id.* at .0012.

157

resources.  In a company with finite resources attempting to develop and market two separate products, it is not unusual that a decision to expend more effort on one product results in less effort being spent on the other.  Plaintiffs have not proven that the Company explicitly had decided on a particular resource allocation scheme or that Defendants subsequently undermined it for self-interested reasons.  Absent such a clear allocation program, it is difficult to see how Defendants acted disloyally in supporting providing a greater share of the available resources for OptimisPT, which they believed would better serve the interests of Optimis and its stockholders.  Instead, the Company's day-to-day operations involved the customary battle for limited resources.

Plaintiffs attempt to turn this competition, which manifested itself in a difference of opinion between Morelli and the Director Defendants, into a breach of the duty of loyalty.  The actions complained of do not amount to such a breach.  For example, several executives thought the DSC was a waste of money.  Even if Horne told Owens not to work on the event, Owens did not listen.  That disputed fact, regarding Horne's alleged statement, is about the strongest evidence Plaintiffs marshal of "sabotage."  Plaintiffs further contend that "Defendants repeatedly challenged Morelli's authority and allocation of assets within the Company, all outside of Morelli's presence."[519]  The duty of loyalty is owed to the corporation and the stockholders at large, not to Morelli.[520]  The

---

[519]     Pls.' Post-Trial Reply Br. [hereinafter "PRB"] 13.

[520]     *See, e.g.*, *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 955 (Del. 1985) ("[C]orporate directors have a fiduciary duty to act in the best interests of the corporation's stockholders."); *eBay Domestic Hldgs., Inc. v. Newmark*, 16 A.3d 1,

duty of loyalty does not require Defendants to act like lemmings with respect to Morelli. The evidence may show that Defendants did not like Morelli, but Plaintiffs have not proven that Defendants "undermined" his authority such that they acted disloyally *to Optimis*.

Plaintiffs also argue that Defendants orchestrated a clandestine scheme of secretly diverting resources and hiding it all from Morelli. But, Morelli knew about the disagreements over Sport and PT. Hwang, for example, told Morelli about them directly.[521] Moreover, Morelli's own emails indicate that he was aware of the allegedly secret resource diversion problem.[522] Additionally, the weight of the evidence shows that Morelli, who worked in close proximity to the developers, decided the Company's direction with respect to the software as he saw fit.[523] Thus, I find that Morelli knew about the resource allocation dispute.

---

34 (Del. Ch. 2010) (explaining that directors' fiduciary duties include "acting to promote the value of the corporation for the benefit of the stockholders."); *Gilbert v. El Paso Co.*, 1988 WL 124325, 14 DEL. J. CORP. L. 727, 743 (Del. Ch. Nov. 21, 1988) ("[T]he directors' fiduciary duty runs to the corporation and to the entire body of shareholders generally, as opposed to specific shareholders or shareholder subgroups."), *aff'd*, 575 A.2d 1131 (Del. 1990).

[521] Tr. 255-56.

[522] JX 233.0003.

[523] *See, e.g.*, Brys Dep. 193 ("Q. Do you agree with Mr. Morelli's assessment that there was a power struggle going on in around [sic] this time? A. No. I don't agree with his assessment. . . . Because everyone reported to Mr. Morelli. He . . . decided how the company was going to be managed and that's how the company was managed and directed. So a struggle implies a competing power. I didn't see one.").

The evidence shows that Defendants, particularly the Director Defendants and Fearon and Levine, believed that the best thing for Optimis would be the completion of OptimisPT. That position was not unreasonable: it was the OptimisPT product that led many successful business people to sell their businesses to Morelli in stock-for-stock transactions; PT is the product with market share; and it is the product that has a proven revenue-generating structure—third-party reimbursement, as opposed to Sport's apparent reliance on out-of-pocket payments. Also, PT was the only Optimis product that was described with any specificity at trial. It remains unclear exactly what Sport consists of, what it will do, how it will work, and how it will generate positive cash flow.[524] Thus, I find that the battle for resources within the Company was driven by a good faith, reasonable belief that the Company's best interests lay in focusing more on completing the PT product.[525]

Plaintiffs allege that Defendants' "self-interested motivation" was eliminating Morelli so they "could force a liquidity event for themselves."[526] This argument lacks merit. There is no evidence Defendants took any action to force a liquidity event.

---

[524] Atkins credibly testified that he previously had experimented with a weight-loss program at Rancho that was not run through a reimbursement platform. That program was difficult to monetize effectively and, in fact, most of those efforts lost money. Tr. 1465-66. When Atkins explained this to Morelli, he replied: "I don't know if you know that much about this . . . . What we're doing is much bigger than what you've done." *Id.* at 1466.

[525] *See* Rohlinger Dep. 69-72, 116 (testifying that the dilution of resources across OptimisPT and Optimis*Sport* was detrimental to all of the Company's products).

[526] POB 13-14.

Indeed, the evidence in the record is to the contrary: the "hostile takeover" email, for example, expressly discusses following Morelli's plan because he was best situated to bring about a liquidity event.[527] Viewing the evidence as a whole, I find that Defendants shared the hope, as Morelli had promised, of achieving an advantageous liquidity event in the relatively near future. Morelli apparently believed the most effective means to that end was focusing primarily on the Sport product. Defendants, for different reasons in some cases, disagreed; they believed giving priority to development of the PT product in the near term would maximize the Company's chances for a liquidity event.

Plaintiffs suggest that I could find Defendants liable even if they acted selflessly and in the best interest of the Company.[528] It is difficult to envision a situation that would provide a useful analogy to this case where that would be true. In any event, Plaintiffs have not explained how a non-self-interested fiduciary could act disloyally when pursuing an objectively reasonable goal.

---

[527]    JX 84.

[528]    *See Guttman v. Huang*, 823 A.2d 492, 506 n.34 (Del. Ch. 2003) ("There might be situations when a director acts in subjective good faith and is yet not loyal (*e.g.*, if the director is interested in a transaction subject to the entire fairness standard and cannot prove financial fairness), but there is no case in which a director can act in subjective bad faith towards the corporation and act loyally."); *see also Johnston v. Pedersen*, 28 A.3d 1079, 1092 (Del. Ch. Sept. 23, 2011) ("The defendant directors therefore breached their duty of loyalty by issuing the Series B Preferred. Despite this fiduciary failing, they have convinced me that they acted in good faith. To reiterate, they honestly believed that a period of "stability" (*i.e.* entrenched incumbency) would be in the best interests of [the company]."). These cases involve either a failure of proof (*Guttman*) or subjective beliefs that objectively are unreasonable under Delaware law (*Johnston*). Plaintiffs also cite *VGS, Inc. v. Castiel* for this proposition. I discuss that case *infra*.

161

Finally, Plaintiffs suggest, without elaborating, that there was a breach of the duty of candor here. The gist of this argument appears to be that Defendants had a duty to tell the Board that they opposed the Optimis*Sport* product. There is no evidence that the Board, before October 20, 2012, operated as any substantial check on Morelli in any area or served any useful purpose other than rubber-stamping his proposals. When a Board member did something Morelli disliked, such as disagree with him, he reacted negatively. For example, when Godges, a highly respected figure in the physical therapy field, crossed Morelli at a Board meeting, Morelli browbeat him into submission. Morelli's demeaning treatment of Godges surprised and concerned the Director Defendants.[529] Not surprisingly, therefore, Defendants were reluctant to cross Morelli, especially in the "public" setting of a Board meeting. Plaintiffs have not cited, and I am not aware of, any case holding that a director's disagreement with the amount of resources devoted to a specific product line without telling the Board amounts to disloyalty, particularly when no Board action on that issue has been sought.

As stated, Plaintiffs have not proven that the Board set an allocation of resources as between PT and Sport. Plaintiffs have not shown that any Defendant acted disloyally—*i.e.*, that a Defendant put the Company's and the stockholders' interests second to some personal interest—by competing for those resources on a day-to-day level. In any event, as discussed above, the evidence shows that Morelli knew there were internal disagreements over the allocation between Sport and PT. Because Plaintiffs

---

[529]    *See supra* notes 225-27 and accompanying text.

162

failed to prove by a preponderance of the evidence that Defendants acted in some way other than loyally to the Company, I reject their duty of candor claim as fatally flawed.

Plaintiffs bear the burden of proving that each Defendant "sabotaged" the Company's strategic direction. They have not shown, however, that any Defendant had a motive contrary to that of the stockholders at large. Similarly, Plaintiffs have shown no evidence that Atkins or Smith did anything to sabotage the DSC or Optimis*Sport*. Plaintiffs have not proven that Horne took actions sufficient to constitute disloyalty—at worst, he told an employee, who ignored him, not to work on a project Horne believed was a waste of money, but in which he nevertheless participated. Plaintiffs also have not shown that Waite did anything more than compete for limited resources within the Company and vent about Morelli's performance as CEO. Based on the evidence presented at trial, therefore, I conclude that Defendants and others in the Company favoring OptimisPT proceeded in good faith and in the reasonable belief that they were acting in the best interests of Optimis and its stockholders.[530] Thus, I conclude that Plaintiffs have not proven that Defendants undermined the Company's strategic vision.

### 2. Attempting to gain control of Optimis by ambush

Plaintiffs' second theory of liability is the closest to a traditional duty of loyalty violation. Although not directly an interested transaction, Plaintiffs argue that Morelli's ouster was self-interested—driven by a hatred of Morelli or a decision to divest him of his contractual right to control the composition of the Board until early 2015 by whatever

---

[530] *E.g.*, Tr. 782-83 (Fearon).

163

means necessary—and fell below minimum standards of fairness. A primary premise of this theory is that the sexual harassment investigation was a sham and a pretext to eliminate Morelli. Plaintiffs contend that the entire process was "tainted by defendants' undisclosed material conflicts."[531] I reject this argument, but note that, in making it, Plaintiffs relied heavily on certain Delaware case law that appears supportive. Having carefully considered those cases, I conclude that the main ones were incorrectly decided and I decline to follow them. In rejecting those cases and applying the law to the facts as I have found them, I find that the process to oust Morelli, though procedurally bungled, was a good faith effort to act in the best interests of the Company and that no liability attaches to that attempt.

### a. The super-director theory

The first element of Plaintiffs' argument is that Morelli, as a director and controller,[532] was entitled to advance notice of the October 20 Meeting and a chance to exercise his contractual rights and reconstitute the Board. By depriving him of that right, Defendants allegedly breached their duty of loyalty. To evaluate Plaintiffs' legal position, it is necessary to examine a line of four cases dating to 1992.

---

[531]    PRB 18.

[532]    Under the Stockholders Agreement, the Initial Stockholders had the right to appoint a majority of the Board. Morelli, individually and through Analog, controlled the vast majority of the shares held by the Initial Stockholders. Accordingly, he unilaterally could determine a majority of the Board. *See supra* notes 177-79 and accompanying text.

The first of those cases was *Koch v. Stearn*.[533]   In that case, the company, Showcase Communications Network, Inc. ("Showcase"), had a four-member board. Stearn, the President, CEO, and majority stockholder, controlled two board seats; Koch, an outside director who owned preferred stock, had the right to appoint two board members and the right to elect a fifth director if certain covenants were breached.  The board initially consisted of Stearn, his appointee Ginsberg, Koch, and his designee Bunn. When Showcase ended up in poor financial condition, Koch offered to invest more money if Stearn resigned.  On April 6, 1992, Bunn faxed Showcase's attorney a letter asking him and Stearn to attend a special board meeting the next morning.  That same day, Bunn circulated to Koch and Ginsberg draft resolutions that provided, among other things, for Stearn's removal, but no one sent those resolutions to Stearn.[534]

At the meeting, after Stearn refused to reconsider the financing offer, Bunn proposed the resolution removing him as President and CEO and replacing him with Ginsberg.  Stearn at some point attempted to remove Ginsberg.  Koch later purported to exercise his power to appoint a fifth director.  A Section 225 action followed.  According to the Court, the "validity of the board action taken on April 7th . . . depends upon whether Stearn was tricked or deceived into attending the meeting."[535]  The Court found

---

[533]    1992 WL 181717, 18 DEL. J. CORP. L. 730 (Del. Ch. July 28, 1992), *vacated*, 628 A.2d 44 (Del. 1993), *overruled in part (despite being vacated)*, *Klaassen v. Allegro Dev. Corp.*, 106 A.3d 1035 (Del. 2014).

[534]    *Id.* at 732-35.

[535]    *Id.* at 737.

that Stearn was tricked into attending, even though Stearn suspected his removal would be discussed. More importantly for present purposes, the Court concluded that Stearn was "disadvantaged" by the failure of the other directors to clue him in on their plans:

> If Stearn had seen the draft resolutions before the meeting, he could have exercised his right to remove Ginsberg as a director and he could have replaced Ginsberg with another nominee who would vote with Stearn to block Stearn's removal. Without doubt, Stearn's inability to thus protect himself constituted a disadvantage. Thus, I conclude that the actions taken at the April 7th board meeting were void and of no effect.[536]

The Court cited no authority in support of its decision and I am aware of no case previously so holding. To the contrary, it long has been the law of Delaware that a Delaware corporation is managed by the directors.[537] The *Koch* opinion, however, suggests that a CEO with board-appointment rights must receive notice of board action against him so that he can preempt the Board.

---

[536] *Id.* at 738.

[537] 8 *Del. C.* § 141(a) ("The business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors . . . ."); *McMullin v. Beran*, 765 A.2d 910, 916 (Del. 2000) ("One of the fundamental principles of the Delaware General Corporation Law statute is that the business affairs of a corporation are managed by or under the direction of its board of directors."); *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984) ("A cardinal precept of the General Corporation Law of the State of Delaware is that directors, rather than shareholders, manage the business and affairs of the corporation."), *overruled in irrelevant part*, *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

The Delaware Supreme Court vacated *Koch*, but its holding still was relied on in the case of *VGS, Inc. v. Castiel*,[538] a case upon which Plaintiffs rely heavily. *VGS* involved an LLC. Castiel, directly or indirectly, owned 75% of the member interests and 75% of the voting rights. Sahagen, a venture capitalist, owned the other 25% of the member interests and the voting rights. Castiel had the right to appoint two directors, and Sahagen had the right to appoint one. The board consisted of Castiel, his appointee Quinn, and Sahagen. Sahagen eventually convinced Quinn that Castiel was a bad manager and needed to be terminated. The pair then used a provision in the LLC's operating agreement allowing the use of non-unanimous written consents and effected a merger whereby Castiel's ownership interest was diluted to 37.5%.[539]

The Court held that Sahagen and Quinn breached the duty of loyalty they owed to Castiel, as another LLC member.[540] In so holding, the Court stated:

> When Sahagen and Quinn, fully recognizing that this [ability to appoint two directors] was Castiel's protection against actions adverse to his majority interest, acted in secret, without notice, they failed to discharge their duty of loyalty to him in good faith. They owed Castiel a duty to give him prior notice even if he would have interfered with a plan that they

---

[538]  2000 WL 1277372 (Del. Ch. Aug. 31, 2000), *aff'd*, 781 A.2d 696 (Del. 2001) (TABLE).

[539]  *Id.* at *1-2.

[540]  This holding is inapplicable in the corporate context. Fiduciary duties are owed to the entity and the stockholders at large, not a single stockholder, even if that person is a majority stockholder. *See supra* note 520.

conscientiously believed to be in the best interest of the LLC.[541]

Next, in 2002, this Court issued a memorandum opinion in the case of *Adlerstein v. Wertheimer*,[542] a Section 225 case upon which Plaintiffs principally rely. *Adlerstein* based its holding on *VGS*, an LLC case,[543] and *Koch*, which was vacated. *Adlerstein* concerned SpectruMedix Corporation ("SpectruMedix") and its former chairman and CEO, Adlerstein. As of 2000, Adlerstein owned about 21% of the equity of SpectruMedix, but controlled 73% of the vote. The company's board then consisted of Adlerstein, Wertheimer, an investment banker, and Mencher, a money manager with expertise in distressed investments. In March 2001, a sexual harassment allegation was lodged against Adlerstein, and an independent consultant later concluded that Adlerstein was guilty of sexual harassment and had not been cooperative during the investigation. Adlerstein also was less than forthcoming with the board about the company's cash situation, which was dire. When the board hired a restructuring consultant, Adlerstein

---

[541]    *VGS*, 2000 WL 1277372, at *4.

[542]    2002 WL 205684 (Del. Ch. Jan. 25, 2002).

[543]    I question the applicability of *VGS* to corporate disputes. The facts of that case were dependent upon particular provisions of the LLC Operating Agreement in question. *See CML V, LLC v. Bax*, 28 A.3d 1037, 1043 (Del. 2011) ("Ultimately, LLCs and corporations are different; investors can choose to invest in an LLC, which offers one bundle of rights, or in a corporation, which offers an entirely separate bundle of rights.").

168

interfered with his work. The consultant eventually advised the board that SpectruMedix could not succeed unless Adlerstein was removed.[544]

Wertheimer contacted Reich, an investor and manager with the wealth and ability to fix SpectruMedix. Reich offered to invest in the company, but only if Adlerstein were removed and Reich were put in charge. Soon thereafter, Wertheimer, Mencher, and Reich discussed firing Adlerstein for cause because of the sexual harassment. By early July 2001, the company was basically insolvent. On July 5, Wertheimer asked Adlerstein to attend a July 9 meeting. On July 6, Reich circulated draft transactional documents to Wertheimer and Mencher, but not Adlerstein. Adlerstein called the July 9 meeting to order and began discussing an ongoing arbitration. Wertheimer interrupted him, changed the topic to finances, and showed Adlerstein the term sheet for the Reich deal. Adlerstein rejected the proposal because it would dilute his shares and eliminate his voting control. Wertheimer then moved to vote on the transaction; he and Mencher voted in favor, thereby approving the deal. Next, Wertheimer and Mencher discussed removing Adlerstein for cause, which they did.[545]

In response to Adlerstein's challenge to the transaction under Section 225, the Court concluded that he had a right to know of the Reich investment deal in advance, because it would have eliminated his majority control. In a line relied upon by Plaintiffs, the Court stated: "This right to advance notice derives from a basic requirement of our

---

[544]    *Adlerstein*, 2002 WL 205684, at *1-4.

[545]    *Id.* at *4-7.

169

corporation law that boards of directors conduct their affairs in a manner that satisfies minimum standards of fairness."[546] The Court continued:

> Adlerstein possessed the contractual power to prevent the issuance of the Series C Preferred Stock by executing a written consent removing one or both of Wertheimer and Mencher from the board. He may or may not have exercised this power had he been told about the plan in advance. But he was fully entitled to the opportunity to do so and the machinations of those individuals who deprived him of this opportunity were unfair and cannot be countenanced by this court.[547]

The Court stated that the result "flows from the fact that Adlerstein was both a director and a controlling stockholder, not from either status individually."[548] The Court further held that the "authority of both *Koch* and *VGS* strongly support the conclusion that Adlerstein had a right to such advance notice in order that he might have taken steps to protect his interest."[549]

---

[546] *Id.* at *9.

[547] *Id.*

[548] *Id.* at *9 n.28. In explaining its rationale, the Court recognized that Adlerstein would not have been entitled to notice as a stockholder, or as a director. But, the Court held that, "when a director either is the controlling stockholder or represents the controlling stockholder, our law takes a different view of the matter where the decision to withhold advance notice is done for the purpose of preventing the controlling stockholder/director from exercising his or her contractual right to put a halt to the other directors' schemes." *Id.*

[549] *Id.* at *11.

The final case in this line is *Fogel v. U.S. Energy Systems, Inc.*[550] There, Fogel was the CEO and chairman of the board, which included three other board members. The company in question was in financial distress and the board determined, on June 14, 2007, to hire a restructuring officer and to meet again on June 29. Over that fifteen-day period, the three independent directors discussed Fogel's performance and eventually decided that he should be fired. By the morning of the 29th, the other directors had resolved to terminate Fogel, and they asked him to resign voluntarily by the end of the day. One of the directors called him that evening; Fogel declined to resign and the director told him he was fired. On July 1, Fogel attempted to call a special meeting of the stockholders to remove the directors, as authorized by the company's bylaws. That same day, the board ignored Fogel's call for a special meeting and passed a resolution terminating him.[551]

Fogel subsequently filed a Section 225 action. The Court determined that the meeting where Fogel was terminated was not a board meeting under Delaware law and thus the action taken there was void. More importantly for present purposes, the Court held, in the alternative, that the action taken was void because Fogel was tricked into coming. Relying on *Koch* and *Adlerstein*, the Court held that, even though Fogel probably lacked the votes, "had he known [the purpose of the meeting] beforehand, he

---

[550]    2007 WL 4438978 (Del. Ch. Dec. 13, 2007), *overruled on other grounds*, *Klaassen v. Allegro Dev. Corp.*, 106 A.3d 1035 (Del. 2014).

[551]    *Id.* at *1-2.

171

could have exercised his right under the bylaws to call for a special meeting *before* the board met. The deception renders the meeting and any action taken there void."[552]

Plaintiffs rely on this line of cases, including primarily *Adlerstein* and *VGS*, for the proposition that it was a breach of the duty of loyalty for the Director Defendants not to provide Morelli fair notice of their intent to remove him and allow him to exercise his rights under the Stockholders Agreement. To the extent that one or more of the cases on which Plaintiffs rely can be read to stand for that proposition, I decline to follow those cases.[553]

At least three of the four cases just discussed threaten the fundamental premise of Delaware law that a corporation is managed by the board of directors.[554] Vice Chancellor Laster examined these and other earlier cases at length in his opinion granting a stay in *Klaassen v. Allegro Development Corp.*[555] I agree with his criticisms of those precedents and summarize some of them here.

---

[552] *Id.* at *4.

[553] I also note that money damages were not a component of any of these four cases, whereas the relief Plaintiffs seek here includes damages. Furthermore, *VGS* is factually distinguishable from this case. First, the machinations undertaken in that case depended upon specific provisions of the LLC Agreement in question. *See supra* note 543. Second, the primary holding of *VGS* was that Sahagen and Quinn breached their duty of loyalty to Castiel. Here, the analogous holding would be that Defendants breached their duty of loyalty to Morelli. But, no such duty exists in the corporate context. *See supra* notes 520 & 540.

[554] *See supra* note 537.

[555] 2013 WL 5967029 (Del. Ch. Nov. 7, 2013). On appeal in *Klaassen*, the Supreme Court recognized that Vice Chancellor Laster questioned the continuing viability

172

In my view, the holdings of these cases depart from key tenets of Delaware law. In a Delaware corporation, the directors of the corporation manage the corporation and that principle is statutorily enshrined in Section 141(a). A written contract allowing board appointment rights cannot be used to thwart that precept of Delaware law.

Plaintiffs' theory, fairly understood, is that Morelli had absolute blocking rights against the Board because it would be unjust to take any action against him before he could exercise his rights to remove and reappoint a majority of the board. This would make him, for all intent and purposes, a "super-director whose powers trump the board's statutory authority under Section 141(a)."[556] Rather than recognize such power in one individual, however, our law consistently has been to the contrary.[557] The board has a duty to act in the best interests of the entity and the stockholders as a whole. Thus, in appropriate instances, the fiduciary duties of directors may enable a board to take action

---

of these precedents, but did not address that concern because it was unnecessary to answer the question presented. 106 A.3d 1035, 1045 n.65 (Del. 2014). Whether or not *Koch*, *Adlerstein*, and *Fogel* are good law squarely has been raised in this case.

[556] *Klaassen*, 2013 WL 5967028, at *3.

[557] *Phillips v. Insituform of N. Am., Inc.*, 1987 WL 16285, 13 DEL. J. CORP. L. 774, 790 (Del. Ch. Aug. 27, 1987) ("Much of plaintiffs' argument that the by-law amendments are invalid seems premised on an assumption that a right to designate a majority of the board involves legally the right to control the board's action and thus the corporation. However, so long as the law demands of directors, as I believe it does, fidelity to the corporation and all of its shareholders and does not recognize a special duty on the part of directors elected by a special class to the class electing them, such a premise must be regarded as legally incorrect.").

*against* a controlling stockholder.[558]  By contrast, the cases upon which Plaintiffs rely

suggest that, even if the directors in the exercise of their fiduciary duties conclude that the

CEO must be fired, the directors first must give the CEO the chance to fire a majority of

the directors and replace them with his own hand-picked group of more acquiescent

directors—a Catch-22 for Optimis in this case.  Such a holding creates serious

entrenchment problems and undermines one of the board's chief functions, which is the

appointment of officers, and particularly the CEO, to manage the corporation's day-to-

day affairs.[559]  Thus, I consider the *Koch* line of cases difficult to square with the bedrock

principle of Delaware law that the directors of a corporation manage the corporation's

affairs.

Accordingly, I reject the first premise of Plaintiffs' ambush theory, *i.e.*, that

Morelli was entitled to advance notice of the meeting so that he could replace the

directors and thwart the Board.  In the circumstances of this case, at least, I find the case

---

[558]    *See, e.g.*, *Mendel v. Carroll*, 651 A.2d 297, 304 (Del. Ch. 1994) ("Where, however, a board of directors acts in good faith and on the reasonable belief that a controlling shareholder is abusing its power and exploiting or threatening to exploit the vulnerability of minority shareholders, I suppose . . . that the board might permissibly take such an action [and dilute the controller's holdings].") (Allen, C.) (citing *Blasius Indus., Inc. v. Atlas Corp.*, 565 A.2d 651 (Del. Ch. 1988), *Freedman v. Restaurant Assoc.*, 1987 WL 14323 (Del. Ch. Oct. 16, 1987), and *Phillips*, 1987 WL 16285); *see also Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022, 1088 (Del. Ch. 2004) ("By parity of reasoning, if actual action to dilute the majority might be justified, the less extreme act of interposing a rights plan should not be ruled out entirely as a permissible response to a controlling stockholder's serious acts of wrongdoing towards the corporation.") (Strine, V.C.), *aff'd*, 872 A.2d 559 (Del. 2005).

[559]    *See Klaassen*, 2013 WL 5967028, at *15 & nn.6-8 (collecting sources).

law supporting Plaintiffs' argument to be unsound and I decline to follow it. Rather, each case must be examined on its own facts, especially in a Court of equity. Here, the first thing Morelli did after October 20, 2012, was fire all three of the Board members he had appointed who voted to terminate him as CEO. I have no doubt he would have terminated those directors in advance of the meeting if he had been given the opportunity. Thus, I hold that none of the Director Defendants breached their duty of loyalty by not advising Morelli in advance of his potential termination.

### b. The Geller Investigation

Plaintiffs further contend that Defendants breached their fiduciary duties by: (1) manipulating the Geller Investigation to provide a pretext to oust Morelli; (2) manipulating the information provided to the Board at the October 20 Meeting; and (3) botching the October 20 Meeting so badly that it amounted to bad faith. These claims rely on a number of factual premises that I have rejected. Accordingly, most of these contentions can be dismissed in short order. For instance, there is no evidence that Smith or Atkins played any role in the Geller Investigation.

As to Plaintiffs' contention that Defendants Waite or Horne manipulated the Geller investigation, Plaintiffs have the burden of proof. Because I have concluded that Geller's deposition testimony is credible, their manipulation argument is without merit. Plaintiffs failed to prove that anyone manipulated Geller. Even though she stated to Waite on September 21 that she did not want to make a sexual harassment claim, Waite acted reasonably and, perhaps, in accordance with the requirements of California law or, at least, Optimis' sexual harassment policy, when he reported Geller's accusations to

175

Kreile. Plaintiffs did not prove by a preponderance of the evidence that Waite knew in advance of September 21 about Geller's allegations. *Even if he did*, however, Plaintiffs have not proven: (a) that anyone encouraged Geller to make the claim; or (b) that anyone encouraged Geller to change her story to Solomon between the first and second interviews. Plaintiffs allege that Defendants bribed Geller, but the evidence they rely on is too weak to overcome her testimony to the contrary. Plaintiffs showed that Geller had free use of Horne's apartment, and *after* October 20, 2012, her pay was *equalized* with other physical therapists and she was allowed to remediate her residency program. As discussed *supra*, there are innocuous explanations for each of these actions. Thus, based on the evidence presented, and my discussion of Plaintiffs' witness tampering, I conclude that Plaintiffs have failed to prove by a preponderance of the evidence that Defendants, individually or collectively, encouraged or bribed Geller to make her claims or encouraged or bribed her to change her story.

Plaintiffs' argument that Horne manipulated the investigation by telling Solomon about his affair with Doherty and asking her not to include that in her report is illogical. By telling Solomon about his relationship, Horne put his cards on the table and she fairly could evaluate his credibility. Similarly, even if Horne lied about previously being friends with Morelli, I do not understand how telling Solomon that he hated Morelli undermined the investigation in any way. Horne also told Solomon that he did not believe Morelli was capable of sexual harassment. In addition, Plaintiffs repeatedly argued that Waite manipulated the investigation by not telling Solomon about his takeover plot. But, Plaintiffs have not proven that Waite, individually or in concert with

others, was involved in a takeover plot; accordingly, they have not proven that Waite had any potential bias that he improperly failed to disclose to Solomon.

In any event, even assuming, hypothetically, that Waite personally wanted to oust Morelli and would lie to accomplish that goal, it remains unclear how that affects the propriety of Solomon's investigation. Under the facts as I have found them, Waite promptly turned the matter over to Kreile in HR. Kreile contacted the insurer. The insurer hired Zilberman. Zilberman hired Solomon. Solomon conducted the investigation and concluded that Geller was credible and that her allegations were corroborated by the testimony of others besides Waite. Solomon—who credibly denied she was rushed—provided her report to Zilberman, who made recommendations to the Board. Meanwhile, Brys engaged Kaufman as independent outside counsel to advise the Company. Thus, Plaintiffs have not proven that the Geller Investigation either was a pretext for a secret takeover plot or that it was compromised, lacked independence, or was not thorough. By contrast, the evidence supports the finding that this was a good faith, independent investigation by outside counsel that concluded Optimis' CEO apparently had engaged in sexual harassment. At a minimum, the evidence shows that the Director Defendants had no reason to question the expertise of Solomon or Zilberman or the reliability of the Solomon Report or Zilberman's advice regarding the Geller Investigation.

Plaintiffs' contrary argument, aside from being based on allegations of a wide-ranging conspiracy, which I have rejected, rests on allegations that one or more Defendants manipulated Geller, and then manipulated or fooled four different

177

independent third-party attorneys—Solomon, Zilberman, Kaufman, and Robbins. On one side of the evidentiary ledger, I have found (or the parties do not dispute) numerous facts that support Defendants' explanation of the challenged events, the bona fides of the investigation, and the actions Defendants took. Morelli admittedly had sexual contact with a subordinate in his bedroom-office while she was working. At least one other female employee previously had seen Morelli naked in his bedroom-office.[560] Defendants had no role in the selection of the investigator that did the fact-finding. Morelli, on the other hand, took actions to interfere with the investigation, such as attempting to convince Horne and Brys to get Geller to rescind her allegations and filing his own sexual harassment complaint against Geller. Thus, Plaintiffs have failed to prove that the Geller Investigation was a pretext or that Defendants manipulated that investigation.

### c. The October 20 Meeting

The October 20 Meeting was not a model of corporate governance, but it does not provide a basis for any breach of the duty of loyalty. Viewing the October 20 Meeting in light of my findings that Plaintiffs have not proven: (1) a takeover motive by any of the Defendants; (2) the existence of a conspiracy; (3) that the Geller Investigation was a pretext; or (4) that Geller was manipulated, the meeting looks like nothing more than a board attempting in good faith to follow the advice provided by several separate legal

---

[560]  Morelli's secretary, Eastman, had seen him come out of the shower in his bedroom-office completely naked. Eastman Dep. 29.

178

advisors.[561]  For incidental failings in this regard, Delaware law provides a safe harbor for directors under 8 *Del. C.* § 141(e).[562]

Directors are protected under Section 141(e) "'when the directors reasonably believe the information upon which they rely has been presented by an expert selected with reasonable care and is within that person's professional or expert competence.'"[563]

---

[561]  Plaintiffs assert that the Director Defendants manipulated the meeting in bad faith. Bad faith is a high standard.  In *Stone v. Ritter*, 911 A.2d 362, 369-70 (Del. 2006), the Supreme Court gave the following examples of bad faith conduct: "where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties." Plaintiffs base their allegations of bad faith on their assertion that Defendants had a purpose other than advancing the Company's best interests.  Because Plaintiffs failed to prove such a purpose, they have not shown that Defendants acted in bad faith at the October 20 Meeting.

[562]  "A member of the board of directors, or a member of any committee designated by the board of directors, shall, in the performance of such member's duties, be fully protected in relying in good faith upon the records of the corporation and upon such information, opinions, reports or statements presented to the corporation by any of the corporation's officers or employees, or committees of the board of directors, or by any other person as to matters the member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the corporation."  8 *Del. C.* § 141(e).

[563]  *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 985 (Del. Ch. 2000) (Steele, V.C. by designation) (internal quotations omitted) (quoting *In re Cheyenne Software, Inc. S'holders Litig.*, 1996 WL 652765, at *2 (Del. Ch. Nov. 7, 1996)).

179

To rebut the Director Defendants' claimed reliance on the advisors in question here, Plaintiffs would have to show that they were grossly negligent in so relying.[564]

It is not material that the full Board did not make the decision to hire these advisors. Section 141(e) expressly allows reliance on those selected "by *or on behalf of* the corporation." Zilberman was hired by PLIS, the Company's insurer; therefore, he comes within the scope of the Section 141(e) safe harbor. In addition, Kaufman was hired by the Company's General Counsel, Brys, to represent Optimis in the event of any conflict between Zilberman and the Company. Those two attorneys were in agreement in every instance when Brys sought a legal opinion of both.[565] Although Robbins's retention is more questionable,[566] there is no indication that he was unqualified as a

---

[564] The Supreme Court has provided the following list of examples that, if proven, would rebut the protection offered by Section 141(e): "(a) the directors did not in fact rely on the expert; (b) their reliance was not in good faith; (c) they did not reasonably believe that the expert's advice was within the expert's professional competence; (d) the expert was not selected with reasonable care by or on behalf of the corporation, and the faulty selection process was attributable to the directors; (e) the subject matter . . . that was material and reasonably available was so obvious that the board's failure to consider it was grossly negligent regardless of the expert's advice or lack of advice; or (f) that the decision of the Board was so unconscionable as to constitute waste or fraud." *Brehm v. Eisner*, 746 A.2d 244, 262 (Del. 2000).

[565] Brys Dep. 104.

[566] Waite testified that he contacted Robbins because he "had apparently taken on Michael Eisner in some board battle or something like that." Tr. 1077 (Waite). This appears to be a reference Robbins's representation of Roy Disney and Stanley Gold in their Vote No campaign against Eisner. *See* Bruce Orwall et al., *Eisner Steps Down as Disney Chairman*, WALL ST. J. (Mar. 4, 2004), *available at* http://www.wsj.com/articles/SB107832734296045356.

corporate attorney. Indeed, the Ad Hoc Committee considered his credentials, which Sussman described as "impressive," and expressly approved his engagement.[567] Plaintiffs complain that none of the advisors was a Delaware attorney. Section 141(e), however, contains no such requirement. Furthermore, many of the issues involved at the October 20 Meeting related to sexual harassment under California law.[568]

Finally, Plaintiffs argue that the Director Defendants manipulated the information provided to the Board. There is no evidence of any such manipulation by either Smith or Atkins. This leaves Waite. Plaintiffs contend Waite had an obligation to tell the Board that he had known of Geller's allegations since February. This argument is unpersuasive because Plaintiffs failed to prove that Waite knew anything about those allegations before September 21, 2012, let alone the details he learned on that date. In any event, I find that any knowledge by Waite more than likely would not have affected Zilberman's advice or the Board's reliance upon it. Even if Waite knew of the allegations in advance, that does not change the fact that Solomon found Morelli engaged in unwelcome sexual interactions with Geller or that Zilberman, Kaufman, and Robbins all advised that Morelli

---

[567]    Tr. 841 (Sussman).

[568]    Plaintiffs speculate that the advisors did not review the relevant Delaware law or were unfamiliar with Optimis' corporate governance documents. Because this is a post-trial opinion, Plaintiffs must prove what they allege and they supplied no evidence to support such speculation. I also do not find persuasive the fact that the meeting may have been contrary to *Adlerstein*. The key inquiry is whether the Director Defendants had some reason to doubt that they reasonably could rely on their legal advisors. No evidence suggests that the existence of a potential problem under *Adlerstein* would have been known to or understood by Defendants.

181

should be fired for that apparent sexual harassment. Plaintiffs again complain that the Director Defendants hid their takeover motives and that Waite had numerous contacts with Geller during the investigation. But, Plaintiffs have not proven either a takeover motive or that Geller ever was encouraged to make the allegations in the first place or change her story.

Accordingly, Waite and the other Director Defendants were entitled under Section 141(e) of the DGCL to rely in good faith upon the three advisors that were present at the October 20 Meeting, and they did. The Director Defendants' actions leading up to and at that meeting, therefore, are fully protected. Waite relied in good faith upon advisors at every step of the way. He relied upon Brys, and probably Sussman, in drafting the meeting notice. He relied on Robbins and Zilberman in excluding Morelli from the meeting.[569] The Board relied on Zilberman and Solomon (via her report) in determining to fire Morelli.

Plaintiffs also contend that Waite misrepresented the effect of Amendment No. 2 to the Board. That amendment, among other things, eliminated the right of the Initial Stockholders (effectively, Morelli) to appoint a majority of the Board until 2015. According to Abdelhamid's deposition, Waite stated that the Amendment was no big

---

[569]   *See also* J. Travis Laster and John Mark Zeberkiewicz, *The Rights and Duties of Blockholder Directors*, 70 BUS. LAW. 33, 57-60 (Winter 2014/2015) (discussing Delaware case law supporting the concept that, in certain situations, a conflicted director can be excluded from decision making relevant to that conflict).

182

deal.[570]  Assuming Waite made that statement, I agree with Plaintiffs that it was inaccurate and potentially misleading.  Abdelhamid's deposition testimony is murky, however, in its descriptions and contrary to contemporaneous documents in which Abdelhamid and Waite discussed the fact that, by virtue of Amendment No. 2, Abdelhamid would lose his own Board appointment right, as would the Director Defendants.[571]  Additionally, even if Waite did say that Amendment No. 2 was a small thing or that it would not affect Morelli, the other testimony supports a reasonable inference that, nonetheless, the Board understood that the purpose of the amendment was to prevent Morelli from undoing his own termination.[572]  Plaintiffs also argue that the Director Defendants are liable for "failing to permit the board to consider Morelli's written consent to elect a new majority of directors."[573]  I have found, however, that

---

[570]  Abdelhamid Dep. 68-69.

[571]  JX 411.0004.

[572]  Tr. 645-47 (Sussman).  Sussman's testimony is perhaps the most sympathetic to Plaintiffs' position.  To the extent that Sussman implies that the Board did not understand the amendment and the need for Amendment No. 2, however, I do not consider his testimony reliable.  The reason is that he seems to have misled Brys and Waite with respect to the meeting notice and then assisted Morelli in creating an agenda, and also because after the meeting Sussman met only with Wing, Morelli's ally on the Board, to work on documentation of the meeting.  I also note that Sussman, a corporate attorney, recognized Morelli was being terminated and told Morelli something to the effect that it was "too late" when Morelli attempted to raise the issue of the written consents.  *Id.* at 1484 (Atkins); *id.* at 1287 (Smith).  All of the Director Defendants understood the purpose of the Amendment. *Id.* at 1083-86 (Waite); *id.* at 1284 (Smith); *id.* at 1483 (Atkins).

[573]  POB 53.

Morelli did not present his written consents until after Amendment No. 2 had been approved, by which time Sussman informed Morelli that it was too late.[574]

Although the Board meeting had many flaws, the Director Defendants reasonably relied on several attorneys to guide them through the process. Plaintiffs have not proven a takeover motive or that the Director Defendants acted in bad faith as to the meeting. In particular, Plaintiffs have not proven that Defendants attempted to take over the company by "ambush" or in a way that falls below minimum standards of fairness. To the extent the *Koch* line of cases otherwise would lead to a different conclusion, I first note that I am not aware of the Delaware Supreme Court ever having endorsed that line of reasoning. Furthermore, if *Koch* or any of its progeny would lead to a different result here, I consider the reasoning of those cases flawed and decline to follow it in the circumstances of this case.

### 3. Trying to steal Rancho

Plaintiffs' third theory is that the Director Defendants breached their duty of loyalty by filing the Rescission Action without telling the Board about the underlying problem: a flawed corporate structure. Specifically, California Business & Professions Code § 2694 prohibits any non-licensed person (*i.e.*, Optimis) from being a shareholder

---

[574] Plaintiffs rely on the unclear deposition testimony of Abdelhamid to suggest that Morelli circulated the written consents before Amendment No. 2 was signed. Abdelhamid Dep. 68-69. I do not consider this chronology to be accurate or reliable, as it is contrary to the facts as I have found them, including Sussman's contemporaneous notes. *See supra* Section II.L; *see also infra* Section V.C.1.

184

of a physical therapy corporation,[575] and California Corporations Code §§ 13406(a) and 13407 render void any transfer of shares in a professional corporation, including physical therapy corporations, to such a non-licensed person.[576] Briefing on this issue by both Plaintiffs and the Director Defendants was sparse and largely unhelpful.

Preliminarily, I note that the Director Defendants did not breach their duty of loyalty by filing the Rescission Action because it was filed after they had resigned from Optimis. Because of the bright-line rule as to the temporal scope of directors' fiduciary duties,[577] filing the lawsuit itself could not have breached a duty they no longer owed. Furthermore, it cannot be said that the lawsuit was meritless. Shortly after the Director Defendants filed the Rescission Action, Optimis remedied the faulty corporate structure that the lawsuit pointed out by assigning Rancho to Tinoco, who is a physical therapist.

As Plaintiffs allege, however, the Director Defendants were aware of the illegal corporate structure while they were Optimis directors and failed to alert the rest of the Board. The Director Defendants instead secretly planned their lawsuit. This leaves Plaintiffs asserting that the Director Defendants breached their duty of candor by not

---

[575] Cal. Bus. & Prof. Code § 2694.

[576] Cal. Corp. Code §§ 13406(a), 13407.

[577] *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 758 (Del. Ch. 2005) ("Just as Delaware law does not require directors-to-be to comply with their fiduciary duties, former directors owe no fiduciary duties . . . .") (footnote omitted), *aff'd*, 906 A.2d 27 (Del. 2006).

185

revealing the defect that formed a primary basis for the Rescission Action.[578] The

Director Defendants have offered no serious defense to the fact that they failed to inform

the Board.[579] Their best argument in that respect stems from an analogy to unfair

competition law, which recognizes that an agent or fiduciary can act consistently with his

or her duty of loyalty while preparing to compete with the entity to which they owe

fiduciary duties.[580] I consider this analogy inapt. There is a material distinction between

a fiduciary's preparing to compete, such as by forming a new entity, and failing to

disclose a material problem in a corporation's structure and then attempting, after

resigning, to exploit that very flaw. The Director Defendants had a duty to deal candidly

---

[578]   *See Mills Acq. Co. v. Macmillan, Inc.,* 559 A.2d 1261, 1283 (Del. 1989) ("[T]he duty of candor is one of the elementary principles of fair dealing . . . . At a minimum, this rule dictates that fiduciaries, corporate or otherwise, may not use superior information or knowledge to mislead others in the performance of their own fiduciary obligations."). The duty of candor, also called the duty of disclosure, can implicate either the duty of care or the duty of loyalty depending on the factual situation. *See generally In re Transkaryotic Therapies, Inc.*, 954 A.2d 346, 357-363 (Del. Ch. 2008) (discussing the evolution of the law on this issue). Here, I infer from the facts that the duty of loyalty is implicated.

[579]   The Director Defendants weakly contended that Morelli, as a corporate attorney, should have been aware of the problem with Optimis' corporate structure. Because it appears that no one focused on this issue in the more than five years since Optimis acquired Rancho, I see no merit in this finger-pointing defense.

[580]   *Triton Constr. Co. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, at *9 (Del. Ch. May 18, 2009) ("[A]n agent can make arrangements or preparations to compete with his principal before terminating his agency, provided he does not act unfairly or injure his principal."), *aff'd*, 988 A.2d 938 (Del. 2010) (TABLE); *see also Seibold v. Camulos P'rs LP*, 2012 WL 4076182, at *21-22 (Del. Ch. Sept. 17, 2012).

with their fellow directors.[581]  Having become aware of the problem with the Rancho-Optimis structure, I conclude that the Director Defendants breached their duty of candor by not alerting the Board to the issue.  Because they acted intentionally for their own benefit, I further find the Director Defendants breached their duty of loyalty in this regard.

Having found that breach, however, I am not convinced that it warrants a monetary or equitable remedy.  The negative effects about which Plaintiffs in fact complain relate to the Rescission Action.  Optimis promptly cured the technical defect regarding the ownership of Rancho by assigning it to Tinoco.  As discussed, however, the filing of the Rescission Action itself was not a breach of fiduciary duty because the Director Defendants owed no fiduciary duties at the time of its filing.  Furthermore, Plaintiffs have offered no basis upon which I could award any non-speculative damages for this breach of the duty of loyalty, as discussed in Section V.F *infra*.

### 4.    Interfering with the B of I financing

Plaintiffs contend that the Director Defendants breached their fiduciary duties by unreasonably delaying the B of I financing, withdrawing their support, and then filing the Rescission Action.  This is virtually identical to the tortious interference claim that I

---

[581]    *Int'l Equity Capital Growth Fund, L.P. v. Clegg*, 1997 WL 208955, at \*7 (Del. Ch. Apr. 22, 1997) (noting that directors owe a "duty to disclose to other directors"); *see also Hoover Indus. v. Chase*, 1988 WL 73758, at \*2 (Del. Ch. July 13, 1988).

discuss in Section V.D.3 *infra*. Overall, Plaintiffs contend that the Director Defendants breached their fiduciary duties by interfering with the Company's financing.[582]

The evidence of disloyally delaying the financing is weak. Morelli testified that it took longer than necessary to get the documentation together, and Plaintiffs seem to blame that on Defendants.[583] The evidence presented is insufficient to prove a breach of the duty of loyalty. Plaintiffs have not shown that this purported delay in providing documentation actually delayed the process of finalizing the loan or that any Defendant intentionally delayed providing the documentation. Additionally, it is difficult to understand how the Director Defendants breached their duty of loyalty by resigning from the Company. Leaving one's job could be a breach of contract, but the act of resigning and therefore choosing to no longer work for a company or owe it fiduciary duties, without more, generally would not give rise to a breach of the duty of loyalty, absent unusual circumstances such as those existing in *In re Puda Coal, Inc. Stockholders Litigation.*[584]

---

[582] Plaintiffs rely on *Shocking Technologies, Inc. v. Michael*, 2012 WL 4482838, at *10 (Del. Ch. Sept. 28, 2012) ("In short, a loyal director does not put the company in dire financial circumstances in order to obtain what he perceives as a benefit for himself and his associated investors."). That opinion was vacated after Plaintiffs filed their brief. 2015 WL 3455210 (Del. Ch. May 29, 2015). The principle for which Plaintiffs cite it, however, remains viable.

[583] Tr. 450-52.

[584] C.A. No. 6476-CS, at 22-23 (Del. Ch. Feb. 6, 2013) (TRANSCRIPT).

Plaintiffs' real complaint is with the Rescission Action, which they contend scuttled the B of I financing. Again, the Director Defendants were not fiduciaries when that action was filed. Plaintiffs' claim appears to be that by filing a lawsuit at a time when the Director Defendants were not fiduciaries, those Defendants breached their fiduciary duties. This claim fails under its own logic. The disruption of the B of I financing is best understood as a tortious interference claim. I address that argument *infra*.

### C. Plaintiffs Have Not Proven a Breach of Contract

Plaintiffs contend that Defendants breached the Stockholders Agreement by adopting Amendment No. 2. These claims, which are asserted against all Defendants, are legally deficient for the reasons that follow.

### 1. No Direct Breach

"[T]o state a breach of contract claim, the plaintiff must demonstrate: first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff."[585] There is no evidence that Defendant Horne ever signed Amendment No. 2, nor was Horne present at the October 20 Meeting. How he breached the Stockholders Agreement is unexplained by Plaintiffs.

In their breach of contract claims against the Director Defendants, Plaintiffs assert that they breached the Stockholders Agreement by refusing to honor the written consents

---

[585] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

189

presented by Morelli on October 20, 2012, thereby breaching Section 3.3(a) of that agreement. That section entitled the Initial Stockholders to appoint five members of the nine-member Board. Plaintiffs also assert a breach of Section 11, which is a "further assurances" clause.

Section 3.1 of the Stockholders Agreement requires the signatories "to vote or cause to be voted such Shares at any regular or special meeting of stockholders of the Company and/or give a written consent as a stockholder with respect to such Shares, in accordance with the provisions of this Agreement."[586] Those provisions included a requirement that "whenever members of the Board are to be elected by written consent," the Initial Stockholders and the Director Defendants "agree to vote or act with respect to their shares so as to: (a) cause and maintain the election to the Board of five (5) individuals designated by the holders of a majority of the Shares held by the Initial Stockholders."[587] The Stockholders Agreement is silent as to how the Initial Stockholders are to "designate" their candidates to the Director Defendants.

This breach of contract claim is meritless. Plaintiffs claim that the Director Defendants breached the Stockholders Agreement by not executing written consents to elect the new directors designated by the Initial Stockholders, *i.e.*, Morelli. Amendment No. 2 purported to eliminate Morelli's right to appoint a majority of the directors of the

---

[586]    SHA § 3.1.

[587]    *Id.* § 3.3(a).

190

Board.[588]  Plaintiffs have not shown that Morelli demanded that the Director Defendants provide such written consents before Amendment No. 2 was adopted.  Nor have Plaintiffs shown how Morelli still had the contractual right to require the Director Defendants to sign written consents when he did make his demand.[589]  I have found that Morelli did not attempt to act by written consents from the stockholders, including consents to be obtained from the Director Defendants, until after the full Board was called to order for a

---

[588]   JX 67.

[589]   Plaintiffs must prove the existence of the provision that allegedly was breached. Defendants have asserted that Section 3.3(a) could not have been breached because it had been amended out of existence.  Plaintiffs seem to argue that Amendment No. 2 never took effect.  The burden is on Plaintiffs, however, to prove that Section 3.3(a) remained in force at the time of the alleged breach, *i.e.*, to prove that Amendment No. 2 did not take effect.  Two elements were necessary to effectuate Amendment No. 2: (1) the votes of a majority of the stockholder-parties to the underlying agreement; and (2) approval by the Board.  In their post-trial briefing, Plaintiffs seemingly contested only the latter of those requirements. But, the Board did approve Amendment No. 2.  The only way that approval would not have completed the amendment process was if the Board's actions were void. The Delaware Supreme Court, however, has held that board action "taken in violation of an equitable rule" is voidable, not void.  *Klaassen v. Allegro Dev. Corp.*, 106 A.3d 1035, 1046-47 (Del. 2014).  Accordingly, even though the parties settled the 225 Action in March 2013 and determined that "any actions of the board purportedly taken at [the October 20 Meeting] were void," JX 684.0004, I am not persuaded that that means Amendment No. 2 was not effective *when Morelli attempted to act by the written consents*.  Rather, I assume that the actions taken at the October 20 Meeting were only voidable, as the holding in *Klaassen* suggests, and therefore remained in force until voided by the settlement agreement.  *See generally* C. Stephen Bigler & Seth Barrett Tillman, *Void or Voidable?—Curing Defects in Stock Issuances Under Delaware Law*, 63 BUS. LAW. 1109, 1115-16 (August 2008) (discussing the distinction between void and voidable and noting that the latter is capable of ratification); *see also Klaassen*, 106 A.3d at 1046 (noting that voidable acts are susceptible to equitable defenses).

191

second time and Amendment No. 2 was adopted.  By that time, he no longer had the right to appoint a majority of the Board.[590]

## 2.    The Implied Covenant Claims Are Fatally Flawed

Plaintiffs' implied covenant claims are more colorable, but still not meritorious. Plaintiffs make several arguments in this regard, some of which were not introduced until the post-trial briefing.  The first is that Amendment No. 2 violated the implied covenant

---

[590]  As discussed in Section V.B.2.c *supra*, I have rejected, as a factual matter, Plaintiffs' contention that Morelli attempted to act by written consent during the morning session of the October 20 Meeting.  If Morelli properly had invoked Sections 3.1 and 3.3 of the Stockholders Agreement in the morning, the question of whether the Director Defendants would have violated the Stockholders Agreement would be more difficult, but the answer is not as clear as Plaintiffs argue.

One instance where a party is excused from complying with a contract is when the counterparty is in material breach of that contract.  *BioLife Solutions, Inc. v. Endocare, Inc.*, 838 A.2d 268, 278 (Del. Ch. 2003) ("A party is excused from performance under a contract if the other party is in material breach thereof.").  Consistent with my rejection of the *Koch* line of cases, I consider it conceivable that Delaware law would excuse what otherwise would be a breach of a stockholders agreement in certain instances, such as when enforcement of the agreement would undermine the principle established by 8 *Del. C.* § 141(a) and consideration of fiduciary duties implicated in a specific situation.

Although I need not reach this issue, I question whether Morelli would have had the right to demand that the Director Defendants execute written consents so that he could thwart the Board from determining, in the exercise of its fiduciary duties, whether Morelli needed to be terminated as CEO.  *See Rohe v. Reliance Training Network, Inc.*, 2000 WL 1038190, at *16 n.50 (Del. Ch. July 21, 2000) (Strine, V.C.) ("[I]t may well be that the director's right to demand a vote was conditioned on his compliance with an implied covenant not to intentionally breach his duty of loyalty to the corporation.  If the director breached that implied covenant, his prior material breach could, as a doctrinal matter, be said to excuse subsequent non-performance by the other party."); *see also Hollinger Int'l*, 844 A.2d at 1076 n.122 (citing *Rohe* for the proposition that "an agreement to vote for a director could be excused if the director later engaged in material misconduct justifying removal").

192

of good faith and fair dealing by generally depriving Morelli of the benefit of the bargain under the Stockholders Agreement. The second argument is that the process of enacting Amendment No. 2 fell below minimal standards of fairness. The third position is that Waite solicited the stockholder consents needed to implement Amendment No. 2 by false pretenses. Under Delaware law, none of these allegations satisfy the standard for stating an implied covenant claim.

"The 'implied covenant of good faith and fair dealing involves . . . inferring contractual terms to handle developments or contractual gaps that . . . neither party anticipated.' It does not apply when the contract addresses the conduct at issue."[591] The implied covenant "is recognized only where a contract is silent as to the issue in dispute."[592] It is not a tool to re-write contracts and it "cannot be invoked to override the express terms of the contract."[593] Indeed, "courts should be most chary about implying a contractual protection when the contract could easily have been drafted to expressly provide for it."[594]

---

[591] *Nationwide Emerging Managers, LLC v. Northpointe Hldgs., LLC*, 112 A.2d 878, 896 (Del. 2015) (quoting *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010)) (footnotes omitted). *See also Lazard Tech. P'rs, LLC v. Qinetiq N. Am. Operations LLC*, 114 A.3d 193, 196 n.12 (Del. 2015) (collecting cases).

[592] *AQSR India Private, Ltd. v. Bureau Veritas Hldgs., Inc.*, 2009 WL 1707910, at *11 (Del. Ch. June 16, 2009).

[593] *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009).

[594] *Allied Capital Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1035 (Del. Ch. 2006).

Plaintiffs' first argument is that they were denied the fruits of their bargain, *i.e.*, the right to appoint five members of the Board. Even though the Stockholders Agreement has a provision expressly allowing for amendment, and even though that provision literally was followed, Plaintiffs contend that Amendment No. 2 violated the implied covenant. This argument fails because the express terms of the contract cover this situation. The Stockholders Agreement previously had been amended to allow Achieve Physical Therapy, Abdelhamid's business, the right to appoint one board member.[595] Thus, the parties themselves previously amended the very provision of the Stockholders Agreement, Section 3.3, that Plaintiffs now suggest could not be further amended without violating the implied covenant.[596] Moreover, the Stockholders Agreement contains several other important provisions and rights, so it is not accurate to say, as Plaintiffs do, that the Stockholders Agreement was amended in a way that hollowed out the agreement.[597] Finally, if Morelli and the Initial Stockholders had

---

[595] JX 69.

[596] Plaintiffs' argument also ignores the fact that Amendment No. 2 stripped *everyone* of their board appointment rights: Morelli, the Director Defendants, and Abdelhamid. This is not a situation where a majority of the stockholders conspired to deprive only Morelli of a contractual right while benefiting themselves. Indeed, Morelli could have triumphed under Amendment No. 2 and had nine board members installed if he convinced a majority of the stockholders to favor his nominees.

[597] For example, Section 3.6 required consensus of the Rancho Stockholders and the Initial Stockholders on any Substantial Transactions, such as a merger, JX 68.0006, and Section 4 instituted a "Market Stand-Off" agreement to effectuate a future underwriting, *id.* at .0007-.0008. These provisions were not changed by Amendment No. 2.

wished to prevent amendment of their Board-appointment rights under the Stockholders Agreement, they could have bargained for that right at the outset. They did not and Morelli cannot seek here via an implied covenant claim what he failed to secure at the bargaining table.

Plaintiffs' second implied covenant claim is that the process by which the amendment was adopted fell below minimum standards of fairness. The argument is that Defendants left Morelli and Analog in the dark by not telling them about the amendment. This argument is based on *Adlerstein* and *VGS*. In addition to my having held that the reasoning in those cases does not control under the facts of this case, this argument is not a cognizable implied covenant claim, because the complained-of conduct—amendment— was covered by an express term of the contract and because Plaintiffs have not identified an implied contractual provision that was violated. Basically, Plaintiffs assert that Defendants acted unfairly. But, unfairness alone is not an implied covenant claim; either the contract's terms, express or implied, were breached, or they were not. The implied covenant is not a license for the Court "'to create a free-floating duty . . . unattached to the underlying legal document.'"[598]

The final argument is that Defendants used false justifications to pass the Amendment. As previously discussed, Plaintiffs have not proven that Waite misrepresented the import of Amendment No. 2 to the Board. The second aspect of this

---

[598] *Nationwide Emerging Managers*, 112 A.2d at 896 n.72 (quoting *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005)).

195

argument is that Waite misrepresented the purpose of Amendment No. 2 to the other stockholders. This is not an implied covenant claim.[599] Instead, it appears to involve Plaintiffs asserting that other people, not parties to this litigation, fraudulently were induced into adopting Amendment No. 2. Plaintiffs have not explained how they have standing to bring fraudulent inducement claims on behalf of unnamed stockholders and then transform those claims into implied covenant claims. They do not have such standing because only parties to an agreement can assert a claim for breach of the implied covenant.[600]

For these reasons, Plaintiffs have failed to prove a breach of the Stockholders Agreement or the related implied covenant of good faith and fair dealing.

### D.    Plaintiffs' Tortious Interference Claims

Plaintiffs also assert three claims for tortious interference with prospective business relations. They have abandoned all of their tortious interference with contract claims. With the exception of the B of I financing situation, these claims border on frivolous. The only tortious interference claim asserted against Horne relates to the DSC.

"To prove a claim for tortious interference with prospective business relations, a plaintiff must show: (1) a reasonable probability of a business opportunity; (2) intentional

---

[599]    Disingenuous invocation of a contractual provision, *i.e.*, utilizing a contractual provision with ulterior motives, is not an implied covenant claim. *Id.* at 897.

[600]    *Gerber v. Enter. Prods. Hldgs., LLC*, 67 A.3d 400, 421 n.53 (Del. 2013) ("We reject [the] argument that the implied covenant applies to nonparties to the contract."), *overruled in irrelevant part*, *Winshall v. Viacom Int'l Inc.*, 76 A.3d 808 (Del. 2013).

196

interference by a defendant with that opportunity; (3) proximate causation; and (4) damages."[601]  In the context of tortious interference with contract, Delaware law recognizes a privilege known as the stranger doctrine.[602]  Defendants contend that the privilege also applies to tortious interference with prospective business relations.  I question that, but consider it unnecessary to decide that here.

### 1.    DSC

Horne contends that Plaintiffs' interrogatory responses only allege interference with the 2012 DSC.  It is true that those responses only allege that Defendants interfered with "the opportunity to obtain media coverage for the benefit of OptimisCorp in connection with the 2012 DSC in Los Angeles, CA."[603]  Nevertheless, Plaintiffs now appear to argue that Defendants tortiously interfered with that event in 2010, 2011, 2012,

---

[601]    *Beard Research, Inc. v. Kates*, 8 A.3d 573, 607-08 (Del. Ch.), *aff'd sub nom. ASDI, Inc. v. Beard Research, Inc.*, 11 A.3d 749 (Del. 2010).

[602]    The stranger doctrine is a slight extension of the principle that "a party to a contract cannot be liable both for breach of that contract and inducing that breach."  *Shearin v. E.F. Hutton Gp., Inc.*, 652 A.2d 578, 590 (Del. Ch. 1994).  Under the stranger doctrine, "employees . . . of a contracting corporation cannot be held personally liable for inducing a breach of contract by their corporations when they act within their role."  *Id.*  Stated differently, "an officer or director may be held personally liable for tortious interference with a contract of the corporation if, and only if, said officer or director exceeds the scope of his agency in so doing."  *Int'l Ass'n of Heat & Frost Insulators & Asbestos Workers Local Union 42 v. Absolute Envtl. Servs., Inc.*, 814 F. Supp. 392, 400 (D. Del. 1993).  *See also Tenneco Auto. Inc. v. El Paso Corp.*, 2007 WL 92621, at *5-6 (Del. Ch. Jan. 8, 2007) (describing the stranger doctrine and the policy underlying the privilege).

[603]    JX 939.0024.

and then "killed the event" thereafter.[604] This is consistent with Plaintiffs' generally shifting litigation strategy and, in itself, provides a sufficient basis to deny their claim as to the DSC in all respects except the 2012 event. Regardless, I find no evidence of tortious interference with the DSC in any year.[605]

The strongest evidence of "interference" is that Horne allegedly told Owens not to work on the DSC and that Waite called it a waste of time or money or both.[606] Plaintiffs also contend that Waite countermanded Morelli's instructions. This evidence falls woefully short of proving tortious interference. By his own testimony, Morelli acknowledged that the event was successful each year, particularly in 2010. And, Owens admitted that he ignored the alleged instruction from Horne not to work on the event. Waite participated in the event all three years, and each of the other Defendants, Atkins, Smith, and Horne, also participated at least once. Accordingly, Plaintiffs have not proven there ever was any "interference" with the DSC.

---

[604] POB 66.

[605] I summarily dismiss Plaintiffs' *ipse dixit* claim that Defendants "killed" the event after 2012. This claim was not made previously, and Defendants were not given fair notice of it. In addition, Plaintiffs failed to identify any evidence supporting such a claim.

[606] Apparently, many people considered the DSC extravagant. *E.g.*, Brys Dep. 192-93 ("There also was a disagreement because I think various members of the company thought that the Optimis DSC was—I wouldn't say a waste of money, but it consumed a lot of money and resources and did not give a lot back to the company.").

198

Plaintiffs also completely failed to prove proximate causation, because the event took place each year and was successful. Plaintiffs seem to contend that, but for the alleged interference (that Plaintiffs have not proven), the event would have been *more* successful and the Company would have received *greater* media coverage and *better* advertising. In that regard, Plaintiffs rely primarily on two specific incidents: the withdrawal of the LA Tri Club's sponsorship and the ALA's decision not to sponsor the event. Neither of those incidents, however, was caused by Defendants. Plaintiffs allege, for example, that the LA Tri Club backed out because of Rohlinger's alleged phone comment to Owens. But, Rohlinger is not a defendant and Plaintiffs have not proven a conspiracy, so there is no basis to attribute his action to any of Defendants. Additionally, based on the evidence, I find that it is more probable than not that the LA Tri Club backed out because of their ongoing litigation with Morelli. Similarly, there is no evidence linking Defendants to the ALA's decision not to sponsor the DSC event. Instead, that decision appears to have resulted from the ALA's own policies and limitations as a non-profit entity.

Finally, Plaintiffs have advanced no persuasive evidence of damages. They cite no record evidence for their bald assertion that "the Company was damaged because it was not able to benefit from the visibility it otherwise would have gained through media coverage and greater penetration of its software into the marketplace."[607] Optimis

---

[607] POB 66.

199

successfully ran the DSC for at least three years, but Plaintiffs have not provided concrete evidence of a measurable benefit from that event in any of those years.

## 2. Preferred Therapy Provider Network

Plaintiffs also contend that Defendants tortiously interfered with a potential business relationship with the Preferred Therapy Provider Network ("PTPN"). I did not include the story of PTPN in the fact Section *supra* because this claim is so flimsy that it borders on frivolous. The argument, basically, is that Waite's poor negotiating skills undermined a potential business relationship with PTPN. Plaintiffs contend that Waite deliberately sabotaged those negotiations.[608]

According to Morelli, the Company engaged in negotiations with PTPN to partner on some form of licensing agreement or similar venture in the fall and winter of 2010. This discussion "fizzled out at the end of 2010."[609] Morelli's version of events is that Michael Weinper, the president and cofounder of PTPN, had a wellness initiative called Physequality and that Optimis had a negotiating strategy under which Optimis would "present a firm stance to Michael Weinper that to succeed, he had to stop really trying to cram Physequality down the throats of his members and rebrand and present a new fresh strategy to them."[610] Presumably, Physequality would be replaced by Optimis*Sport*, OptimisPT, or both. Morelli claims that, in the middle of a conference call with Weinper

---

[608] Horne, Atkins, and Smith had no involvement with the PTPN negotiations.

[609] Tr. 328 (Morelli).

[610] *Id.* at 330.

in early December 2010, Waite interrupted and offered Weinper the opportunity to keep Physequality. Waite then flew to meet with Weinper and, as a result of that meeting, Weinper made a proposal to work with Optimis that Morelli described as a nonstarter. Even according to Morelli, Waite was "shocked" at how off the mark Weinper's proposal was.[611] Waite testified that he "worked hard to try to get that deal to close," which would have served his own interests as an Optimis stockholder.[612] Waite said he volunteered to fly out to meet with Weinper because, from his perspective, the process was failing and on the conference call it "looked like . . . it was going to die."[613]

Even assuming Morelli's version of events is accurate, Plaintiffs have not proven tortious interference. Waite unquestionably acted within the scope of his authority. If Morelli was displeased with Waite's efforts, he should have overruled him as CEO or otherwise criticized his actions in the nature of a performance review. Instead, Morelli let Waite meet with PTPN and continue the discussions, notwithstanding Morelli's testimony that Waite already had torpedoed the negotiations. This incident represents nothing more than a disagreement between two senior executives as to how best to deal with a prospective client. It is far from an actionable tort.

Furthermore, tortious interference with business relations requires a showing that there was reasonable probability of a business relationship. The most reasonable

---

[611]    *Id.* at 335.

[612]    *Id.* at 1028.

[613]    *Id.* at 1029.

inference from the testimony of Waite and Morelli is that Weinper was not interested in letting go of Physequality, as evidenced by PTPN's inadequate proposal to Optimis. Thus, Plaintiffs have not proven a reasonable probability of a business relationship. Similarly, they also failed to prove the necessary elements of proximate cause and damages. Thus, Plaintiffs failed to meet their burden of proof on all aspects of the PTPN claim.

### 3. Bank of the Internet financing

The B of I financing is a closer call. Ordinarily, the filing of a lawsuit is privileged action and cannot form the basis of liability for tortious interference.[614] Such a filing, however, must be in good faith. On the one hand, it is difficult to conclude that the Rescission Action was filed in bad faith. Within days after the Director Defendants filed it, Optimis tacitly acknowledged the merits of the lawsuit's primary claim by reworking its corporate structure and assigning Rancho away to Tinoco.[615] On the other hand, the timing of the Rescission Action is difficult to ignore. The Director Defendants resigned on the day the B of I loan documents were supposed to be executed, and they filed the Rescission Action the next day. This raises the question of whether an otherwise colorable lawsuit can be filed in bad faith by virtue of its timing.

---

[614] *See Corning Inc. v. SRU Biosystems, LLC*, 292 F. Supp. 2d 583, 586 (D. Del. 2003) ("Section 773 of the Second Restatement [of Torts] provides a defense to a party who, in good faith, files an action to protect a legal interest.").

[615] JX 800.

Regardless of whether the Rescission Action was privileged, Plaintiffs have not met their burden of proving all the elements for a claim of tortious interference. In particular, it is questionable whether they have shown proximate cause and they definitely have not shown damages. With respect to proximate cause, the documentary record indicates that the B of I officials were quite concerned about the Rescission Action.[616] The lawsuit, however, was not B of I's only concern. Their representatives noted the "huge operational risk with [the Director Defendants'] departure" and wrote that the lender needed to "perform an operational assessment of Rancho with your newly appointed managers and determine its going concern."[617] Thus, the Director Defendants' resignation itself was a concern.

Additionally, the record shows that B of I continued negotiations with Optimis after the Rescission Action was filed.[618] On July 18, a B of I representative emailed Morelli and stated that the lender's "chief legal counsel believes that unless all of the complaints have been dismissed we are not in a position to go forward."[619] That email specifically references the TRO in the Rescission Action, but Geller's litigation against

---

[616] JX 794.0001 (6/28/13 email from B of I representative to Morelli and others: "This litigation and the issues raised by the litigation have drastically changed (i.e., increased) the risk profile of the proposed loan transaction.").

[617] JX 793.0001 (6/28/13 email from B of I representative to Morelli and others).

[618] *E.g.*, JX 794.0001 ("This email is not a loan commitment, but rather an expression of the Bank's willingness to continue to investigate the viability of making a loan to OptimisCorp.").

[619] JX 813.0001.

the Company also remained pending at this time, making it unclear if B of I required that litigation to be resolved as well. Overall, it seems that B of I was concerned primarily, but not exclusively, about the Rescission Action. In any event, even assuming *arguendo* that Plaintiffs have met their burden of proof as to proximate cause, Plaintiffs have made no showing sufficient to satisfy their burden with respect to damages.

The Company, according to Morelli, eventually did receive financing from a Boston-based lender called SCM sometime in the summer of 2013.[620] The terms of that financing are not in the record and it is unclear not only when that loan was made, but also whether the SCM loan was on better or worse terms than the B of I loan. There also has been no effort to quantify the purported harm to Optimis, if any, caused by the delay in not receiving financing. Thus, even if Plaintiffs had made a showing sufficient to overcome the defense that filing a lawsuit is a privileged action, and even if they sufficiently had proven proximate cause, Plaintiffs failed to meet their burden of showing damages. Therefore, Plaintiffs' claim for tortious interference with the B of I financing will be dismissed.

### E.      There Was No Aiding and Abetting

It is unclear whether Plaintiffs assert that Smith and Atkins aided and abetted Waite,[621] but Plaintiffs have asserted that Horne aided and abetted the alleged wrongs committed by the Director Defendants, and Waite in particular, even if Horne was not a

---

[620]    Tr. 669-72. That is less than three months after the filing of the Rescission Action.

[621]    Plaintiffs essentially put all of their eggs in the "vast conspiracy" basket.

member of a conspiracy. Aiding and abetting requires proof of: "(1) the existence of a fiduciary relationship; (2) a breach of that fiduciary's duty; (3) Defendants' knowing participation in that breach; and (4) damages."[622] Conduct by a fiduciary (such as Horne), however, that would amount to aiding and abetting is instead an independent breach of that fiduciary's duties.[623]

Here, the aiding and abetting claim against Horne fails because there was no underlying breach of fiduciary duty with which he was involved. The only breach of fiduciary duty claim Plaintiffs have proved involved the failure of the Director Defendants to inform the Board about the flaw in Optimis' corporate structure. There is no evidence Horne knew of that defect or that Horne had any involvement with the subsequent Rescission Action. Additionally, with respect to most of the facts underlying Plaintiffs' fiduciary duty claims—such as manipulating the Geller Investigation and attempting to take over the Company—Waite acted alone. There is no evidence that Smith or Atkins played any role in the Geller Investigation. Horne's role was limited to: (1) dealing with Morelli's attempt to have Horne and Brys convince Geller to drop her claims; (2) being interviewed by Solomon, at which time he revealed his biases; and (3) advising Brys about the possible need to amend the Stockholders Agreement. I already have discussed the first two items. As to the third, it is not surprising that Horne, as

---

[622] *In re Crimson Exploration S'holder Litig.*, 2014 WL 544919, at *27 (Del. Ch. Oct. 24, 2014).

[623] *Higher Educ. Mgmt. Gp., Inc. v. Mathews*, 2014 WL 5573325 at *13 & n.78 (Del. Ch. Nov. 3, 2014).

205

Optimis' CFO, knew about the provision in the Stockholders Agreement effectively giving Morelli the ability to appoint a majority of Optimis' Board until early 2015. Similarly, once Brys told Horne that it might be necessary to remove Morelli as CEO, it would have been consistent with Horne's duties as an officer of Optimis to advise her of the provision in the Stockholders Agreement that would enable Morelli to reverse any such action. Thus, Plaintiffs have not proven any aiding and abetting.

### F. Plaintiffs' Damages Calculations Are Speculative and Unreliable

Plaintiffs request approximately $50 million in damages and equitable relief in the form of a two-year extension of the Stockholders Agreement. I conclude first that Plaintiffs have not proven any damages.

With respect to money damages, Plaintiffs' showing in this regard was inadequate to support any form of monetary relief. Plaintiffs' damages expert, Walter Bratic, calculated damages by comparing the Company's actual performance against a combination of prior management projections developed in 2012 and new management projections developed after Horne and the Director Defendants left Optimis.[624] As Defendants pointed out in their pre- and post-trial briefing, the problems with Plaintiffs' damages calculations are legion. Yet, Plaintiffs have failed to address the majority of those concerns. The most fundamental flaw is that Bratic relied upon management projections (the "Projections") that are unreliable and highly speculative.

---

[624] JX 1085.0001. Horne also contends that the latter projections were developed for this litigation and not in the ordinary course of business, rendering them especially unreliable. I need not reach this argument, however.

The Projections come from Optimis' September 2012 PPM.[625]  Notably, although the Projections paint a rosy picture of Optimis' future, no one invested in the Company on the basis of that PPM.  I question the overall growth predicted by the Projections in general.  More importantly, I find no reliable basis in the record whatsoever for the predicted explosion in revenue from the Software Division.  The following table shows the revenue and income-before-tax figures from the Projections, with year-over-year growth percentages indicated in brackets:[626]

| | 2010 (A) | 2011 (A) | 2012 (E) | 2013(E) | 2014(E) |
|---|---|---|---|---|---|
| Clinical Revenue | $28,383,990 | $32,143,500 [13.25%] | $39,778,839 [23.75%] | $48,862,040 [22.83%] | $58,940,076 [20.63%] |
| Software Revenue | $528,565 | $1,001,157 [89.41%] | $1,663,539 [66.16%] | $6,372,160 [283.05%] | $15,593,826 [144.72%] |
| Total Income Before Tax | $ (707,841) | $19,983 | $ (1,641,631) | $1,226,414 | $11,287,759 |

The Projections estimate that software revenue would be fifteen times larger by the end of 2014 than it was in 2011.  Similarly, the Company's income before taxes was expected to be roughly nine times larger in 2014 than in 2013.

Part of the clinical growth was expected to come from acquisitions of additional clinics, which the Company has not made.  Additionally, the assumed growth in acquired clinics, fifteen per year from 2012-2014 and then ten per year for 2015 and 2016, is entirely out of line with the fact that the Company acquired, on average, only 4.25 clinics

---

[625]    JX 289.

[626]    JX 289.0119.  "(A)" represents actual results and "(E)" represents expected results.

per year from 2009-2012.[627]  Most of the Company's clinical acquisitions occurred in 2007 and 2008, when 19 and 21 clinics were acquired, respectively.  There is no basis in the record to assume that the Company suddenly would start acquiring dramatically more clinics.

With respect to the Software Revenue, the evidence shows that OptimisPT was, at best, only marginally more developed as of 2012 than it was when it was released in late 2009.  Thus, PT provides no support for the predicted growth explosion.[628]  Indeed, Levine testified that, even as of trial in February 2015, OptimisPT still was not being developed quickly enough and the Company was "in the same boat of not having resources."[629]  The likely contribution of Optimis*Sport* to revenue and income is even more speculative. [630]  Accordingly, I find that the factual record does not support the massive predicted growth in revenue for the Software Division.

---

[627]   JX 1014.0005-.0006.

[628]   Tr. 754-56 (Fearon).

[629]   *Id.* at 1597.

[630]   The revenue figures for Optimis*Sport* border on fantasy.  Most of the testimony at trial suggested that Sport was not even at a level to be salable during most of the time period relevant to this litigation.  It generated or was predicted to generate revenue for the first time at the end of 2012, amounting to $11,880.  The Projections then indicate that Sport was predicted to generate $558,000 in 2013, $3.4 million in 2014, $8.4 million in 2015, $13.4 million in 2016, $16 million in 2017, and $16.1 million in 2018.  JX 1085.0031-.0038.  Other than the fact that senior management of Optimis, including Horne, were willing to give these Projections to investors, there has been no evidentiary showing that these revenue figures for the Sport product are anything more than mere speculation.  Regarding the creation of the Projections, Horne testified that Morelli provided the inputs for

Perhaps these flaws could be rationalized, to some extent, if the Company previously had been remotely in the ballpark with respect to its forecasts. But, the evidence showed that the Company's previous projections egregiously overstated future performance. In the 2009 PPM, the Company forecasted that, in 2012, the Clinical Services Division would have 90 clinics and $63 million in revenue and the Software Division would generate $23 million in revenue from OptimisPT alone.[631] The September 2012 PPM had reduced 2012 revenues for the Clinical Services Division, which only had 57 clinics, to about $40 million and revenue for the Software Division, which now included *both* OptimisPT and Optimis*Sport*, to $1.66 million.[632] In quite an understatement, Horne explained: "It's just—this company did not meet its forecasts."[633] As of 2012, Optimis' 2009 PPM had overstated the number of clinics the Company would have by 33 and achieved only about 63% of its predicted revenue for the Clinical Services Division.

---

Sport: "If I was looking at OptimisSport, the only person we could really go to would be Alan, *because we never actually developed a product or determined how we were going to price it.*" Tr. 1324 (emphasis added). Basically, the Sport projections were based solely on Morelli's vision of the product, which had not been developed yet. Horne continued: "But, again, we didn't know how we were going to market it to the [physical therapists]. All we knew is we hoped we were going to get 70 to $80 a visit. It was going to be cash from the individual patient, not the insurance companies. And we were going to try and charge a percentage of that per-visit fee as a licensing fee." *Id.* at 1325.

[631] JX 75.0113; Tr. 1328-29 (Horne).

[632] JX 289.0119; Tr. 1329-31 (Horne).

[633] Tr. 1331.

I therefore find that the Projections that form the basis of Plaintiffs' damages calculation are speculative, especially as to Optimis*Sport*, and generally unreliable. There is ample support in Delaware precedent for rejecting damages claims based primarily on speculative evidence.[634] Although I need not address all of the other problems with Bratic's damages calculations, I note the following additional concerns. Neither Plaintiffs nor Bratic made any effort to apportion the harm allegedly suffered among the three separate plaintiffs, namely, Morelli, Optimis, and Analog.[635] Plaintiffs give short shrift to this concern, but it remains the fact that each Plaintiff has to prove that he or it is entitled to damages. There also is no indication that Bratic apportioned the harm from each alleged wrong. Even though I have found liability on one fiduciary duty claim, the evidence of record makes it impossible to determine what amount of damages, if any, was caused by that wrong.

Plaintiffs contend that, because they have shown that Defendants engaged in wrongdoing, the Court should overlook the speculative nature of their damages calculation.[636] In the same vein, they note that "Delaware law dictates that the scope of

---

[634] *See In re Mobilactive Media, LLC,* 2013 WL 297950, at *24 (Del. Ch. Jan. 25, 2013); *cf. Doft & Co. v. Travelocity.com Inc.*, 2004 WL 1152338, at *5-6 (Del. Ch. May 21, 2004) (finding management projections unreliable in the context of an appraisal action because, among other reasons, management themselves did not regard them as reliable).

[635] Tr. 943 (Bratic).

[636] *See In re Mobilactive Media,* 2013 WL 297950, at *24 ("Public policy has led Delaware courts to show a general willingness to make a wrongdoer 'bear the risk of uncertainty of a damages calculation where the calculation cannot be

recovery for a breach of the duty of loyalty is not to be determined narrowly."[637]  It is true that this Court shows solicitude for plaintiffs with respect to the difficulty of precise damages in certain circumstances and that damages in duty of loyalty cases serve the dual purposes of compensating for injury and deterring future breaches of the duty of loyalty. It remains the law, however, that "when acting as the fact finder, this Court may not set damages based on mere 'speculation or conjecture' where a plaintiff fails adequately to prove damages."[638]  Here, Plaintiffs' damages calculation is not merely uncertain, it is speculative and unreliable.  Even giving Plaintiffs the benefit of the doubt, the Projections do not provide an appropriate basis from which to determine damages and any damages award based on them would be mere conjecture.  Additionally, even though I have found one breach of the duty of loyalty—albeit a minor one in comparison to the claims Plaintiffs alleged—I reach the same conclusion.

Even though Plaintiffs have made out one of their claims relating to the Director Defendants' failure to inform the Board of Optimis' faulty corporate structure, I conclude that no equitable relief is warranted on that claim because of Plaintiffs' unclean hands in this action, particularly with respect to their witness tampering in general and treatment

---

mathematically proven.'") (quoting *Great Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC*, 2010 WL 338219, at \*23 (Del. Ch. Jan. 29, 2010)).

[637]    *Thorpe v. CERBCO, Inc.*, 676 A.2d 436, 445 (Del. 1996).

[638]    *In re Mobilactive Media*, 2013 WL 297950, at \*24 (quoting *Medek v. Medek*, 2009 WL 2005365, at \*12 n.78 (Del. Ch. July 1, 2009)).

of Geller in particular.[639]  Those actions were inequitable and I consider it appropriate to apply the doctrine of unclean hands here to deny Plaintiffs any nominal equitable relief to which they otherwise might have been entitled for the one breach they did prove, out of the scores of violations they asserted over the course of this litigation.[640]  Finally, based on my rulings on the merits, which generally favor Defendants, I deny Plaintiffs' request for their attorneys' fees and expenses.

Defendants also have requested their attorneys' fees and expenses.  That request also is denied.  Although Defendants prevailed on most issues, many of those issues were close and the Court needed to resolve numerous disputed issues of material fact regarding them.  Some of those disputes were resolved against Defendants.  In addition, Plaintiffs' legal position regarding the *Adlerstein* case, for example, was reasonable, even if not successful.  Although after considering all the evidence, I generally adopted Defendants' version of the facts and, in particular, I rejected Plaintiffs' conspiracy theory, it is my opinion that there was sufficient evidence to make many of the positions taken by Plaintiffs, and expertly presented by their counsel, plausible.  As a result, apart from the witness tampering discussed at length *supra*, I do not find that Plaintiffs engaged in bad

---

[639]     *See supra* Section I.

[640]     *See Nakahara v. NS Am. Trust*, 718 A.2d 518, 522 (Del. Ch. 1998) ("The unclean hands doctrine is aimed at providing courts of equity with a shield from the potentially entangling misdeeds of the litigants in any given case. The Court invokes the doctrine when faced with a litigant whose acts threaten to tarnish the Court's good name.  In effect, the Court refuses to consider requests for equitable relief in circumstances where the litigant's own acts offend the very sense of equity to which he appeals.").

faith or vexatious litigation conduct that would warrant departing from the American Rule and awarding Defendants, or any of them, their attorneys' fees. I consider my finding that there was improper witness tampering here to be important, and, on that basis, I imposed serious merits-based sanctions. Because the witness tampering issue is relatively novel in Delaware and Plaintiffs ultimately produced a significant number of the underlying documents relating to the settlements in question, I do not believe an additional sanction in the form of attorneys' fees is appropriate here.

## VI. CONCLUSION

For the foregoing reasons, Plaintiffs are not entitled to any relief. The conspiracy alleged was not proven. Plaintiffs did prove a breach of the duty of loyalty with respect to Defendants' failure to alert the Board of the flaw in Optimis' corporate structure regarding Rancho, but Plaintiffs did not prove damages for that wrong. Otherwise, Plaintiffs claims failed. Plaintiffs' claims, therefore, shall be dismissed with prejudice. An implementing order accompanies this Opinion.